**In the Matter of:**

MAGGIE RUSSELL

vs

MISS. GULF COAST COMMUNITY COLLEGE

---

*RUSSELL, SUSAN*

*March 29, 2023*

---



844.533.DEPO

EXHIBIT

" 1 "

MAGGIE RUSSELL vs MISS. GULF COAST COMMUNITY COLLEGE
Susan Russell - 03/29/2023

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                     SOUTHERN DIVISION

 3

 4  MAGGIE RUSSELL                              PLAINTIFF

 5  VS.                          1:22-CV-00086-TBM-RPM

 6  MISSISSIPPI GULF COAST COMMUNITY
    COLLEGE through its Board of
 7  Trustees (in their official
    capacities) and DOES 1-20; inclusive    DEFENDANTS
 8

 9  _____

10              DEPOSITION OF SUSAN RUSSELL
    _____
11

12  Taken at the offices of Boyce Holleman &
    Associates, 1720 23rd Avenue, Gulfport,
13  Mississippi, on Wednesday, March 29, 2023,
    beginning at 11:31 a.m.
14

15

16

17

18                    REPORTED BY:

19          Kati Vogt, RPR, RMR, RDR, CRR
             MS CSR #1557  NCRA #052536
20          eDeposition Reporting Services
                Post Office Box 14148
21          Jackson, Mississippi  39236
             kati.vogt@edeposition.com
22            Mobile: (228) 860-5111
                  844-533-3376
23
                  COAST ADDRESS:
24
                Post Office Box 1048
25            Biloxi, Mississippi  39533
```

844.533.DEPO

```
 1                 A P P E A R A N C E S

 2

 3     REPRESENTING THE PLAINTIFF:

 4          KEITH ALTMAN, ESQ.
            Law Office of Keith Altman
 5          33228 West 12 Mile Road
            Suite 375
 6          Farmington Hills, MI  48331
            keithaltman@kaltmanlaw.com
 7

 8     REPRESENTING THE DEFENDANT:

 9          KRISTI ROGERS BROWN, ESQ.
            C. HUNTER SALAMONE, ESQ.
10          Daniel Coker Horton & Bell, P.A.
            1712 15th Street, Suite 400
11          Post Office Box 416
            Gulfport, Mississippi  39502
12          kbrown@danielcoker.com
            hsalamone@danielcoker.com
13
            HOLLIS TAYLOR HOLLEMAN, ESQ.
14          Boyce Holleman & Associates, P.A.
            1720 23rd Avenue
15          Gulfport, Mississippi  39501
            hollis@boyceholleman.com
16

17
       ALSO PRESENT:
18
            Jason Pugh
19          Philip Bonfanti

20

21

22

23

24

25
```

```
 1                    I N D E X

 2

 3   WITNESS:  SUSAN RUSSELL                    PAGE:

 4

 5   Examination by Ms. Brown.................... 5

 6   Examination by Mr. Altman.................. 99

 7   Certificate of Court Reporter.............. 101

 8   Errata Sheet............................... 102

 9

10

11                  E X H I B I T S

12

     Exhibit 1
13        ACT Report (Bates-marked Russell 0015). 32

14   Exhibit 2
          10/11/18 email from Craig Nydick
15        (Bates-marked Russell 0151)............ 53

16   Exhibit 3
          10/4/18 letter from Dr. Suzana Brown... 55
17
     Exhibit 4
18        Course Catalog, Visual BASIC Computer
          Programming I.......................... 62
19
     Exhibit 5
20        1/9/18 email string
          (Bates-marked Russell 0187)............ 82
21

22

23

24

25
```

```
 1              S T I P U L A T I O N

 2       It is hereby stipulated and agreed by and

 3   between the parties hereto, through their

 4   respective attorneys of record, that this

 5   deposition may be taken at the time and place

 6   hereinbefore set forth, by Kati Vogt, RPR, RMR,

 7   CRR, RDR, Court Reporter and Notary Public,

 8   pursuant to the Federal Rules of Civil Procedure,

 9   as amended;

10       That the formality of reading and signing is

11   specifically RESERVED;

12       That all objections, except as to the form of

13   the questions and the responsiveness of the

14   answers, are reserved until such time as this

15   deposition, or any part thereof, may be used or is

16   sought to be used in evidence.

17                         - - -

18

19

20

21

22

23

24

25
```

MAGGIE RUSSELL vs MISS. GULF COAST COMMUNITY COLLEGE
Susan Russell - 03/29/2023                                                           Page 5

```
 1                    SUSAN RUSSELL,

 2         having been first duly sworn, was

 3         examined and testified as follows:

 4                    EXAMINATION

 5                       - - -

 6    BY MS. BROWN:

 7         Q.   Ms. Russell, I introduced myself a moment

 8    ago.  My name is Kristi Brown.

 9         A.   Right.

10         Q.   I represent Mississippi Gulf Coast

11    Community College in this litigation.

12         A.   Right.

13         Q.   Hunter Salamone is my associate.  Hollis

14    Holleman is also representing the college.

15         A.   Sure.

16         Q.   Dr. Pugh is also with us.  Have you met

17    Dr. Pugh?

18         A.   No.

19         Q.   Okay.  Couple of ground rules before we

20    get started.  I'm going to ask you some questions.

21    If you'll let me finish my question before you

22    start your answer.  That way, we're not speaking

23    over each other and we can have a clean transcript.

24         A.   Sure.  Yeah.

25         Q.   Also, "uh-huhs" and "nuh-uhs" don't
```

MAGGIE RUSSELL vs MISS. GULF COAST COMMUNITY COLLEGE
Susan Russell - 03/29/2023                                    Page 6

```
 1   translate well into the transcript.
 2        A.   Okay.
 3        Q.   So if you'll say yeses and nos, verbal
 4   responses.  It happens to everybody.  I'll try to
 5   remind you.
 6        A.   Okay.  Yes and no.
 7        Q.   Yes and no.
 8             Lastly, if I ask you a question that you
 9   don't understand, tell me you don't understand my
10   question, and I will ask it a different way.  If
11   you answer the question the way I ask it, I'm
12   going to assume you understood it.  Is that fair
13   enough?
14        A.   Yes.
15        Q.   Okay.  Is there any reason you can't
16   answer my questions today?
17        A.   No.
18        Q.   Okay.  Have you had any medication that
19   would affect your ability to understand or answer
20   my questions?
21        A.   No.
22        Q.   State your full name, please.
23        A.   Susan C. Russell.
24        Q.   Where do you currently reside?
25        A.   1 --
```

```
 1                  MR. ALTMAN:  Wait.  Hold on.

 2                  MS. BROWN:  Off the record.

 3          (Off the record.)

 4                  MS. BROWN:  Back on the record.

 5    BY MS. BROWN:

 6          Q.    That's in Harrison County?

 7          A.    Yes.

 8          Q.    Okay.  Who resides with you at that

 9    address?

10          A.    My husband and my daughter, Maggie.

11          Q.    Maggie is your only child?

12          A.    My only child.

13          Q.    How old is she?

14          A.    25.

15          Q.    What's her date of birth?

16          A.    July 9, 1997.

17          Q.    Okay.  Where was Maggie born?

18          A.    Keesler Air Force Base, Biloxi,

19    Mississippi.

20          Q.    Where did you grow up?

21          A.    I grew -- I've spent most of my life in

22    Gulfport.  I was a military child.

23          Q.    Okay.

24          A.    Overseas.

25          Q.    What's your maiden name?
```

```
 1          A.    Dillon.
 2          Q.    Did you go to school here on the
 3    Mississippi Gulf Coast?
 4          A.    I did.
 5          Q.    Okay.  Where did you graduate from high
 6    school?
 7          A.    Gulfport East High School.
 8          Q.    Do you have family here on the Gulf
 9    Coast?  Harrison, Hancock, Jackson --
10          A.    I do.  I have a sister.
11          Q.    Okay.  What's her name?
12          A.    Debora Watson.
13          Q.    Okay.  Is she married?
14          A.    Divorced.
15          Q.    Okay.  Nieces and nephews?
16          A.    She has a son.  His name is Bryan Watson.
17          Q.    Does he also live here on the Coast?
18          A.    He does.
19          Q.    Okay.  Any other relatives, family?
20          A.    No.  They're all deceased.  My mother and
21    father.
22          Q.    Aunts, uncles, any of that?
23          A.    All deceased.
24          Q.    Do you attend church here on the
25    Mississippi Gulf Coast?
```

```
 1         A.   I do not.  I pray at home.
 2         Q.   Are you a member of any civic
 3    organizations --
 4         A.   I am not.
 5         Q.   What's your husband's name?
 6         A.   Bobby M. Russell, Jr.
 7         Q.   Where is Mr. Russell from?
 8         A.   Jackson.  He was born in Jackson.
 9         Q.   Does he have any family here on the
10    Mississippi Gulf Coast?
11         A.   He does.  He has -- one, two -- three
12    sisters, but one's in Texas, and one's in Jackson,
13    I think, and one here in Vancleave.
14         Q.   Okay.  What's her name?
15         A.   The one in Vancleave?
16         Q.   Yes.
17         A.   Is Roberta Hunt.
18         Q.   And is she married?
19         A.   She is.
20         Q.   Her husband's name?
21         A.   Byron.
22         Q.   Hunt?
23         A.   Hunt.
24         Q.   Does she have children?
25         A.   She does have two girls.
```

```
 1        Q.   Do they live in Jackson, George, Stone,
 2   Harrison County?
 3        A.   Well, I'm not sure about that, but they
 4   are here.
 5        Q.   Okay.  What are their names?
 6        A.   Mary and Katie.
 7        Q.   Hunt?
 8        A.   No.  They're -- they've been married.
 9        Q.   Okay.
10        A.   But I don't know to who or how many
11   times.
12        Q.   Okay.  How old are Mary and Katie?
13        A.   They're over 21, both of them.
14        Q.   Husband have any other family?
15        A.   No.
16        Q.   Here on the Coast?
17        A.   No.
18        Q.   Is your husband a member of any civic
19   organizations?
20        A.   No.
21        Q.   Okay.  Do you work outside of the home?
22        A.   No, I don't.
23        Q.   Have you ever worked outside the home?
24        A.   I worked up until 1997 when Maggie was
25   born.
```

1          Q.    Okay.  What did you do?

2          A.    I worked in the medical field.  I worked

3    at the police department for six years.  Dental

4    offices.  I got a degree in travel and tourism back

5    in the '90s, but there were no casinos, so I just

6    went over to the medical field.

7          Q.    Okay.  Where did you get this degree?

8          A.    It was Phillips Junior College when it

9    was here.

10         Q.    Phillips?

11         A.    Uh-huh.

12         Q.    Okay.  So it's an associate's degree

13   in --

14         A.    It is, travel and tourism.

15         Q.    What year did you get that?

16         A.    That would be probably '90- -- I'm trying

17   to say '91 or '92, but I think it was '92.

18         Q.    Okay.

19         A.    Yeah.  It's been a while.

20         Q.    And so you worked for about five years

21   after getting that degree before Maggie was born?

22         A.    Correct.

23         Q.    Okay.  What year did you graduate from

24   Gulfport East?

25         A.    1976.

1      Q.    Does your husband work outside the home?

2      A.    He has a job.

3      Q.    Okay.  What does he do?

4      A.    He's a network administrator at the Air

5   National Guard base.

6      Q.    Okay.  How long has he had that position?

7      A.    It will be ten years in April.

8      Q.    Now, as I understand it, Maggie has been

9   diagnosed with several learning disabilities?

10      A.    Correct.

11      Q.    When did you first notice that Maggie was

12   having difficulties?

13      A.    Maggie was diagnosed by the Gulfport

14   school system.  I had her tested; and at age three

15   and a half, she went to the Harrison County Child

16   Development Center for two years.  They diagnosed

17   her with Asperger's.

18      Q.    Okay.  My question was:  When did you

19   first notice that Maggie was having problems or

20   issues?

21      A.    When I took her to the doctor and she --

22   he told me she couldn't -- she should talk --

23      Q.    How old was she --

24      A.    -- and say more than 25 words.  So that's

25   when I first noticed.

```
 1         Q.   How old was she?

 2         A.   She was three.

 3         Q.   At three?

 4         A.   Uh-huh.

 5         Q.   Before she was three, had she met all of

 6    her milestones?

 7         A.   Yes.  Correct.  No problem.

 8         Q.   No problem.

 9              But at three, you took her to the doctor

10    for a well-child visit?  Or was there an issue?

11         A.   I do not recall.

12         Q.   Okay.  But the doctor told you that she

13    should have more language than she did?

14         A.   Correct.

15         Q.   Okay.  So what did you do after that

16    visit?  Did he direct you to some testing or

17    therapies?

18         A.   Gulfport school system.

19         Q.   Okay.  So that's -- you took her to the

20    Harrison County Child Development Center?

21         A.   No, I had her tested with the Gulfport

22    school system.

23         Q.   Okay.

24         A.   And then that's when I knew that I had to

25    take her to the Harrison County Child Development
```

```
 1   Center and...
 2        Q.   So you had her -- you contacted the
 3   school system and had her tested.  What were the
 4   results of those tests?
 5        A.   From the school?
 6        Q.   Yes.
 7        A.   They found that she was just disabled.
 8        Q.   What were her disabilities?
 9        A.   Speech, occupational therapy with her
10   hands.  She could not do things normal children do.
11        Q.   Okay.
12        A.   Hold her fork, a spoon, you know.
13        Q.   So she had delays with speech and with
14   coordination, fine motor skills?
15        A.   Uh-huh.
16        Q.   Okay.  That's the only diagnosis you got
17   from the school district?
18        A.   When she had -- later on she had one in
19   reading comprehension.  Yes, that's -- she's had
20   that all along.
21        Q.   Who diagnosed her as Asperger's?
22        A.   The school.
23        Q.   The school gave a diagnosis of
24   Asperger's?
25        A.   Yes.
```

```
 1          Q.   Was that a Ph.D., a psychologist?  Do you
 2     know who that was?
 3          A.   No, I do not know, but I provided the
 4     documentation from the school.
 5          Q.   Did you discuss that with your
 6     pediatrician?
 7          A.   What, the diagnosis?
 8          Q.   Yes.
 9          A.   I don't remember, but I'm sure that I
10     did.  That was a long time ago.
11          Q.   When you took her to the Harrison County
12     Child Development Center, what did they do out
13     there?
14          A.   Well, she started school.
15          Q.   At three.
16          A.   Yeah, she did.
17          Q.   And that was with speech therapists?
18          A.   I don't know what they did, but yeah.
19          Q.   Did she have occupational therapy there?
20          A.   I'm not sure.
21          Q.   Okay.  You don't know what they gave --
22          A.   I do not know what they did for her, but
23     they worked on her speech --
24          Q.   Did she get --
25          A.   -- and her occupational therapy.
```

```
 1          Q.   So they did those two things --
 2          A.   They did those two things for sure.
 3          Q.   If you'll let me finish my question,
 4   please.
 5          A.   Sorry.
 6          Q.   They did speech therapy and occupational
 7   therapy at Harrison County Child Development
 8   Center.
 9          A.   Correct.
10          Q.   How long was she at the Harrison County
11   Child Development Center?
12          A.   Two years.
13          Q.   Where did she go after that?
14          A.   Bayou View Elementary.
15          Q.   And did she enroll as a kindergartner?
16          A.   Excuse me?
17          Q.   Did she enroll as a kindergartner?
18          A.   Yes.
19          Q.   When she started in kindergarten at Bayou
20   View, did you discuss an IEP?
21          A.   Yes.
22          Q.   Do you know with which administrator you
23   had that discussion?
24          A.   I do not.
25          Q.   Okay.  What -- do you remember what her
```

```
 1   IEP included?

 2        A.   Speech, occupational therapy, and

 3   physical therapy.

 4        Q.   Okay.  Did she get all those things at

 5   school?

 6        A.   Yes, she did.

 7        Q.   Did she have any outside-of-school

 8   therapists?

 9        A.   Not at the time.

10        Q.   Okay.  She matriculated through Bayou

11   View Elementary through what grade?

12        A.   I don't understand the question.

13        Q.   How long was she at Bayou View

14   Elementary?

15        A.   Oh.  Till third grade.

16        Q.   Okay.  And she -- I think Maggie told us

17   that she left because of Katrina, or after Katrina,

18   she left Bayou View Elementary?

19        A.   That's correct, because we were renting a

20   house, and they wanted to sell the house, so we had

21   to move.

22        Q.   Okay.  And you moved to Biloxi at that

23   point?

24        A.   Correct.

25        Q.   Where did Maggie go to school after that
```

```
 1   in the third grade?
 2        A.   Well, she started fourth grade at Popps
 3   Ferry.
 4        Q.   Okay.  And had an IEP there?
 5        A.   Correct.
 6        Q.   What was her IEP at Popps Ferry?
 7        A.   It was math, was added to the other
 8   disabilities.
 9        Q.   And math was added in the fourth grade?
10        A.   No, she had math since she was at
11   Harrison County Child Development Center.
12        Q.   Okay.  We didn't talk about that.  What
13   math was involved in her IEP?
14        A.   What math?
15        Q.   What was the IEP?  What was the
16   accommodation for math?
17        A.   Oh, I don't know what they did back then
18   when she was -- in her younger years.
19        Q.   Okay.  You don't remember what the IEP
20   was in elementary school?
21        A.   I don't, except the occupational therapy,
22   the speech, and the physical therapy.
23        Q.   Okay.  You said that when she was in
24   Bayou View, she didn't have outside therapists.
25   When did those get added, if ever?
```

```
 1        A.    Okay.  Are you talking about --

 2        Q.    Did she ever have speech therapy outside

 3   of school?

 4        A.    No, ma'am.

 5        Q.    Did she ever have occupational therapy

 6   outside of school?

 7        A.    No, ma'am.

 8        Q.    Did she ever have any counseling or other

 9   therapies outside of school?

10        A.    No, ma'am.

11        Q.    Today, as we sit here, is she getting any

12   speech therapy outside --

13        A.    No.

14        Q.    Is she getting any occupational therapy?

15        A.    No.

16        Q.    Does she have a therapist?

17        A.    She does.

18        Q.    Who is her therapist?

19        A.    Dr. Donna Burrowes.

20        Q.    When did she start seeing Dr. Burrowes?

21        A.    In 2015.

22        Q.    Where is Dr. Burrowes?  Is she a doctor?

23        A.    She's a therapist.

24        Q.    A Ph.D.?

25        A.    Licensed.
```

MAGGIE RUSSELL vs MISS. GULF COAST COMMUNITY COLLEGE
Susan Russell - 03/29/2023                                            Page 20

```
 1        Q.   Okay.

 2        A.   But she's a specialist in autism.

 3        Q.   Where is she?  Where is her office?

 4        A.   It's on Creosote Road in Gulfport.  I

 5   think that's the name of the road, there by Walmart

 6   and Sonic, you know.

 7        Q.   Uh-huh.

 8        A.   Yeah.  Maggie's also had to get a

 9   psychiatrist and is on medication now.

10        Q.   Okay.  Who is that psychiatrist?

11        A.   Dr. Wilson.

12        Q.   And when did Maggie start seeing that

13   psychiatrist?

14        A.   A month ago.

15        Q.   One month ago?

16        A.   Yeah.

17        Q.   Where is Dr. Wilson?

18        A.   I believe she's in Gulfport.  Mindful

19   Matters.

20        Q.   What medication is she taking?

21        A.   Zoloft.

22        Q.   Okay.  That's been about a month?

23        A.   Yes.

24        Q.   Okay.  What was the reason for taking

25   Maggie to see Dr. Wilson?
```

```
 1        A.   Because she had suicidal thoughts and
 2   she's been upset.
 3        Q.   About?
 4        A.   School.  Not getting her degree.
 5        Q.   Maggie wants her degree?
 6        A.   Maggie wants her degree.
 7        Q.   What does Maggie want to do with her
 8   degree?
 9             MR. ALTMAN:  Objection; foundation.
10   BY MS. BROWN:
11        Q.   You can answer.
12             MR. ALTMAN:  You can answer.
13             THE WITNESS:  Okay.
14        A.   What does she want to do with her degree?
15   She did want to be an art therapist so she could
16   help children like her; but having gone through
17   college and succeeded, she has been able to think
18   about what she's going to do.
19   BY MS. BROWN:
20        Q.   When did she change her mind about being
21   an art therapist?
22             MR. ALTMAN:  Objection; foundation.
23   BY MS. BROWN:
24        Q.   You said she did want to be an art
25   therapist?
```

MAGGIE RUSSELL vs MISS. GULF COAST COMMUNITY COLLEGE
Susan Russell - 03/29/2023                                                Page 22

```
 1       A.   She did.

 2       Q.   Does she still?

 3       A.   She's uncertain.  She's too upset to

 4    decide.

 5       Q.   Let's go back to Maggie's school years.

 6            COURT REPORTER:  Kristi, could I

 7       interrupt for second?

 8            MS. BROWN:  Of course.

 9            COURT REPORTER:  I want to clarify an

10       answer, make sure I heard right before we go

11       any further.

12            MS. BROWN:  Absolutely.

13            COURT REPORTER:  The question was, "What

14       does Maggie want to do with her degree?"

15            Your answer was, "What does she want to

16       do with her degree?  She did want to be an

17       art therapist so she could help children like

18       her; but having gone through college and

19       succeeded, she has been able to think about

20       what she's going to do"?

21            I just want to make sure I heard you

22       correctly.

23            THE WITNESS:  I suppose that's right,

24       yeah.

25            COURT REPORTER:  Thank you.
```

```
 1    BY MS. BROWN:
 2         Q.    Maggie was at Popps Ferry in Biloxi?
 3         A.    Correct.
 4         Q.    And then she went to Biloxi Junior High,
 5    correct?
 6         A.    Correct.
 7         Q.    And she went to Biloxi High School?
 8         A.    Correct.
 9         Q.    Okay.  How was Maggie doing at Biloxi
10    Junior High?
11         A.    Well, in regards to --
12         Q.    Educational.
13         A.    She did great.  Maggie's been a great
14    student.
15         Q.    Okay.
16         A.    Except with math.
17         Q.    But she was able to take her math classes
18    in junior high.
19         A.    She took them.
20         Q.    She had assistance?
21         A.    She did.
22         Q.    Do you know what that assistance was?
23         A.    Well, she's had accommodations.  She's
24    always had an IEP.
25         Q.    What accommodations did she have in
```

1    junior high school?

2         A.   Well, she had multiple.  She had a

3    calculator.  She had time -- special time for

4    testing.  There's several more that I cannot

5    recall, but --

6         Q.   When you say "special time," does that

7    mean additional time to take her tests?

8         A.   Yes.

9         Q.   Okay.

10        A.   And then in a quiet place away from other

11   children.

12        Q.   Okay.  Did she have a tutor or Special Ed

13   teacher that would help her read questions to her?

14        A.   She did.

15        Q.   Okay.  That was part of her IEP?

16        A.   Yes.

17        Q.   And that was all the way through high

18   school, correct?

19        A.   Correct.

20        Q.   Do you recall any of the other

21   accommodations she was provided per her IEP?

22        A.   I don't recall.  I think that you covered

23   them.

24        Q.   And Maggie made it through her math

25   classes in junior high school?

MAGGIE RUSSELL vs MISS. GULF COAST COMMUNITY COLLEGE
Susan Russell - 03/29/2023                                              Page 25

```
 1        A.   She did.
 2        Q.   Okay.  How was Maggie in junior high
 3   school emotionally?
 4        A.   Maggie has been a victim of bullying
 5   since elementary school.  It continued in junior
 6   high, and it was really bad in high school.
 7        Q.   Did you have conversations with the
 8   administration about that?
 9        A.   I kept in touch with the instructors via
10   email, and they were always good about taking care
11   of Maggie, but if there was something really bad
12   going on, I would go in person and talk with the
13   principals.
14        Q.   Okay.  What's something -- what's an
15   example of something really bad that went on?
16        A.   She was in the gym, and three girls had a
17   switchblade, and they ran it across her back.  That
18   would be one.
19        Q.   Did they cut her?
20        A.   They did not cut her, but they scared
21   her.
22        Q.   Okay.  You talked to the administration
23   about that?
24        A.   I did.
25        Q.   That was in junior high or high school?
```

     1        A.   That was in junior high, I think.  Yeah,
     2   junior high.
     3        Q.   **And you said it was really bad in high**
     4   **school?**
     5        A.   Yes.
     6        Q.   **Okay.**
     7        A.   It was.
     8        Q.   **But you stayed in communication with her**
     9   **teachers?**
    10        A.   Yes.
    11        Q.   **And with the administration?**
    12        A.   Yes.
    13        Q.   **Okay.  Does Maggie have friends?**
    14        A.   Very few.
    15        Q.   **Okay.  Does she have -- does she**
    16   **communicate with those friends by text, or does she**
    17   **talk on the phone with them?**
    18        A.   She has one very special friend now that
    19   she texts, and she sees her every other week.
    20        Q.   **Okay.  When she sees her, do they go to**
    21   **the movies?  Do they get together at somebody's**
    22   **house?**
    23        A.   She comes to Maggie's house, or we go to
    24   her employment, because she works at El Rancho, and
    25   her father owns El Rancho.  So we see her a lot.

```
 1        Q.   Okay.  So she's Maggie's close friend?

 2        A.   Best friend.

 3        Q.   Best friend.

 4        A.   She's out there now.

 5        Q.   Okay.  Does Maggie have any other friends

 6   that she communicates with?

 7             MR. ALTMAN:  Objection; foundation.

 8        A.   Not -- not really.  She has older

 9   friends.  My husband has friends who have bought

10   Maggie's art and support her, you know, but that's

11   it.

12   BY MS. BROWN:

13        Q.   Does she have any social activities that

14   she's involved in?

15        A.   She and I do everything together.  We go

16   shopping.  We go eat.  We go do art things.  We do

17   pottery.  She tells me I'm her best friend.

18        Q.   Okay.  She doesn't have any activities

19   that she's involved in --

20        A.   No.

21        Q.   -- with peers?

22        A.   No, because she has a fear of people.

23   And she gets her feelings hurt easy because she

24   doesn't understand facial cues or jokes.  You know,

25   she just doesn't get it.
```

```
 1        Q.   Have you looked into whether there --
 2   does she do Camp Able?
 3        A.   Excuse me?
 4        Q.   I'm going to start that over.  Does she
 5   go to Camp Able in the summer?
 6        A.   I don't know about Camp Able.
 7        Q.   You don't know anything about Camp Able?
 8        A.   No, I don't.
 9        Q.   Okay.  Maggie was able to graduate from
10   high school?
11        A.   Correct.
12        Q.   She passed the necessary math classes to
13   do that?
14        A.   Well, here's the thing.  They took away
15   her pencil and paper and tried to put her on a
16   computer to take --
17        Q.   Who is "they"?
18        A.   The administration.  So I had to get an
19   attorney to give -- get them to give her back her
20   pencil and paper.  And two weeks before the end of
21   the year, the law changed and said that students
22   did not have to pass all four core subjects.  So
23   that meant the College Algebra thing, Maggie was
24   able to get her degree.
25        Q.   Okay.  We're talking about high school?
```

1        A.    Yes, ma'am.

2        Q.    Okay.  So we're not talking about College

3    Algebra.  We're talking about high school?

4        A.    Right.

5        Q.    And you said that they took away her

6    pencil and paper.  Who are "they"?

7        A.    The administration.

8        Q.    Okay.

9        A.    Whoever's in charge of testing.

10       Q.    So for testing, she was supposed to take

11   those tests on a computer?

12       A.    They did put her on a computer, where

13   she's always, all her life, since she started

14   school, used a pencil and paper.  There is a

15   difference --

16       Q.    Okay.

17       A.    -- for her.

18       Q.    Was that part of her IEP?

19       A.    Pencil and paper?  Yes.

20       Q.    Okay.  So you discussed the pencil and

21   paper with the administration at the school?

22       A.    Yes, of course.

23       Q.    And they would not give it back?

24       A.    They would not.

25       Q.    They did not comply with the IEP?

```
 1        A.    No.

 2        Q.    So you retained counsel?

 3        A.    I did.

 4        Q.    Who was that?

 5        A.    I can't remember his name.

 6        Q.    You don't remember the lawyer's name?

 7        A.    No, I don't.  It was at the Mississippi

 8   Justice organization.

 9        Q.    Mississippi Access to Justice?

10        A.    No, Mississippi Justice something.

11        Q.    Did they write a letter, or did they have

12   to file suit?

13        A.    No.  We had a meeting with the

14   administration and the SPED director and everybody,

15   and he was there.

16        Q.    The lawyer was there?

17        A.    Yes.  And they made a phone call to the

18   Mississippi Department of Education, and the SPED

19   director himself asked about her pencil and paper;

20   and they told him, yes, give it back to her.

21        Q.    So the -- who was the SPED director at

22   Biloxi?

23        A.    Stephen Huckaby.

24        Q.    So you had a meeting.  Stephen Huckaby

25   called the Department of Education?
```

```
 1        A.   Yes.

 2        Q.   And Maggie got her pencil and paper back?

 3        A.   She did.

 4        Q.   Okay.  That was for her senior math?

 5        A.   Yes.

 6        Q.   Okay.  So it was just in her senior year

 7   when all those issues happened with the pencil and

 8   paper?

 9        A.   Yes.

10        Q.   Also there was some state testing,

11   correct --

12        A.   Correct.

13        Q.   -- that's a separate issue?

14        A.   Correct.

15        Q.   And before -- just before she graduated,

16   they changed the standard, and she was able to

17   graduate without passing the math portion?

18        A.   Correct.  She got a high school diploma,

19   not a certificate.

20        Q.   Right.  So she was able to get a diploma?

21        A.   Yes.

22        Q.   And Maggie applied to Mississippi Gulf

23   Coast Community College?

24        A.   She did.

25        Q.   Was that her decision, or did you want
```

```
 1   her to do that?

 2        A.   She wanted to go to college.

 3        Q.   Okay.  And did she take the ACT?

 4        A.   She did.

 5        Q.   How many times?

 6        A.   Once.

 7        Q.   What was her score?

 8        A.   16.

 9        Q.   Okay.  Did you get the results of that

10   score -- of that test?

11        A.   I did.

12        Q.   Did you review the results of that test?

13        A.   I did.

14        Q.   Do you know what her score in math was?

15        A.   I do not recall.

16             MS. BROWN:  I'm going to mark this as

17        Exhibit 1.

18                  (Exhibit 1 was marked.)

19   BY MS. BROWN:

20        Q.   This is the ACT report.  Is that the

21   report you received after Maggie took the ACT?

22        A.   Yes.

23        Q.   Okay.  Can you see on there what her math

24   score was?

25        A.   It says 20 -- 20 -- 25 percent or 20.
```

```
 1        Q.   Okay.  Did she have accommodations to
 2   take the ACT?
 3        A.   I do not recall.
 4        Q.   Were you involved in scheduling that
 5   test?
 6        A.   Yes, I was.
 7        Q.   Okay.  Did they assist you at the high
 8   school with the scheduling of that test?
 9        A.   They did.
10        Q.   Okay.  But you don't know if she had any
11   accommodations?
12        A.   I do not.
13        Q.   Okay.  Maggie was accepted to Mississippi
14   Gulf Coast Community College, correct?
15        A.   Correct.
16        Q.   Do you know if she declared a major when
17   she went to school?
18        A.   Art.
19        Q.   At that point, she wanted to be an art
20   therapist?
21        A.   Correct.
22        Q.   Okay.  When Maggie started at Mississippi
23   Gulf Coast Community College, did she enroll as a
24   full-time student or a part-time student?
25        A.   Four courses.  That's all she could
```

```
 1   manage, four courses.

 2        Q.   In a semester?

 3        A.   Yes.

 4        Q.   Okay.  She took four classes each

 5   semester?

 6        A.   So I guess that's 12 hours.

 7        Q.   Okay.  And she started in the fall of

 8   2015, correct?

 9        A.   Right after high school, yes.

10        Q.   Okay.  Did you take her to visit the

11   campus after she was accepted?

12        A.   I did.

13        Q.   Did she get a tour?

14        A.   She did.

15        Q.   From whom?

16        A.   I do not recall.

17        Q.   You don't know who gave her the tour?

18        A.   No, I don't.

19        Q.   Was Maggie excited about starting

20   college?

21        A.   Yes.

22        Q.   Okay.  She liked the campus?

23        A.   She did.

24        Q.   Okay.

25        A.   She does.
```

 1        Q.    When she started in the fall -- she
 2   doesn't drive, correct?
 3        A.    No, she cannot drive.
 4        Q.    You took her to school?
 5        A.    I did.
 6        Q.    And dropped her off.
 7        A.    I did.
 8        Q.    Okay.  Was she there most of the day,
 9   every day?
10        A.    Probably just for two courses a -- yeah.
11   Just two.  So she wasn't there all day.  Just half
12   a day.
13        Q.    Did she have a phone and she'd call you
14   to come back and get her, or did you have a meeting
15   time?
16        A.    She called me.  She has a cell phone.
17        Q.    Okay.  Did she make any friends at Gulf
18   Coast Community College?
19        A.    She did.
20        Q.    Yeah?  Did she still keep in touch with
21   those friends?
22        A.    No, they did not.
23        Q.    Okay.  Was the bullying better?
24        A.    Oh, yes.
25        Q.    Yeah?

```
 1        A.    Yes.

 2        Q.    Did she get involved in any activities on

 3    campus?

 4        A.    No.

 5        Q.    Did she join any clubs?

 6        A.    Phi Theta Kappa.

 7        Q.    What is that?

 8        A.    An art club.

 9        Q.    Did they have meetings?

10        A.    They did.

11        Q.    And she stayed for those meetings?

12        A.    She did not stay with the -- at the Phi

13    Theta Kappa, but she did attend some Art -- Art

14    Club meetings.

15        Q.    Okay.  Maggie enrolled in Beginning

16    Algebra, I believe, at Mississippi Gulf Coast,

17    correct?

18        A.    Correct.

19        Q.    And she completed that class?

20        A.    She did.

21        Q.    She got a passing grade?

22        A.    She did.

23        Q.    And then she took Intermediate Algebra,

24    correct?

25        A.    Yes.
```

| | | |
|---|---|---|
| 1 | Q. | Did she complete that class? |
| 2 | A. | Failed.  But she stayed in the class for |

3    the whole 12 weeks, but her instructor informed her

4    she could not pass it.

| | | |
|---|---|---|
| 5 | Q. | She didn't withdraw? |
| 6 | A. | She did not.  Not to my knowledge. |
| 7 | Q. | Okay.  Do you know who her counselor was |

8    at Mississippi Gulf Coast?

| | | |
|---|---|---|
| 9 | A. | Ms. Aimee McGehee. |
| 10 | Q. | Did you have meetings with Ms. Aimee? |
| 11 | A. | We did. |
| 12 | Q. | Before Maggie started? |
| 13 | A. | Not before, no. |
| 14 | Q. | Okay.  Afterwards? |
| 15 | A. | We had meetings together, me, Ms. Aimee, |

16   and Maggie.

| | | |
|---|---|---|
| 17 | Q. | Okay.  But not before she started? |
| 18 | A. | No. |
| 19 | Q. | Okay.  So we didn't request any |

20   accommodations before Maggie started school?

| | | |
|---|---|---|
| 21 | A. | Well, yeah, we did. |
| 22 | Q. | How did we do that? |
| 23 | A. | We made an appointment to see her. |
| 24 | Q. | Okay.  And so you saw her during that |

25   first semester?

1        A.    Yes.

2        Q.    Okay.  And what accommodations did you

3    request?

4        A.    Well, we let her know about her

5    disability in math.

6        Q.    Okay.

7        A.    And reading comprehension.  She also has

8    reading comprehension.

9        Q.    Did you request specific accommodations?

10       A.    We -- Maggie told her about the ones that

11   she had been receiving.  Those are the ones that we

12   requested.

13       Q.    Okay.  Pencil and paper, calculator,

14   somebody to --

15       A.    Yes.

16       Q.     -- read the questions to her?

17       A.    Yes.  And Ms. Aimee did that.  Yes.

18       Q.    Okay.  Was there ever any discussion

19   about a reduced number of problems on math tests?

20       A.    We -- we stated to Ms. Aimee that there

21   was not a reduced number of problems on the test.

22       Q.    I don't understand what you're telling

23   me.

24       A.    There were no reductions on the tests.

25       Q.    Did you request a reduced number of

1   questions?

2        A.   Well, I did not, because I did not know

3   that I needed to.

4        Q.   Okay.  You did not make that request?

5        A.   To my knowledge, I do not remember making

6   that request.

7        Q.   Okay.  Did Maggie enroll in College

8   Algebra?

9        A.   She did.

10        Q.   And that was a College Algebra class that

11   was four hours, correct?

12        A.   Yes.

13        Q.   It had a lab component with it?

14        A.   Yes.

15        Q.   How did Maggie do in that class?

16        A.   Maggie did not -- Maggie had to withdraw

17   from that class.

18        Q.   Did you have a conversation with

19   Ms. Aimee about Maggie and College Algebra?

20        A.   We've had multiple --

21        Q.   While she was enrolled in the 1314, the

22   four-hour class?

23        A.   No, I never had a conversation with her

24   about that.

25        Q.   So you talked to Aimee the first semester

1    Maggie was enrolled about her accommodations.  When

2    is the next time you talked to Aimee about any

3    problems that Maggie might be having?

4         A.   Probably when she was having difficulty

5    in Intermediate Algebra.

6         Q.   So you had an appointment and talked

7    about it during Intermediate Algebra?

8         A.   Yes.

9         Q.   What were the results of that

10   conversation?

11        A.   I do not recall.

12        Q.   Okay.  Did they talk about helping come

13   up with a solution, offering options?

14        A.   I do not recall.

15        Q.   Did you request options?

16        A.   I don't recall.

17        Q.   Do you have notes about any of this?

18        A.   About?

19        Q.   Your meetings, your conversations, what

20   you requested.

21        A.   No, I did not take notes on conversations

22   with Ms. Aimee.  No.

23        Q.   Did you keep a calendar where you made

24   notes about the meetings that were being scheduled

25   and what you were going to discuss?

1          A.    No, I did not.

2          Q.    **Did you keep a diary or a journal about**

3     **the conversations or Maggie's attendance at**

4     **Mississippi Gulf Coast?**

5          A.    I did not keep notes about her

6     attendance.

7          Q.    **About her issues with Mississippi Gulf**

8     **Coast?**

9          A.    I documented everything that I said and

10    did with the college after they denied her degree.

11         Q.    **How did you document that?**

12         A.    I wrote letters.

13         Q.    **To whom?**

14         A.    MGCC [verbatim].

15         Q.    **Okay.  Do you have copies of those**

16    **letters?**

17         A.    I do.  And so do they.

18         Q.    **Okay.  Other than writing those letters,**

19    **you said you documented everything.  Did you make**

20    **any other notes?  Did you make a list of things**

21    **that you had complaints about?**

22         A.    I may have made -- I don't -- I don't

23    recall sending emails.

24         Q.    **Okay.  So Maggie withdrew from College**

25    **Algebra.**

1          What was your request to Mississippi

2    Gulf Coast Community College after Maggie withdrew

3    from College Algebra?

4          A.   Congressman Stephen Palazzo contacted me

5    with the disability law, and it said it's within

6    the constituent's rights to petition MGCC to waive

7    and replace College Algebra with a comparable

8    course.  And that's what I did.

9          Q.   You asked that they replace it with other

10   course?

11         A.   That's what the law said.

12         Q.   Okay.  Did they offer you replacement

13   courses for Maggie?

14         A.   No.

15         Q.   You were never offered a replacement

16   course for College Algebra?

17         A.   Not right away.

18         Q.   Were you ever offered --

19         A.   Yes.

20         Q.   Let me finish my question.

21              Were you ever offered replacement

22   courses for College Algebra?

23         A.   Yes.

24         Q.   Okay.  When were those offers made?

25         A.   When?

1      Q.    Yes.

2      A.    The first one was made months after the

3  request.

4      Q.    When was the request made?

5      A.    When was the request -- when did I make

6  the request?

7      Q.    Yes.  I'm assuming that you made it and

8  not Maggie.

9      A.    Yes, I did.  June 11, 2018.

10     Q.    That, you remember?

11     A.    Yes, I do.  That's --

12     Q.    To whom did you make that request?

13     A.    To Dr. Suzi Brown.

14     Q.    Was that in writing or in a meeting?

15     A.    In writing.

16     Q.    And you requested that they waive College

17  Algebra and replace it --

18     A.    With a comparable course.

19     Q.    -- with a comparable course?

20     A.    Yes.

21     Q.    Okay.

22     A.    Uh-huh.

23     Q.    It was June of 2018.  Did Ms. Brown --

24  Dr. Brown, I'm sorry, respond to that letter?

25     A.    No, she did not.

```
 1        Q.    Never responded to that letter?

 2        A.    No, she did not.

 3        Q.    What did you do after writing that letter

 4   and not receiving a response?

 5        A.    I wrote another letter.

 6        Q.    When was that?

 7        A.    I don't -- do not remember the date of

 8   that letter.

 9        Q.    Is there some reason that you remember

10   the June 11 date?

11        A.    Well, it's hard to remember when you've

12   written nine letters.  I can't remember all the

13   dates, but I do have it written down.

14        Q.    You have what written down?

15        A.    Requesting a comparable course, trying

16   to --

17        Q.    Do you have a timeline of the letters you

18   wrote?

19             MR. ALTMAN:  Wait, hold on.  I think she

20        was in the middle of answering and you kind

21        of cut her off.

22             MS. BROWN:  Okay.  My apologies.

23   BY MS. BROWN:

24        Q.    Requesting a comparable course?

25        A.    Yes, I did.
```

1          Q.   So you said you'd done that in writing?

2          A.   Yes, multiple times.  I even -- let's

3    see.  I sent three to President Mary Graham trying

4    to, you know, get her to understand Maggie's

5    disabilities and the evidence that I had to prove

6    that she was autistic.  No response from anybody.

7          Q.   You said at the beginning of that that

8    you had it written down.  Did you make a list of

9    the dates you sent the correspondence?

10         A.   Yes.  I have a copy of the letters.

11         Q.   Okay.  So you have copies of all the

12   letters.  That's how --

13         A.   Yes, ma'am.

14         Q.   -- you have it written down?

15         A.   Yes, ma'am.

16         Q.   So you wrote letters to Dr. Brown; you

17   wrote letters to Dr. Graham?

18         A.   Uh-huh.

19         Q.   To whom else did you write a letter?

20         A.   They were all addressed to Dr. Brown -- I

21   mean D. Brown.

22         Q.   And it's your testimony that Dr. Brown

23   never responded to any of those letters?

24         A.   She did not.

25         Q.   Did you ever have a conversation with

1    Ms. McGehee, with Aimee, about the waive and

2    replace?

3         A.    Yes.  I remember telling her about it.

4         Q.    Okay.  Tell me about that conversation.

5         A.    Well, we probably went in there for some

6    other reason, but I believe I remember telling her

7    that we received notification from Congressman

8    Stephen Palazzo about the disability law, and we

9    were excited.  It was hopeful.

10        Q.    Did he just reach out to you out of the

11   blue, Congressman Palazzo?

12        A.    No.  I wrote a letter to him requesting

13   assistance.

14        Q.    Okay.  Do you have a copy of that letter?

15        A.    Not with me.

16        Q.    But at home?

17        A.    I do.

18        Q.    Okay.  And what was the assistance you

19   were requesting?

20        A.    I was explaining to him that I was trying

21   to get a comparable course and --

22        Q.    But he's the one that told you you could

23   have a comparable course?

24              MR. ALTMAN:  Hold on.

25              Were you finished answering?

```
 1                   THE WITNESS:  Yeah, I'm fine.
 2                   MR. ALTMAN:  Okay.  Sorry.
 3      BY MS. BROWN:
 4           Q.   Correct?
 5           A.   Okay.  What --
 6           Q.   He's the one that told you about the
 7      comparable course?
 8           A.   He sent me a copy of the law.
 9           Q.   Okay.  Had you had conversations, before
10      you reached out to the congressman, with anyone at
11      the college about replacing College Algebra with
12      another course?
13           A.   Well, that would be June 18th and the
14      nine letters that I wrote to them.
15           Q.   Okay.  So that -- that all happened
16      before you communicated with Congressman Palazzo?
17           A.   I contacted him first because I knew --
18      he's the one who told me about the law.
19           Q.   That's my question to you.  Had you had
20      any conversations with anyone at Mississippi Gulf
21      Coast Community College before you reached out to
22      Congressman Palazzo?
23           A.   Other than Ms. Aimee, no.
24           Q.   Okay.  Did you talk to Ms. Aimee about
25      how Maggie could get her degree with a different
```

1    course besides College Algebra?

2          A.    We did have a conversation about that, I

3    believe.

4          Q.    Okay.  Tell me about that conversation.

5          A.    Well, there was nothing else -- there's

6    no other maths.

7          Q.    Is that what Ms. Aimee told you?

8          A.    That's not what Ms. Aimee told me.  I

9    believe that conversation was with Dr. Brown.

10   Yeah.

11         Q.    You had a conversation with Dr. Brown?

12         A.    Yeah.

13         Q.    Was that before you sent the first letter

14   to her?

15         A.    Yes, probably.  I was trying to find

16   something -- we were trying to find something --

17   yeah, we did.

18         Q.    Okay.  Trying to find some way to -- so

19   Maggie could complete the necessary coursework --

20         A.    Correct.

21         Q.    -- to get her degree?

22         A.    Yes, we did.

23         Q.    Okay.  You talked to Ms. Aimee; you

24   talked to Dr. Brown?

25         A.    Yes.

1        Q.   And you asked for a replacement course?

2        A.   Yes.

3        Q.   And it's your testimony that Dr. Brown

4   told you there were no other math classes?

5        A.   I think the only thing they had available

6   was a business math, is what she said.

7        Q.   Okay.  And did Maggie attempt that class?

8        A.   She could not attempt that class because

9   it had algebra in it.

10       Q.   She did not attempt that class?

11       A.   No.

12       Q.   Okay.

13       A.   It had algebra in it.  She couldn't do

14  it.

15       Q.   You had a conversation with Dr. Brown and

16  Ms. Aimee.  Those are the two conversations you had

17  before you reached out to the congressman; is that

18  correct?

19       A.   I would have to see the paperwork.

20       Q.   Your paperwork?

21       A.   Yes, the date -- the date on the -- on

22  the paperwork.  I could not really accurately tell

23  you without seeing the date on the congressman's

24  paperwork.

25       Q.   Do you remember when you got the letter

1   from the congressman?

2        A.   I do not.

3        Q.   How did you learn about the Office of

4   Civil Rights?

5        A.   Well, I did my research.

6        Q.   Okay.  And you reached out to that

7   office?

8        A.   I did.

9        Q.   Who was your contact there?

10       A.   They had an attorney, but you fill out a

11  form, and then they get back in touch with you.

12       Q.   You fill out a form.  And what does that

13  form -- what information does that form provide?

14       A.   You have a place to file your complaint,

15  you know, your name and address and all that.

16       Q.   Okay.  What was your complaint?

17       A.   Disability discrimination.

18       Q.   Did you give any more information than

19  that?

20       A.   I explained to them that we weren't

21  getting any assistance.

22       Q.   Did they contact you after you submitted

23  your complaint?

24       A.   They did.

25       Q.   And what did they tell you?

1          A.   In the first letter, they said they were

2    going to investigate.  Then on

3    September 24th, 2018, I received a letter saying

4    they were going to investigate that.

5               COURT REPORTER:  I'm sorry.  Could you

6          repeat that?

7          A.   I received a letter from them stating

8    they were going to investigate.  And then I

9    received another letter from them saying they were

10   going to -- they are investigating.  Yes.

11   BY MS. BROWN:

12         **Q.   Do you know when you submitted the**

13   **complaint to the OCR?**

14         A.   It was in 2018.

15         **Q.   Was it in the summer of 2018?  In the**

16   **fall of 2018?**

17         A.   I'm trying to remember.  I believe it was

18   in July.

19         **Q.   And then you received a response from**

20   **them.  When did you say that was?**

21         A.   September 24th.

22         **Q.   Okay.  And that response said that they**

23   **were currently investigating or that they planned**

24   **to investigate?**

25         A.   They were going to investigate.

1      Q.   When did you hear back from the OCR about

2   an investigation?

3      A.   So the next time I heard from them was on

4   October 10th.

5      Q.   Okay.

6      A.   Of 2018.

7      Q.   When you heard back from the OCR, what

8   was that communication?

9      A.   This is when I received a copy of

10   something referred to as the resolution agreement

11   outlining options for Maggie to take in order to

12   receive her fine arts degree.

13      Q.   Okay.

14      A.   It is a contract that was signed with the

15   college and the administration -- excuse me,

16   with -- the college and the OCR signed a resolution

17   agreement without our knowledge, without our

18   consent, and offered Maggie four options, all of

19   which its prerequisites were College Algebra and

20   Intermediate Algebra.

21      Q.   I'm going to start with:  What kind of

22   degree do you think Maggie was going to receive

23   from Mississippi Gulf Coast Community College?

24      A.   What kind of degree?

25      Q.   Right.

1          A.    A fine arts degree.

2          **Q.    Do you understand that Mississippi Gulf**

3     **Coast Community College doesn't grant fine arts**

4     **degrees?**

5               MR. ALTMAN:   Objection; foundation.

6     BY MS. BROWN:

7          **Q.    Do you understand that?**

8          A.    Nobody said anything about that.

9          **Q.    Do you understand that the course would**

10    **be for an associate of arts degree?**

11         A.    I don't know what it's called.  To me

12    it's always been a fine arts degree.

13         **Q.    Okay.  That's just your language.  That**

14    **doesn't --**

15         A.    Right.

16         **Q.    Okay.**

17         A.    That's my language.

18         **Q.    Okay.**

19         A.    Yes.

20         **Q.    So you heard back from the Office of**

21    **Civil Rights, and you said in October.  I'm going**

22    **to show you an email that's marked Exhibit 2.  Is**

23    **that the email that Mr. Nydick sent you?**

24               (Exhibit 2 was marked.)

25         A.    Yes, I recall this.

 1   BY MS. BROWN:

 2       Q.   Okay.  And that email had some

 3   attachments.  Those were the options being offered

 4   as substitute courses by Mississippi Gulf Coast

 5   Community College?  Is that correct?

 6       A.   These?

 7       Q.   Is -- this is the communication where you

 8   were advised of the options being offered?

 9       A.   This does not say what they are.  It just

10   says A and B and C and D.  So I can't say --

11       Q.   There were attachments to this email,

12   correct?

13       A.   No, there were not.  I received, before I

14   received notification on October 10th from the OCR,

15   a letter from Dr. Brown outlining the resolution

16   agreement with the same options on October 4th,

17   which means MGC [verbatim] and OCR ended this

18   investigation even before I got the notice from the

19   OCR on October 10th.

20       Q.   Okay.  You see on this email where it

21   says there are five attachments to it?

22       A.   Okay.  Well, I never got any.

23       Q.   You never got -- this --

24       A.   No.

25       Q.   -- email was directed to you?

```
 1        A.   I got this part.  I never got any
 2   attachments whatsoever.
 3        Q.   Okay.  That's Exhibit 2.
 4             I'm going to mark this as Exhibit 3.
 5                  (Exhibit 3 was marked.)
 6   BY MS. BROWN:
 7        Q.   This is a letter dated October 4th to
 8   Maggie from Dr. Brown, correct?  Is that the letter
 9   you're referencing?
10        A.   Yes, it is.  October 4th.  That's the
11   one.
12        Q.   All right.  And this letter gives four
13   options for Maggie to complete her course
14   requirements, correct?
15        A.   Yes.
16        Q.   Okay.  Did you review this letter?
17        A.   I did.
18        Q.   Did you talk to Maggie about this letter?
19        A.   Yes.
20        Q.   Okay.  Did you select any of these
21   options for Maggie to complete her coursework?
22        A.   Maggie took Economics.
23        Q.   Did you select any of these options for
24   Maggie to complete her coursework?
25        A.   No.
```

1        Q.    At the time this letter was issued, the

2    only thing left for Maggie to complete to get her

3    associate's degree was a substitution for College

4    Algebra, correct?

5        A.    Correct.

6        Q.    And it's your testimony that you did not

7    accept any of these options.

8        A.    She does not qualify for these -- these

9    courses.

10       Q.    That's not my question.

11       A.    Then I have no answer.

12       Q.    Did you select any of these four options

13   for Maggie to complete her associate's degree?

14             I need an answer.

15             MR. ALTMAN:  She's evaluating it.  Give

16        her a second.

17       A.    I did not select any of those courses for

18   Maggie to take.

19   BY MS. BROWN:

20       Q.    But you testified that Maggie enrolled in

21   Economics?

22       A.    She did.

23       Q.    Was that in an effort to complete

24   Option B?

25       A.    It was.  And then I requested that they

1    waive Visual BASIC programming.

2         Q.   All right.  So Maggie enrolled in

3    Economics in an effort to complete Option B,

4    correct?

5         A.   Yes.

6         Q.   You selected Option B?

7         A.   Yes, she did.  Uh-huh.

8         Q.   Okay.  And did she complete Economics?

9         A.   She did.

10        Q.   Did she pass Economics?

11        A.   She did.

12        Q.   And your testimony is that you then

13   requested an additional accommodation for Visual

14   BASIC programming?

15        A.   I did.

16        Q.   What was the accommodation you requested?

17        A.   That it be waived.

18        Q.   Why?

19        A.   Because of the prerequisites, College

20   Algebra.

21        Q.   You requested that it be waived, not that

22   it be substituted?

23        A.   Waived.  Waived or substituted.

24        Q.   Were you told that the prerequisite of

25   College Algebra was being waived for this class?

1         A.    Was I told that --

2         Q.    **That Maggie could enroll in Visual BASIC**

3    **programming without first taking College Algebra.**

4         A.    Yes, they did tell me that.  Yes.

5         Q.    **Did Maggie enroll in Visual BASIC**

6    **programming?**

7         A.    No, ma'am.

8         Q.    **Why not?**

9         A.    Prerequisites.

10        Q.    **There was no prerequisite.  It was**

11   **waived.**

12        A.    Then please explain to me how she's

13   supposed to take the course.

14        Q.    **Did Maggie enroll in Visual BASIC**

15   **programming?**

16        A.    No, never.

17        Q.    **You would not allow her to do that.**

18        A.    I would not.

19        Q.    **You told her she couldn't do that.**

20        A.    No, I did not.

21        Q.    **What did you tell her?**

22        A.    She did not want to take it.  She could

23   not take it.

24        Q.    **You told her she couldn't take it?**

25        A.    No, I did not.

| | | |
|---|---|---|
| 1 | Q. | **You didn't allow her to enroll in it?** |
| 2 | A. | She did not want to enroll in it. |
| 3 | Q. | **Why not?** |
| 4 | A. | Because she knew she couldn't do it. |
| 5 | Q. | **Without trying, she knew that?** |
| 6 | A. | Yes, ma'am.  If it has a prerequisite |

with College Algebra, she didn't stand a chance.

| | | |
|---|---|---|
| 8 | Q. | **In your opinion?** |
| 9 | A. | I've seen the course syllabus for the |

course.

| | | |
|---|---|---|
| 11 | Q. | **Okay.  Do you have a degree in** |

**mathematics?**

| | | |
|---|---|---|
| 13 | A. | No, I don't. |
| 14 | Q. | **Are -- have you ever taught mathematics?** |
| 15 | A. | No, ma'am.  I'm not a teacher. |
| 16 | Q. | **Did you have a conversation with anybody** |

**at the college about the requirements of Visual**

**BASIC programming?**

| | | |
|---|---|---|
| 19 | A. | No, I did not. |
| 20 | Q. | **You made the decision that Maggie could** |

**not complete that course?**

| | | |
|---|---|---|
| 22 | A. | I did not make that decision. |
| 23 | Q. | **Who made that decision?** |
| 24 | A. | Maggie made that decision. |
| 25 | Q. | **Did she talk to you about it?** |

1          A.    Oh, yes, she did.

2          **Q.    Did you tell her she couldn't complete**

3   **the course?**

4          A.    I did not tell her she could not do it.

5          **Q.    Okay.   What did Maggie tell you about it?**

6          A.    That she couldn't do it.

7          **Q.    Maggie told you she couldn't?**

8          A.    Yes.

9          **Q.    Did you encourage her to try?**

10         A.    No, I did not.

11         **Q.    Did you have a conversation with**

12   **Ms. Aimee about it?**

13         A.    I do not recall.

14         **Q.    You said you've seen the course syllabus?**

15         A.    I have.

16         **Q.    And what in the syllabus made you think**

17   **Maggie couldn't do the class?**

18         A.    Besides College Algebra, there would be

19   numbers; there would be all kinds of things that

20   she could not do.  She could not comprehend it

21   because she has comprehension -- reading

22   comprehension disability.

23         **Q.    With the accommodations regarding reading**

24   **questions and assistance?**

25         A.    Not enough.  When she was in 9th grade --

1    no, when she was in 11th grade, excuse me, she was

2    doing reading -- reading on the 9th grade level.

3         **Q.   In the 9th grade, she was reading on the**

4    **9th grade level?**

5         A.   No.  In the 11th grade, she was reading

6    on the 9th grade level.

7         **Q.   Okay.**

8         A.   So that kind of makes algebra and Visual

9    BASIC programming, and let's not forget about

10   Statistics, impossible for her.

11        **Q.   Okay.  We're not talking about**

12   **Statistics.  We're talking about Visual BASIC**

13   **programming.**

14        A.   Well, it's on the -- it's on there.

15        **Q.   Statistics is listed in Option C.  She**

16   **didn't select Option C.  You selected Option B.**

17        A.   Well, that's true.

18        **Q.   Okay.  So Statistics is not something**

19   **that you selected.**

20        A.   No.

21        **Q.   Visual BASIC programming is the last**

22   **class that Maggie needs to take to obtain her**

23   **degree.**

24        A.   That she's not qualified to take.

25        **Q.   In your opinion?**

```
 1        A.   It's their course syllabus.  It's stated
 2   clearly.
 3        Q.   Have you ever taken Visual BASIC
 4   programming?
 5        A.   No.  I have not.
 6        Q.   What is stated clearly on the course
 7   syllabus?
 8        A.   Well, unless I have it in front of me...
 9             MS. BROWN:  Make this Exhibit 4.
10             (Exhibit 4 was marked.)
11   BY MS. BROWN:
12        Q.   Is this what we're talking about?
13        A.   Yes, this is the one.  Problem solving;
14   that's reading comprehension.  Documentation,
15   program statements, algorithms.  She can't do that.
16        Q.   We don't know because she never tried --
17        A.   And she doesn't have an ACT of 19.  She
18   can't do it.
19        Q.   We don't know that because she never
20   tried.
21        A.   Yes, we do know it.  I'm pretty sure her
22   therapist will tell you she can't do it.
23        Q.   What therapist?
24        A.   Dr. Burrowes, who tested her.
25        Q.   What kind of test?
```

1      A.    It's a test to find out about her math.

2      Q.    **When was that test given?**

3      A.     It was given last year, and we discovered

4  that she has had dyscalculia all her life, and it's

5  been undiagnosed.

6      Q.    **But it was diagnosed last year?**

7      A.    Uh-huh.

8      Q.    **Okay.**

9      A.    Yeah.

10     Q.    **But all of this was happening in 2018.**

11     A.     But the reason I had that done, that

12  testing done, was to prove to the college that

13  Maggie's not -- she's not faking anything, that she

14  does have dyscalculia.

15     Q.    **Has anybody ever told you that they think**

16  **Maggie's faking something?**

17     A.    Well, I don't understand.  Then why

18  haven't they helped her?

19     Q.    **It's your opinion that they haven't**

20  **helped her?**

21     A.    They have not.

22     Q.    **How have they not helped her?**

23     A.    Because they've done a lot against her.

24     Q.    **What?**

25     A.    This resolution agreement, for one.

```
 1        Q.   How is this against Maggie?
 2        A.   The prerequisites.  And then Option D,
 3   I've requested that they waive College Algebra, and
 4   they have that as Option D.
 5        Q.   You requested they substitute --
 6        A.   You keep using that word, but I prefer
 7   the word "waive."
 8        Q.   Okay.  There's a difference between
 9   "waive" and "substitute."  Did you make a request
10   that they waive a course, completely waive it, and
11   give Maggie a degree without completing the
12   coursework?
13        A.   I believe in my letter it might have said
14   "waive or substitute," yes.
15        Q.   Okay.  So you have always asked that it
16   be waived and substituted?
17        A.   Uh-huh.
18        Q.   That's why I use that word.
19             You understand that Maggie has to
20   complete certain coursework to get a degree,
21   correct?
22        A.   Yes.
23        Q.   Maggie hasn't completed that coursework,
24   has she?
25        A.   She cannot pass College Algebra.
```

```
 1        Q.    Maggie hasn't completed that coursework,

 2   has she?

 3        A.    She has not.

 4        Q.    She never enrolled in Visual BASIC

 5   programming?

 6        A.    She is not qualified to take that course.

 7        Q.    She never enrolled in Visual BASIC

 8   programming?

 9        A.    She is not qualified to take that course.

10        Q.    Is that because you believe there's a

11   prerequisite?

12        A.    There is one.

13        Q.    It was waived.

14        A.    That doesn't make any difference.

15        Q.    In your opinion, correct?

16        A.    I'm -- I guess so.

17        Q.    Okay.  Did you have a conversation with

18   Ms. Aimee about Visual BASIC programming?

19        A.    I do not recall.  That's been years ago.

20        Q.    All of this happened many years ago.  Did

21   you have any conversations with anyone at

22   Mississippi Gulf Coast Community College about

23   Visual BASIC programming?

24        A.    I did not.  Because I could read this

25   (indicating).
```

```
 1        Q.    Okay.  You made that decision?
 2        A.    I did.
 3        Q.    You stopped working with them about -- to
 4    achieve the --
 5        A.    They never worked with me.
 6        Q.    How did they never work with you?
 7        A.    They never responded to my letters.
 8        Q.    With respect to this course, they worked
 9    with Maggie all through her tenure, correct?
10        A.    Yes.
11        Q.    And they offered alternatives?
12        A.    There was never a request for any
13    alternative except College Algebra.
14        Q.    And they offered alternatives?
15        A.    They offered one, and she was not
16    qualified to take that.  That was in one -- only
17    one time.
18        Q.    What -- what one time?  What was that?
19        A.    They offered her Quantitative Reasoning.
20        Q.    Okay.  Did she enroll in that?
21        A.    There's no way she could pass it.  No,
22    she did not.  It's worse than College Algebra.
23        Q.    In your opinion?
24        A.    Yes, in my opinion.
25        Q.    Okay.  Have you reached out to math
```

MAGGIE RUSSELL vs MISS. GULF COAST COMMUNITY COLLEGE
Susan Russell - 03/29/2023                                    Page 67

1    educators to discuss the requirements of those

2    courses?

3         A.   I believe -- I have not.

4         Q.   Okay.  Did you have any conversations

5    with any math educators before you decided that

6    Maggie couldn't take Visual BASIC?

7         A.   I haven't reached out to anybody.

8         Q.   Okay.  These --

9         A.   I've spoken to other people that surround

10   my world, and they have -- they agree with me.

11        Q.   Okay.  Other people that surround your

12   world.  Are any of them math educators?

13        A.   No.

14        Q.   Do any of them have any degrees in

15   mathematics?

16        A.   No.

17        Q.   Okay.  Do any of them have degrees in

18   education?

19        A.   Well, some do.

20        Q.   Okay.  What kind -- are they elementary

21   school teachers?  High school teachers?

22        A.   No.

23        Q.   Okay.  Who does?  Who has a degree in

24   education?

25        A.   I have a sister.

```
 1        Q.    What's her degree?

 2        A.    She has a -- I'm trying to think of the

 3  name -- where they help students come from high

 4  school to college and they need help with reading

 5  and math or whatever.

 6        Q.    She went to college --

 7        A.    Development -- yes, she did.

 8        Q.    I'm sorry.  I interrupted you.

 9  Development?

10        A.    I wish I could think of the name of it.

11  I'm just kind of blank right now.

12        Q.    Can't think of it?

13        A.    Nuh-uh.

14        Q.    Your sister went to college?

15        A.    She did.

16        Q.    She got a degree?

17        A.    She has a master's.

18        Q.    Where did she get that?

19        A.    Where did she get it?

20        Q.    Uh-huh.

21        A.    Hattiesburg.

22        Q.    And what's her master's in?

23        A.    Education.

24        Q.    She has a master's in education?

25        A.    She does.
```

 1        Q.   And she has told you that Maggie can't do
 2   this class?
 3        A.   I don't want to put words in her mouth,
 4   but yes, she understands our situation.
 5        Q.   I'm asking you if she has told you that
 6   Maggie can't do that class.
 7        A.   Yes.
 8        Q.   So if I were to put her under oath and
 9   ask her that question, she would say that Maggie
10   can't do that class?
11        A.   Yes.
12        Q.   Okay.
13             MS. BROWN:  I think this is a good spot
14        for a break.
15        (Off the record.)
16             MS. BROWN:  We are ready.  We've been
17        joined by Dr. Bonfanti.
18             All right.  We're back on the record
19        with Ms. Russell.
20   BY MS. BROWN:
21        Q.   I want to talk a little bit about -- you
22   mentioned that you reached out to Congressman
23   Palazzo, and he provided you with a law that said
24   you could request a substitution for College
25   Algebra, correct?

```
 1       A.   A comparable course, yes.

 2       Q.   A comparable course.

 3       A.   Uh-huh.

 4       Q.   But that law doesn't say that you get to

 5   choose what that comparable course is, does it?

 6       A.   No.

 7       Q.   Okay.

 8            All right.  So you wrote a letter to

 9   Dr. Brown.  Did you ever have a meeting with

10   Dr. Brown?

11       A.   I went into her office several times to

12   check to see if they could come up with a

13   comparable course.

14       Q.   Okay.  And what did she tell you?

15       A.   "No."

16       Q.   "No"?

17       A.   "No."

18       Q.   Just flat "No"?

19       A.   Just flat "No."

20       Q.   They weren't making any effort to do

21   that?

22       A.   No.

23       Q.   Okay.  Did she tell you why?

24       A.   No.

25       Q.   Okay.  So then you reached out to OCR?
```

```
 1        A.   Yes.

 2        Q.   And OCR and the college reached a

 3   resolution?

 4        A.   Yes.

 5        Q.   You were advised of that?

 6        A.   I was not.

 7        Q.   You were advised that they reached a

 8   resolution?

 9        A.   Yes.  Yes.  I'm sorry.

10        Q.   But I think you seem to take issue with

11   the fact that you weren't included in the

12   discussions about the resolution?

13        A.   Yes.  We were not there.  We -- we didn't

14   know it was happening.

15        Q.   Okay.  Why do you believe you should have

16   been included?

17        A.   Because the law says we should have been.

18        Q.   What law?

19        A.   The disability law.  And I can't quote

20   it, but I've read it.

21        Q.   Okay.  And what -- in your opinion, what

22   does it say?

23        A.   That we were denied procedural access to

24   being there.

25        Q.   Did you have conversations with someone
```

1   at the OCR about your complaints?

2        A.   No, I never spoke to anybody in person.

3   It was always in writing.

4        Q.   You never had a tele- -- a live

5   conversation, either by telephone or in person,

6   with anyone from ORC?

7        A.   Oh, I did.  The attorney, Craig Nydick.

8        Q.   You had a conversation with him?

9        A.   On one occasion.

10       Q.   Okay.  And what was the substance of that

11   conversation?

12       A.   I asked him why he thought that offering

13   Maggie these options, and especially three courses

14   for one, was fair.  And he would not answer.  I

15   also asked him why they did not request records

16   regarding Maggie's disability in algebra, that I

17   would have been happy to give them to him; and he

18   went off on me.

19       Q.   What did he say?

20       A.   Like what -- what do you want me to do?

21   What do you think we should offer her?

22            And he was screaming like he was in

23   court, and Maggie was sitting there, and he made

24   her cry.  And I just -- we just terminated the --

25       Q.   This was a phone call?

```
 1      A.   It was.
 2      Q.   Okay.  What records could he have
 3  requested?
 4      A.   What records?
 5      Q.   You just mentioned that you were upset he
 6  didn't request any records.  What records --
 7      A.   Oh, her medical -- her medical records.
 8      Q.   Okay.
 9      A.   Her school records.  Everything that I
10  submitted to MGCC.  The algebra SATP that she
11  failed four times, you know.  Since second grade,
12  below basic in algebra.  You know, medical --
13  letters from doctors specifically stating where the
14  algebra thing was causing her distress and having
15  suicidal thoughts and -- I mean, there's just a lot
16  of it.
17      Q.   And you've given all that to your lawyer?
18      A.   I have.
19      Q.   Okay.  You mentioned a moment ago that
20  Maggie started seeing Ms. Burrowes last year?
21      A.   No.  She's been seeing her for over five
22  years, I think, now.
23      Q.   Okay.
24      A.   This is 2023.  Yeah.  By -- it's
25  either 2015 or 2017.  It's probably 2017.
```

 1       Q.   When were the -- was the test given to

 2   Maggie when she was diagnosed with dyscalculia?

 3       A.   I don't know the exact date.  It was last

 4   year.

 5       Q.   Okay.  So last year is when you obtained

 6   a diagnosis of dyscalculia?

 7       A.   Last year, yeah, or the -- or the year

 8   before.  I can't keep up.

 9       Q.   So that would have been in '21 or '22,

10   2021 or 2022?

11       A.   Yes.  Yes.  One of the two.

12       Q.   So in 2018 Maggie did not have a

13   diagnosis of dyscalculia, correct?

14       A.   It was undiagnosed.  Correct.

15       Q.   You did not have a formal diagnosis.

16       A.   No.

17       Q.   Okay.  So you had a conversation with

18   Mr. Nydick, and you hung up the phone dissatisfied

19   with that conversation?

20       A.   Yes.

21       Q.   You believed it to be unfair that the

22   substitutions being offered were three courses?

23       A.   That is three courses on A -- on B and C.

24       Q.   You believed that to be unfair?  Was that

25   your word?

```
 1        A.   Yes, unfair.
 2        Q.   Why is that unfair?
 3        A.   Three courses for one College Algebra?
 4   That is unfair.
 5        Q.   How?
 6        A.   The workload, for one.
 7        Q.   Okay.  Do you understand what it means to
 8   substitute courses in place of College Algebra?
 9        A.   I can count.  Physical Science,
10   Economics, Visual BASIC programming.  That's three.
11        Q.   Okay.  Do you understand what it means to
12   substitute courses for College Algebra?
13        A.   Substitute?  Not in college language.
14        Q.   Tell me what you believe that means.
15        A.   You take one away, and you put one in.
16        Q.   So it's got to be a one for one, in your
17   opinion.
18        A.   In my opinion, yes.  That's what's fair.
19        Q.   Okay.  Does the law say it has to be one
20   for one, in your opinion?
21        A.   It says "a comparable course."  "A" is
22   one.
23        Q.   That's what the law says?
24        A.   Well, yeah.  That's what's in the law.
25        Q.   Okay.  You said you had meetings with
```

```
 1    Dr. Brown after you wrote the letter.

 2         A.   Yes.

 3         Q.   You went to OCR.

 4         A.   Yes.

 5         Q.   You were unhappy with what you got from

 6    OCR.

 7         A.   Yes.

 8         Q.   So you went to Mississippi Disability

 9    Rights, correct?

10         A.   Yes.

11         Q.   How did you find them?

12         A.   I knew about them.  I did research.

13         Q.   Okay.

14         A.   Online.

15         Q.   And did you make a complaint?  Did you --

16    how did you contact them?

17         A.   Through email, and then they contacted

18    me.

19         Q.   Okay.  What was your -- what did you

20    communicate to Disability Rights?

21         A.   That they were trying to get Maggie to

22    take College Algebra, and I was telling them that

23    she has a disability in math and College Algebra.

24         Q.   When you reached out to Disability

25    Rights, you told them that the college was, quote,
```

1    trying to get Maggie to take College Algebra?

2         A.   Well, I don't know what it was word for

3    word.

4         Q.   Okay.  Did you believe at that time they

5    were still, quote, trying to get her to take

6    College Algebra?

7         A.   Yes, it was.  That's why I contacted

8    them.

9         Q.   Okay.  At that point, you had received

10   the letter with the resolution offering substitute

11   courses, correct?

12        A.   Yes.  Yes.

13        Q.   So you were aware that they had offered

14   substitution?

15        A.   Yes.

16        Q.   Okay.  You also understand that you have

17   to complete certain coursework in order to achieve

18   a degree, correct?

19        A.   Yes.  She had completed them all except

20   College Algebra.

21        Q.   And she was offered an accommodation to

22   take three other courses in place of College

23   Algebra, correct?

24        A.   Yes.  And then -- and then there's

25   Option A and Option C.

1        Q.    There was Option A, B, and C --

2        A.    Uh-huh.

3        Q.    -- other than College Algebra.

4        A.    And D.

5        Q.    Other than College Algebra.

6        A.    Oh, yes.  Okay.

7        Q.    Okay.

8        A.    Yes.

9        Q.    And you selected Option B?

10       A.    I told Maggie if she took Economics and

11  showed good faith, that maybe they would waive the

12  Visual BASIC programming.

13       Q.    So you told Maggie not to take Visual

14  BASIC programming?

15       A.    No, I didn't tell her not to take it.  I

16  told her this is what they might do.

17       Q.    But you dispute that you selected

18  Option B?

19       A.    We didn't select anything.  That was the

20  only thing that she could do to have a chance of

21  passing is Economics.

22       Q.    In your opinion.

23       A.    Yeah.

24       Q.    Okay.  You've made your complaint to the

25  Office of Disability Rights, and they contacted

1    you.   Who contacted you?

2         A.   I spoke with Ms. Warren, Rebecca Warren.

3         **Q.   How many times did you speak to her?**

4         A.   Multiple times.

5         **Q.   Okay.**

6         A.   Through email.

7         **Q.   Through email.**

8         A.   Uh-huh.

9         **Q.   Okay.  And did you come up with some**

10   **solution?**

11        A.   No, because eventually they decided that

12   there was nothing more they could do.  They have

13   a -- something about their finances.  They're

14   confined by their finances.

15        **Q.   Okay.  So the Office of Civil Rights told**

16   **you that there was an accommodation offered,**

17   **correct?**

18        A.   The Office of Civil Rights -- a

19   resolution agreement is what I got.

20        **Q.   And you rejected that offer?**

21        A.   Yes, because there's nothing she could do

22   on it.  And the prerequisite, she does not qualify

23   for.

24        **Q.   You continue to understand that the**

25   **prerequisite was being waived?**

1        A.    What difference would that make?  It's

2   still College Algebra.  Right?

3        **Q.    Do you understand it was waived?**

4        A.    I believe that was mentioned.  Yes, it

5   was.

6        **Q.    Okay.  Did you have a conversation with**

7   **either Aimee or Dr. Brown or Dr. Bonfanti about why**

8   **they were waiving or what it meant to waive that**

9   **prerequisite?**

10       A.    No, I did not.

11       **Q.    And the Disability Rights actually told**

12  **you that you had been offered an accommodation and**

13  **that there was nothing more they could do for you,**

14  **correct?**

15       A.    Yes.  They wanted Maggie -- they started

16  to advocate for Maggie to take the Visual BASIC

17  programming, so that was that.

18       **Q.    So you were done with them.**

19       A.    Of course.

20       **Q.    So you weren't --**

21       A.    And they were done with me because they

22  weren't going to go to court.

23       **Q.    Okay.  But you just wanted to go to**

24  **court, right?**

25       A.    No.  That's not right.

MAGGIE RUSSELL vs MISS. GULF COAST COMMUNITY COLLEGE
Susan Russell - 03/29/2023                                           Page 81

1        Q.   No?

2        A.   No.

3        Q.   **What did you want?**

4        A.   I wanted them to answer my letters, to

5   work with me, to try to find something for Maggie.

6   Something she had a chance to pass.  Any core:

7   English, history, science, something.  They offered

8   her nothing.

9        Q.   **Maggie needed to complete her math**

10  **requirements, correct?**

11       A.   And she has a disability in math, and you

12  just don't accept it.

13       Q.   **And so you're asking for her to get a**

14  **college degree without completing the requisite**

15  **coursework.**

16       A.   They either -- yes.

17       Q.   **So you want Maggie to have a degree that**

18  **she didn't earn?**

19       A.   I wanted --

20            MR. ALTMAN:  Objection; argumentative.

21  BY MS. BROWN:

22       Q.   **You can answer.**

23       A.   I wanted them to give her something she

24  had a chance to pass.  Like I said, any core

25  subject would have worked for me.  But they kept

 1  giving her courses that she didn't have no chance

 2  to pass at all.

 3       Q.   In your opinion.

 4       A.   No, I know it's true.  I can read the

 5  course syllabus for every one of these courses, and

 6  I couldn't do it.

 7       Q.   Because you couldn't do it, it means

 8  Maggie can't do it?

 9       A.   Maggie has autism.  She has disabilities.

10  No, she cannot.  It's a matter of record.  You

11  don't have to take my word for it.

12       Q.   Okay.  This is Exhibit 5.  That's an

13  email communication you had with the Mississippi

14  Disability Rights.  Do you recall that?

15            (Exhibit 5 was marked.)

16       A.   I'm sure I do.  Yes, I remember this.

17  And this is why we went our separate ways.

18  BY MS. BROWN:

19       Q.   Okay.

20       A.   They think that she should have tried to

21  take the Visual BASIC programming; but they've

22  never seen the course syllabus, so they didn't know

23  what they were asking her to do.  And so instead of

24  taking and attempting the VP course, she attempted

25  to take the College Algebra and couldn't do it and

 1   had to withdraw.

 2        Q.   **When is the last time she was enrolled?**

 3        A.   And -- and --

 4        Q.   **I'm sorry.**

 5        A.   When was she what, now?

 6        Q.   **I interrupted you.  You said she**

 7   **attempted to take College Algebra and had to --**

 8        A.   She did.

 9        Q.   **-- withdraw and what?**

10        A.   She had to withdraw because she couldn't

11   do it.  And that was before I wrote the letter to

12   the college.

13        Q.   **Okay.  She attempted College Algebra?**

14        A.   She did.

15        Q.   **And withdrew?**

16        A.   She did.  She had to.  She couldn't do

17   it.  Specifically, because the course syllabus said

18   no retests.  And Maggie has to reteach, retest, and

19   tutor to pass any -- any test in College Algebra.

20   And that's how she was able to pass Beginning

21   College Algebra is because she had an instructor

22   had helped her in class and outside class.

23        Q.   **Did you have a conversation with Aimee**

24   **about assistance in getting her through College**

25   **Algebra?**

    1        A.    What kind of assistance?
    2        Q.    **This is what I'm asking you.  Did you**
    3    **have a conversation with Aimee about any of that?**
    4        A.    The only time we talked to Aimee was to
    5    tell her how -- how things were going.  And usually
    6    Maggie would talk to her, not me.
    7        Q.    **You didn't request accommodations from**
    8    **Aimee?**
    9        A.    Maggie has accommodations.  She got --
   10    she always got everything she needed from -- this
   11    is nothing about accommodations.
   12        Q.    **She got everything she needed from the**
   13    **college?**
   14        A.    Except a comparable course.
   15        Q.    **In your opinion.**
   16        A.    Well, yes, in my opinion.
   17        Q.    **Okay.  She was offered a path to**
   18    **graduation?**
   19        A.    Like I said, she's got 93 semester hours
   20    for a 60-semester-hour degree.  I believe she
   21    completed everything but the College Algebra.
   22        Q.    **You believe?**
   23        A.    It's fact.
   24        Q.    **So at some point you went to WLOX?**
   25        A.    I did.

1      Q.   Okay.  Why did you do that?

2      A.   Let's see.  It goes back to the nine

3   letters that were unanswered.

4      Q.   Meetings with Dr. Brown don't qualify as

5   an answer to your letter?

6      A.   When all she says to me is "No."

7      Q.   That's all she said.

8      A.   That's all.

9      Q.   She didn't work with you at all?

10      A.   She would go and tell them -- I think one

11   time I asked, What about a computer course?"  And

12   she said she would try.  And when I went back, the

13   answer was no.

14      Q.   Visual BASIC programming, is that a

15   computer course?

16      A.   I have no idea knowing, but --

17      Q.   You don't know what it is, but you --

18           MR. ALTMAN:  Hold on.  You didn't give

19           her a chance to finish her answer.  Slow down

20           a little bit.

21      A.   I do not know what Visual BASIC

22   programming is except from what I read from the

23   course syllabus.  And I know enough about what I'm

24   reading to know that my daughter can't do it

25   because of her disabilities and autism.

1    BY MS. BROWN:

2         Q.    Okay.   You don't know what Visual BASIC

3    programming is?

4         A.    No, I don't.

5         Q.    Okay.   So what did you say when you

6    called WLOX?

7         A.    I called -- actually, I just submitted

8    the paperwork.

9         Q.    What paperwork?

10        A.    And they called me.

11        Q.    What paperwork?

12        A.    Some of the -- specifically some of the

13   articles I wrote.  I wrote an article, "Life of

14   Maggie Before College Algebra."  I submitted that

15   to them.

16        Q.    You wrote this article just for -- did

17   you have it published somewhere?

18        A.    The Parenting Autism magazine.

19        Q.    Was it published?

20        A.    Yes, it is.

21        Q.    So you sent them that article?

22        A.    Yes.  And they called me and they wanted

23   to do a story.  And since I was not getting any

24   help, I was hoping that that would help.

25        Q.    Help what?

1      A.    Somebody to respond.  But it didn't.  As

2  a matter of fact, the -- the comeback from MGCC was

3  half the truth.  They said they offered three

4  options when they offered four, and they did not

5  mention that they offered three courses for one in

6  their response to my letter.  So...

7      **Q.    Okay.  They offered three substitutions**

8  **and then reiterated that College Algebra was an**

9  **option?**

10     A.    No, it didn't, not under the WLOX thing.

11     **Q.    The letter there indicates there are four**

12 **options, correct?**

13     A.    There is.  But on --

14     **Q.    And one of those is College Algebra?**

15     A.    Yes, it is.

16     **Q.    So there are three alternatives, correct?**

17     A.    No.  College Algebra counts.  It's right

18 here on the paper.  You're offering her College

19 Algebra.

20     **Q.    And how many alternatives are right there**

21 **on that piece of paper?**

22     A.    There's four.

23     **Q.    How many alternatives to College Algebra**

24 **are on that paper?**

25     A.    Okay.  Quantitative Reasoning, Visual

1    BASIC programming, Statistics, and College Algebra.

2    Four.

3         Q.   Other than College Algebra, how many

4    options are offered in that --

5         A.   Four.

6         Q.   That's your answer?

7         A.   That's my answer.

8         Q.   And that's why you think there was a

9    misrepresentation in response?

10        A.   I do.

11        Q.   Okay.  Maggie told me earlier that she

12   wrote and published a book.

13        A.   She did.

14        Q.   And it's for sale on websites.

15        A.   It is.

16        Q.   What happens to the money that is made

17   from the sale of those books?

18        A.   She has a savings account.

19        Q.   Okay.  In her name?

20        A.   Yes, it is.

21        Q.   Okay.  Is she doing well selling that

22   book?

23        A.   I really don't know.  She is doing good,

24   but I don't know how many books she's sold because

25   I'm having trouble with the -- getting her

1    royalties from the publishing company, believe it

2    or not.

3         Q.    Okay.  Who is the publishing company?

4         A.    iUniverse.

5         Q.    iUniverse?

6         A.    Uh-huh.

7         Q.    And so you have a dispute with them?

8         A.    Well, not a dispute.  I'm just going

9    to -- it's just an issue I'm going to have to

10   address eventually.

11        Q.    About paying royalties for the book?

12        A.    Yes.  She earned it.

13        Q.    Is she writing another book?

14        A.    No, not currently.

15        Q.    She's not?

16        A.    No.

17        Q.    No?  She selling art?

18        A.    She does commissions once in a while; and

19   yes, she has a fine arts shop.

20        Q.    On the internet?

21        A.    Fine Art America, yeah.  Uh-huh.

22        Q.    And what happens to the money from those

23   sales?

24        A.    They deposit it in that savings account

25   automatically.

1      Q.   So you filed this lawsuit.  Maggie filed

2  this lawsuit.  What is your -- what is your goal?

3  What are you seeking in this lawsuit?

4      A.   What I've always wanted for her:  her

5  degree.  She earned it.

6      Q.   Okay.  After you filed this lawsuit,

7  there was another alternative offered to Maggie

8  that included a self-paced course at no charge.  Do

9  you recall that?

10      A.   I do.  And it comes a little bit too

11  late.  She's been suffering for three years.

12  Maggie's never going to do another algebra problem

13  in her life.

14      Q.   Because you say so.

15      A.   Well, if you ask her, she's going to tell

16  you she's not going to do it.

17      Q.   The alternative course that was offered

18  after the suit was filed, you rejected it simply

19  because it -- the timing?

20      A.   You have tortured my daughter

21  emotionally, physically.  She has suicidal

22  thoughts.  So do you think I'm going to let her be

23  taught some more math and then, Well, if you make

24  an 80, you get your degree?

25      Q.   How physically has she been tortured?

 1          A.   Emotions affect the body.  And you don't

 2     have to take my word for it.  You can ask her

 3     doctors.

 4          Q.   This has gotten worse?  It --

 5          A.   Yes.  I had her in the ER on January 17th

 6     for suicidal and depression.

 7          Q.   Okay.  How did she express those suicidal

 8     ideations?

 9          A.   She wants to hurt herself.

10          Q.   Do you need a minute?

11          A.   I'm sorry.

12               MR. ALTMAN:  Just take a minute if you

13          need.  Want to take a break for a second and

14          just run to the bathroom?

15               THE WITNESS:  No.  I'm okay.

16     BY MS. BROWN:

17          Q.   Was she released from the ER, or did they

18     keep her in the hospital?

19          A.   They released her.  They were very good.

20     They talked to her, you know.  They were very kind.

21     Just the best hospital ever.

22          Q.   Where did you take her?

23          A.   Ochsner's.

24          Q.   The one up north of the interstate, the

25     old Garden Park?

MAGGIE RUSSELL vs MISS. GULF COAST COMMUNITY COLLEGE
Susan Russell - 03/29/2023                                    Page 92

```
 1       A.   Yes.
 2       Q.   So you told me that the whole goal of
 3   this lawsuit is for Maggie to get her degree.
 4       A.   Correct.
 5       Q.   Are you seeking money damages?
 6       A.   I am.
 7       Q.   For?
 8       A.   Punitive for sure.  Attorney fees.  Yes.
 9       Q.   Okay.
10       A.   I think that's the least she -- she
11   should get.
12       Q.   Do you have documentation on Maggie's art
13   sales and book sales, what kind of money she's
14   making from that?
15       A.    In -- in, like -- let's see.  How long
16   has she been on there?  Like, four years, she's
17   made $570.  She doesn't sell a whole lot because
18   her artwork is childlike, but it's beautiful.  It's
19   bold and expressive, and she's won three awards at
20   MGCC for her art.
21       Q.   And you said $500.  Is that for selling
22   her art?
23       A.   Well, that includes all the money coming
24   from Fine Art America, her sales.
25       Q.   That --
```

```
 1        A.    Yeah.

 2        Q.    Okay.  But she does commissions.

 3        A.    Yes.

 4        Q.    She makes money for those.

 5        A.    Yeah.

 6        Q.    So you can account for her income --

 7        A.    Well, that's part of that, too, because

 8   she only makes 40 -- $40.

 9        Q.    $40 for what?

10        A.    For a 9 by 12.  Yeah.

11        Q.    She sells those for $40?

12        A.    Yes.

13        Q.    Do you have any estimate of what she's

14   made from her book sales?

15        A.    No, I don't.  I don't think it's very

16   much.  You only get like 10 percent of it.  And the

17   book was -- they priced it too high.  There's been

18   all kinds of issues with it.  But still, she's

19   still selling some.

20        Q.    Again, I'm going to butcher his name, but

21   do you recall Mr. Dedual?

22        A.    Excuse me?

23        Q.    Dedual?  Mr. Dedual that helped Maggie --

24        A.    Oh, Mr. Dedual.  Yeah.  Yeah.  He tutored

25   her with College Algebra on Saturdays for a while
```

```
 1   to help her get better.

 2        Q.   Okay.  When was that?

 3        A.   That was when she was in high school.

 4        Q.   He tutored her in College Algebra in high

 5   school?

 6        A.   Uh-huh.

 7        Q.   Why was she taking College Algebra in

 8   high school?

 9        A.   She wasn't taking College Algebra.  She

10   was doing high school College Algebra and doing it

11   with him.

12        Q.   High school algebra?

13        A.   Yes.

14        Q.   Okay.  Did he help her at all with Gulf

15   Coast Community College?

16        A.   No.

17        Q.   Okay.

18        A.   No.

19        Q.   You have no knowledge of him being at the

20   college?

21        A.   He was at the college, and she was going

22   to try it with him, you know, the College Algebra,

23   but he was taken off the list because he didn't

24   have enough points.  And so even though she may

25   have felt comfortable with him because she knew
```

```
 1  him, she still wouldn't have been able to pass,
 2  so...
 3      Q.    How do you know?
 4      A.    Because of her disability.
 5      Q.    He got her through high school algebra
 6  didn't he?
 7      A.    Yeah, he did.  But high school algebra is
 8  not the same as College Algebra, I believe.  It's a
 9  little more difficult.
10      Q.    You think?
11      A.    I think.
12      Q.    Okay.  Did you talk to Aimee about having
13  him help her with College Algebra?
14      A.    When I talked to her, she's the one that
15  told us that the points had been -- and he was off
16  the -- off it, so...
17      Q.    You didn't take that any further?
18      A.    No.
19      Q.    Okay.  Has Maggie ever surprised you?
20      A.    Surprised me?
21      Q.    Yeah.  Performed, done something that you
22  didn't think she could do?
23      A.    Writing a book is one.
24      Q.    You didn't think she could do that?
25      A.    She has the art.  Yeah.
```

 1        Q.    You didn't think she could write the

 2   book?

 3        A.    Well, no, I'm not saying that.  I thought

 4   you meant something wonderful that she did.

 5        Q.    Yeah.  But is there something that you

 6   didn't think she could do that she's done that

 7   surprised you?

 8        A.    Well, offhand I can't think of anything.

 9        Q.    Okay.  Did you ever talk to anybody at

10   the college about the syllabus for Visual BASIC

11   programming?

12        A.    No.

13        Q.    Okay.  They never told you that that

14   syllabus was the law, that it had to be followed

15   and they weren't going to make accommodations or

16   assist Maggie with that class?

17        A.    I never spoke to anybody in person.  If I

18   couldn't get them to speak to me on -- through the

19   letters, how are they going to -- they did not want

20   to communicate with me.

21        Q.    You never spoke to anybody in person?

22        A.    No.  Never.  Except one time, when they

23   offered me Quantitative Reasoning.  Dr. Brown and

24   Vice President Cedric Bradley was there when they

25   offered that course.

1      Q.   It's your testimony that that's the only

2   time you ever had a conversation with anyone at the

3   college?

4      A.   Yes.  Aimee and Dr. Brown.

5      Q.   And Dr. Bradley?

6      A.   Yes.  Well, he was there, but he didn't

7   say anything.

8      Q.   So that's the only conversation you ever

9   had?

10     A.   That I can recall, yes.

11     Q.   When they --

12     A.   Oh, wait, wait, wait.  Yes, we did have a

13   problem with a -- what is it called -- a proctor.

14   Maggie went to test, and she did not understand the

15   instructions.  And when she went up to talk to the

16   person, he was rude.  He said some things, made her

17   cry, and she went back down.  And I believe I

18   talked to Mr. Pugh.

19     Q.   You talked to Dr. Pugh --

20     A.   I did.  I reported it.

21     Q.   -- about a problem with a proctor?

22     A.   Yeah.

23     Q.   But other than that problem with a

24   proctor, it is your testimony today that you had

25   one conversation with Dr. Brown, Aimee, and

1   **Dr. Bradley about a substitute course.**

2       A.   No.  I talked to Aimee about trying to

3   find courses to substitute.

4       **Q.   You had one conversation with Dr. Brown?**

5       A.   No, I saw Dr. Brown several times, coming

6   in to check to see if you -- you know, they offered

7   anything else or -- that's it.

8       **Q.   You had many conversations with Dr.**

9   **Brown?**

10      A.   More than two or three, yes.  That's it.

11  And then I got a letter from MGC saying, you know,

12  yes, to, "Please see our attorney."  Well, I'm not

13  going to go see an attorney without an attorney.

14      **Q.   Did you ever have a conversation with**

15  **Dr. Pugh other than about the proctor?**

16      A.   No.

17      **Q.   Okay.  Did you ever have a conversation**

18  **with Dr. Bonfanti?**

19      A.   No.  I don't know him.  I mean -- yeah,

20  I'm sorry.  You're --

21      **Q.   Never had any conversations with him?**

22      A.   No.

23      **Q.   In 2015 did Maggie not report to a doctor**

24  **that she felt off the rails and dreamed of jumping**

25  **off the Popps Ferry Bridge?**

1      A.   Oh, yeah -- a doctor about jumping off

2   the bridge?  I don't know which doctor that is.

3      **Q.   Okay.  Dr. Matherne?**

4      A.   Okay.  Yeah, could be.  But that was many

5   years ago, and I don't recall.

6      **Q.   Okay.**

7      A.   I think that might have been when she had

8   the suicidal ideology, yeah.

9      **Q.   So this is not new?  She's had them**

10  **before?**

11     A.   Yes, in high school, College Algebra.

12  Yes.

13          MS. BROWN:  Anything else?

14          MR. HOLLEMAN:  No.

15          MS. BROWN:  That's all I have.

16          MR. ALTMAN:  I've got a couple of

17      questions.

18                        EXAMINATION

19                           - - -

20  BY MR. ALTMAN:

21     **Q.   Susan, did -- if there was a class in**

22  **performance band at the university, could Maggie go**

23  **in and play the oboe?**

24     A.   No, sir.

25     **Q.   How do you know?**

1      A.   Because of her occupational therapy with

2   her hands, and she can't read music, and she has

3   reading comprehension.

4      **Q.   So you mean you might need to know how to**

5   **read music to play in the band?**

6      A.   Yes.

7           MR. ALTMAN:  Nothing further.

8           MS. BROWN:  I have no additional

9      questions.

10       (Deposition concluded at 1:38 p.m.)

11                     - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF COURT REPORTER

 2         I, Kati Vogt, RPR, RMR, CRR, RDR, Court

 3    Reporter and Notary Public in and for the County of

 4    Harrison, State of Mississippi, hereby certify:

 5         That on the 29th day of March, 2023, there

 6    appeared before me SUSAN RUSSELL;

 7         That I placed the witness under oath to

 8    truthfully answer all questions in this matter

 9    under the authority vested in me by the State of

10    Mississippi;

11         That the foregoing 100 pages, and including

12    this page, contain a full, true, and correct

13    transcript of the testimony of said witness, as

14    reported by me using the stenotype reporting

15    method, to the best of my skill and ability.

16         I further certify that I am not in the employ

17    of, or related to, any counsel or party in this

18    matter, and have no interest, monetary or

19    otherwise, in the final outcome of the proceedings.

20         Witness my signature and seal, this the 20th

21    day of April, 2023.

22

23    _____

      Kati Vogt, RPR, RMR, CRR, RDR
24    My Commission Expires January 4, 2026

25
```

```
 1                    ERRATA SHEET

 2        I, SUSAN RUSSELL, do solemnly swear that I
      have read the foregoing transcript and that the
 3    same is a true and correct transcript of the
      testimony given by me on the 29th day of March,
 4    2023, at the time and place hereinbefore set forth,
      with the following corrections:

 5
      Page:     Line:    Correction:        Reason for
 6                                           Correction:

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16                       _____
                         SUSAN RUSSELL
17

18                    NOTARIZATION

19        Subscribed and sworn to before me, this _____

20    day of _____, 2023.

21
                         _____
22                       NOTARY PUBLIC

23    MY COMMISSION EXPIRES:

24    _____

25
```