**In the Matter of:**

MAGGIE RUSSELL

VS

MISS. GULF COAST COMMUNITY COLLEGE

*MCGEHEE, AIMEE*

*March 29, 2023*



844.533.DEPO



EXHIBIT
" 4 "

MAGGIE RUSSELL vs MISS. GULF COAST COMMUNITY COLLEGE
Aimee McGehee - 03/29/2023

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                      SOUTHERN DIVISION


 3


 4   MAGGIE RUSSELL                              PLAINTIFF


 5   VS.                         1:22-CV-00086-TBM-RPM


 6   MISSISSIPPI GULF COAST COMMUNITY
     COLLEGE through its Board of
 7   Trustees (in their official
     capacities) and DOES 1-20; inclusive    DEFENDANTS

 8


 9   _____


10            DEPOSITION OF AIMEE MCGEHEE
     _____

11


12   Taken at the offices of Boyce Holleman &
     Associates, 1720 23rd Avenue, Gulfport,
13   Mississippi, on Wednesday, March 29, 2023,
     beginning at 3:09 p.m.

14


15


16


17


18                   REPORTED BY:


19         Kati Vogt, RPR, RMR, RDR, CRR
             MS CSR #1557   NCRA #052536
20         eDeposition Reporting Services
                Post Office Box 14148
21         Jackson, Mississippi   39236
              kati.vogt@edeposition.com
22             Mobile: (228) 860-5111
                   844-533-3376
23
                  COAST ADDRESS:
24
                Post Office Box 1048
25            Biloxi, Mississippi   39533
```

```
 1                A P P E A R A N C E S

 2

 3    REPRESENTING THE PLAINTIFF:

 4         KEITH ALTMAN, ESQ.
           Law Office of Keith Altman
 5         33228 West 12 Mile Road
           Suite 375
 6         Farmington Hills, MI  48331
           keithaltman@kaltmanlaw.com
 7

 8    REPRESENTING THE DEFENDANT:

 9         KRISTI ROGERS BROWN, ESQ.
           C. HUNTER SALAMONE, ESQ.
10         Daniel Coker Horton & Bell, P.A.
           1712 15th Street, Suite 400
11         Post Office Box 416
           Gulfport, Mississippi  39502
12         kbrown@danielcoker.com
           hsalamone@danielcoker.com
13
           HOLLIS TAYLOR HOLLEMAN, ESQ.
14         Boyce Holleman & Associates, P.A.
           1720 23rd Avenue
15         Gulfport, Mississippi  39501
           hollis@boyceholleman.com
16

17
      ALSO PRESENT:
18
           Jason Pugh
19         Philip Bonfanti

20

21

22

23

24

25
```

MAGGIE RUSSELL vs MISS. GULF COAST COMMUNITY COLLEGE
Aimee McGehee - 03/29/2023                                                    Page 3

```
 1                    I N D E X

 2

 3   WITNESS:  AIMEE MCGEHEE                    PAGE:

 4
```

```
 5   Examination by Mr. Altman.................. 5

 6   Certificate of Court Reporter.............. 32

 7   Errata Sheet............................... 33
```

```
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              S T I P U L A T I O N

 2        It is hereby stipulated and agreed by and

 3   between the parties hereto, through their

 4   respective attorneys of record, that this

 5   deposition may be taken at the time and place

 6   hereinbefore set forth, by Kati Vogt, RPR, RMR,

 7   CRR, RDR, Court Reporter and Notary Public,

 8   pursuant to the Federal Rules of Civil Procedure,

 9   as amended;

10        That the formality of reading and signing is

11   specifically RESERVED;

12        That all objections, except as to the form of

13   the questions and the responsiveness of the

14   answers, are reserved until such time as this

15   deposition, or any part thereof, may be used or is

16   sought to be used in evidence.

17                       - - -

18

19

20

21

22

23

24

25
```

```
 1                      AIMEE MCGEHEE,

 2          having been first duly sworn, was

 3          examined and testified as follows:

 4                      EXAMINATION

 5                         - - -

 6   BY MR. ALTMAN:

 7          Q.   Hello, Ms. McGehee.  How are you?

 8          A.   I'm well.  How are you?

 9          Q.   All right.

10               Have you ever had your deposition taken

11   before?

12          A.   I have not.  This is a new experience.

13          Q.   Okay.  So let me go over a few things

14   before we start.

15          A.   Okay.

16          Q.   One of the things, that's going to take

17   some practice, is for you to wait for me to finish

18   asking my questions and for me to wait for you to

19   finish answering my questions so we get a nice

20   clean record and the court reporter doesn't get mad

21   at us.  Okay?

22          A.   Sounds good.

23          Q.   You have to use verbal responses.  Nods

24   of the head, shakes of the head don't work.  Gotta

25   say yes/no.  Okay?  Real words.  Okay?
```

     1          A.   Okay.

     2          Q.   If I ask you a question and you don't

     3   understand it, please let me know.  Okay?

     4          A.   Okay.

     5          Q.   And if you don't tell me that you don't

     6   understand the question, I'll assume that you did.

     7   Okay?

     8          A.   Okay.

     9          Q.   And the last thing is, is that this is

    10   not an endurance test.  Anytime you think you need

    11   a break, as long as there's no question pending, we

    12   can take a break to meet your needs or anybody's

    13   needs.  Okay?

    14          A.   Okay.

    15          Q.   All right.  What is your current title at

    16   the university -- the college?  I'm sorry.

    17          A.   I am the support services coordinator

    18   and -- for the Harrison County campus, and I'm also

    19   an enrollment specialist, and I am the C2C coach

    20   for the college, Harrison County.

    21          Q.   What's a C2C coach?

    22          A.   It is a grant program funded by the

    23   state, and it's for Complete 2 Compete.  It's just

    24   a program to help students who have been out of

    25   college for a while, for at least 24 months, come

 1   back to be able to get their degree; and they get a

 2   grant if they meet all the criteria.

 3        **Q.   Okay.  How long have you been with the**

 4   **college?**

 5        A.   Eight years.

 6        **Q.   Okay.  So during the relevant time period**

 7   **in 2015 to 2019, you were there when Maggie Russell**

 8   **was at the school, correct?**

 9        A.   Correct.

10        **Q.   Okay.  You worked directly with Maggie**

11   **Russell, correct?**

12        A.   Yes, I did.

13        **Q.   Now, approximately how many students do**

14   **you work with, you know, anything more than just a**

15   **passing moment?**

16        A.   Do you mean for accommodations or with

17   C2C or with enrollment specialist?

18        **Q.   For accommodations.**

19        A.    I generally each semester have anywhere

20   from 60 to a hundred students that ask for

21   accommodations per semester.

22        **Q.   Okay.**

23        A.    It varies per semester depending on our

24   enrollment.

25        **Q.   And --**

1      A.   And -- I'm sorry.  And also which

2   semester it is.  I obviously have less students I

3   deal with in summer semesters because we have less

4   enrollment, so...

5      **Q.   Now, with respect to Maggie Russell, did**

6   **you spend more time with her than average for you?**

7   **And I'm only talking about, you know,**

8   **accommodations.  More time with her than average,**

9   **or less?**

10     A.   Probably more than most students.

11     **Q.   Okay.  And why is that?**

12     A.   Because she used her accommodations and

13  asked me to help her with a private room for

14  testing and also to help read test questions to

15  her.

16     **Q.   Okay.  And in terms of reading test**

17  **questions, did you do that for her?**

18     A.   Yes, I did.

19     **Q.   Did anybody else do that for her, or did**

20  **you do it all the time?**

21     A.   If I was sick, there may have been

22  another person in my office that read them to her,

23  but I can't recall that that ever happened.  It has

24  happened with other students, but I can't recall if

25  it's happened to Maggie or not.

1      Q.   Okay.  How common is it for you to be

2  reading questions for a student?

3      A.   Very common.

4      Q.   Okay.  And what percentage of your time

5  do you spend doing that for students?

6      A.   Probably 5 percent.  It's not something

7  that most students request, but it's available to

8  them if they need it.

9      Q.   Okay.  So I'm a little bit confused.

10  When I asked -- and maybe I just got it wrong, and

11  it's been a long day.

12      A.   Okay.

13      Q.   When Maggie was one of the students you

14  were working with, how many students did you read

15  questions for during that time approximately?

16      A.   Probably two.

17      Q.   Okay.  So it's not that common that you

18  read questions for a student?

19      A.   It's common that it is something I do

20  every semester, but I only have a few students that

21  usually require it each semester.

22      Q.   Okay.  Gotcha.  Fair enough.  Now I

23  understand.  There was a little bit of a disconnect

24  that I didn't --

25      A.   Sure.

1          Q.    -- quite -- I didn't quite understand.

2                When did you first meet Maggie Russell?

3          A.    Her first semester, which I believe was

4    in 2015 in the fall.

5          Q.    Okay.

6          A.    Came in before classes started to talk

7    about accommodations and get that -- that process

8    started and set up.

9          Q.    And I should have done this:  What did

10   you do to prepare for today's deposition?  And one

11   of the things I just want to caution you on, I'm

12   sure sister and brothers counsel will stop you -- I

13   don't want to know what you talked about with your

14   counsel.  So I want you to be very careful about

15   that.

16               What did you do to prepare for today's

17   deposition?

18         A.    I went back to look over emails and

19   conversations that I had with Maggie.  I also went

20   back over any notes that I had put in our computer

21   system, reviewing meetings that I had with her and

22   her mother.  And then I reviewed our guidelines and

23   our policies and procedures.

24         Q.    Did you meet with anybody to prepare for

25   today's deposition?

```
 1        A.   Yes.  I met with counsel and some of the
 2   leaders of our college.
 3        Q.   Okay.  Who other than the people in this
 4   room did you meet with?
 5        A.   Dr. Bradley and Dr. Brown.
 6        Q.   And were they part of the same meeting
 7   where you met with the people in this room?
 8        A.   Yes.
 9        Q.   Did you have any meetings with anybody
10   else?
11        A.   No.
12        Q.   Okay.  When was the last time you spoke
13   to Maggie or Susan Russell?
14        A.   I believe the last conversation I had was
15   in 2019, and it was through email, and she was
16   telling me about a book that she was having
17   published, and she wanted me -- I'm sorry.  It
18   wasn't about a book.  It was about a contest she
19   was entering, and she wanted me to go and vote for
20   her.
21        Q.   When was the last time you had a
22   discussion with either one of them concerning
23   Maggie as a student?
24        A.   Probably 2018.  Probably 2018.
25        Q.   Was it before or after -- strike that.
```

1          You're aware that there was an OCR

2    complaint, correct?

3          A.   Yes, I was aware.

4          Q.   Okay.  Was it before or after the OCR

5    complaint?

6          A.   I spoke with them after that.

7          Q.   Did you talk with them after the

8    Resolution Agreement was submitted?

9          A.   Yes.

10         Q.   Okay.

11         A.   I believe Maggie had a class after that,

12   so I was helping her with her accommodations after

13   that OCR agreement was made.

14         Q.   Okay.  Now, when Maggie came in to --

15   strike that.

16              When you met Maggie for the first time

17   to talk about her accommodations, you were aware

18   that she had difficulties with math, correct?

19         A.   They discussed that in the first meeting,

20   and she also presented her IEP from high school.

21   So it had her -- it had some test results on there,

22   but it also had some information about her present

23   level of performance in high school.

24         Q.   And you were aware she had performed

25   pretty poorly on the ACTs, correct?

1      A.   I don't know that I knew specifics about

2   her ACT.  I did look at her grades, and I know that

3   she passed her high school classes in math, but she

4   struggled with the state test.  And she was afraid

5   she wasn't going to get to graduate because she

6   couldn't pass a state test; but then the state

7   changed the rules, so she was able to graduate with

8   her B in Algebra 2, I believe.

9      **Q.   Okay.  When did you become aware that**

10  **Maggie was having difficulty with College Algebra**

11  **at the -- at the school?**

12     A.   I believe it was when she was taking her

13  Intermediate Algebra class.  Which specific

14  semester that was, I don't recall.

15     **Q.   And she didn't pass that class,**

16  **Intermediate Algebra, correct?**

17     A.   She withdrew from it.

18     **Q.   The College Algebra or the Intermediate**

19  **Algebra?**

20     A.   Intermediate Algebra.

21     **Q.   Okay.  Now, subsequent to that, she also**

22  **took College Algebra, correct?**

23     A.   Yes.

24     **Q.   And she withdraw from that class,**

25  **correct?**

 1      A.   Yes.

 2      Q.   Now, did she take that class in the

 3  summertime?  Is that --

 4      A.   Yes.

 5      Q.   -- when she took that class?  Okay.

 6           And did you assist her with

 7  accommodations during that class?

 8      A.   Yes.

 9      Q.   And what was your impression of her

10  ability to be successful in that class?

11      A.   I don't know how she would be successful

12  in that -- I mean, I don't -- I guess I don't

13  understand your question.

14      Q.   Okay.  Whose -- do you know whose idea it

15  was for her to withdraw from that class?

16      A.   Hers.

17      Q.   Did you discuss it with her?

18      A.   Yes.

19      Q.   Did you agree that she should withdraw

20  from the class?

21      A.   I did not agree or disagree.  That's her

22  choice.

23      Q.   So you didn't provide any kind of

24  assistance, counseling assistance in that regard to

25  her?

1        A.   I don't recall my exact conversation; but

2   I always supported Maggie and told her that, you

3   know, we were there to assist her with whatever she

4   needed.  I did agree that having a summer class was

5   not the best option for her.  But that was the

6   class they wanted to take, so that was the class

7   that she registered for.

**8        Q.   When you say "they" wanted to take, who's**

**9   the "they"?**

10       A.   She and her mother.

**11       Q.   Okay.  If she had continued with the**

**12   class and finished it, do you think she would have**

**13   passed the class, based on your working with her?**

14            MS. BROWN:  Object to the form.

15       A.   I don't work with them specifically with

16   tutoring and helping with classwork.  I just help

17   with making sure accommodations are provided.  And

18   I believe if she had gotten -- gone to the learning

19   lab and she had gotten a tutor and assistance, I

20   believe Maggie could have passed that class.

21   BY MR. ALTMAN:

**22       Q.   There's a difference between that she**

**23   could have passed the class and would have passed**

**24   the class.**

25            MS. BROWN:  Object to the form.

 1   BY MR. ALTMAN:

 2       Q.   **"I believe that she could have" is just**

 3   **totally -- you know, it's totally indefinite.  So I**

 4   **just want to be very clear with what you're saying.**

 5            MS. BROWN:  Object to form.

 6       A.   I can't say that she would have passed it

 7   because I don't know what her -- how she would have

 8   worked and what kind of assistance she would have

 9   gotten outside of class as far as tutoring.

10   BY MR. ALTMAN:

11       Q.   **Was there any educational counselors**

12   **available to Maggie that could have discussed that**

13   **kind of an issue with her?**

14            MS. BROWN:  Object to the form.

15       A.   What kind of issue?

16   BY MR. ALTMAN:

17       Q.   **Like a guidance counselor, somebody that**

18   **she could discuss, you know, a little bit**

19   **bigger-picture stuff.  Or was that you?**

20       A.   I am a -- I'm not a counselor.  I'm an

21   enrollment specialist, and we help them choose

22   their classes based on sometimes test scores;

23   sometimes it's based on what classes they've

24   previously taken, what classes they need for their

25   program.  So I would be a person that could help

1   her with that.

2        Q.   And did she discuss those kinds of issues

3   with you or her mother?

4        A.   Her struggle with math?

5        Q.   Yes.

6        A.   Yes.

7        Q.   And if I understand right, you were not

8   involved in seeing that she get tutoring or any

9   kind of assistance along those lines?

10        A.   I can refer her to -- or advise her to go

11   down to the learning lab or Learning Resource

12   Center to get tutoring.

13        Q.   And did you do that with Maggie?

14        A.   Yes.

15        Q.   With the College Algebra class?

16        A.   Yes.  All of her classes, anything she --

17   any of her classes, she could have gotten

18   assistance with at the LRC.

19        Q.   I understand she could have gotten

20   assistance.  Did you specifically say to Maggie on

21   the College Algebra, "Maggie, you need to go to the

22   learning center to try to get additional

23   assistance"?

24        A.   Yes, I did advise her to do that.

25        Q.   And what was her response?

1          A.    I don't recall whether she went or did

2    not -- did or did not go.

3          Q.    I'm not asking whether she went or didn't

4    go.  I'm asking what her response was to you when

5    you suggested to her that she go to the learning

6    center.

7          A.    I don't recall what her response was.

8          Q.    Did you recommend that with respect to

9    the Intermediate Algebra?

10         A.    Yes.

11         Q.    And what was her response with respect to

12   Intermediate Algebra?

13         A.    I don't recall that either.

14         Q.    Okay.

15         A.    I know she was getting some assistance

16   from the instructor that was teaching the

17   Intermediate Algebra class at that time.  She was

18   meeting with him, and they were -- he was

19   re-going-over things that he taught with her.  Now,

20   I don't know if he was in the LRC at that time or

21   if that was just after class.

22         Q.    Do you know if Maggie ever used the

23   Learning Resource Center for anything?

24         A.    I don't know.

25         Q.    Based on your experience with Maggie, do

MAGGIE RUSSELL vs MISS. GULF COAST COMMUNITY COLLEGE
Aimee McGehee - 03/29/2023                                           Page 19

1    **you think she could have been successful in a**

2    **Visual BASIC programming class?**

3              MS. BROWN:  Object to the form.

4         A.   I don't think that I can fairly answer

5    that question because I truly don't know everything

6    that they teach in that class.  I don't know what

7    those class objectives are.

8    BY MR. ALTMAN:

9         **Q.   Maggie also had trouble with reading**

10   **comprehension, correct?**

11        A.   She never had any trouble in any of her

12   classes that required reading that I'm aware of.

13   She seemed to do well in them.  I believe her IEP

14   did say something about reading comprehension, but

15   it was never an issue in any of her classes.

16        **Q.   Then why did you need to read her**

17   **questions for exams?**

18        A.   It's -- basically it was part of her --

19   something for her comfort level because of her

20   anxieties on tests and her autism.

21        **Q.   Okay.  Were there other students that you**

22   **worked with who had comparable disabilities to**

23   **Maggie?**

24        A.   Yes.

25        **Q.   What accommodations have you seen being**

1   **provided to students with respect to the College**

2   **Algebra class?**

3        A.   Extended time on tests, private room for

4   testing, use of a calculator.  Those are three --

5   those are three that I see mostly.

6        **Q.   Any others that you can think of?**

7        A.   No.

8        **Q.   This was -- I mean, reading the questions**

9   **is obviously another one.**

10       A.   For math I didn't read a lot of questions

11  for Maggie.  It was mainly for her other classes

12  that I would read questions for her, ones that were

13  more -- involved more words and not numbers.

14       **Q.   And then she would sit and write the**

15  **answers to the questions based on your reading them**

16  **to her?**

17       A.   Correct.  Correct.

18       **Q.   She did have extra time for the math**

19  **classes?**

20       A.   Yes, she did.

21       **Q.   And she had distraction-free testing?**

22       A.   Yes, she did.

23       **Q.   And who would proctor those situations?**

24       A.   Either I would do it or it would be in

25  our assessment center in -- at our campus.

1        Q.   So in the assessment center, how did that

2    work?

3        A.   They make an appointment to have a

4    test -- to take a test, usually on a computer.

5    They show up at that time and they're checked in,

6    and they go in and take the test, logging into

7    their program, Canvas or -- yeah, I think it's our

8    Canvas program, and then they take their test.  And

9    they're proctored by the proctors that are in the

10   assessment center.

11       Q.   Okay.  And Maggie used the assessment

12   center sometimes?

13       A.   She did.

14       Q.   And she would take the -- her exams on a

15   computer?

16       A.   She did.

17       Q.   Okay.

18       A.   There were multiple formats.  She could

19   bubble in; she could circle; she could take it

20   on -- in the computer.  So depending on what class

21   and what the test required.

22       Q.   Okay.  Thank you.

23            Now, were you part -- you're aware that

24   the OCR and the school came up with a resolution

25   agreement, correct?

 1          A.    I am aware of that, yes.

 2          Q.    Okay.  Did you see that resolution

 3     agreement before it was signed by the parties?

 4          A.    No.

 5          Q.    Were you part of determining the

 6     potential classes that would be offered to Maggie

 7     as part of that agreement?

 8          A.    No.

 9          Q.    Do you think it would have been important

10     for Maggie to have been part of that process before

11     it was agreed to between the university and the OCR

12     -- the college and the OCR?

13               MS. BROWN:  Object to the form.

14          A.    I assumed Maggie was involved.

15     BY MR. ALTMAN:

16          Q.    Would it surprise you to find out that

17     Maggie and her mother testified that nobody from

18     the OCR spoke to them before that agreement was

19     signed?

20          A.    Yes.

21          Q.    Do you think it's appropriate that Maggie

22     was not part of that process to decide what would

23     be good alternatives?

24          A.    I think Maggie should have been involved

25     in that.  I'm surprised that -- I find it hard to

 1   believe she wasn't involved in that.
 2        **Q.   Well, the only testimony from her and her**
 3   **mother is that they had no involvement whatsoever.**
 4        A.   Okay.
 5        **Q.   Do you think that the solutions that were**
 6   **offered should have been solutions that Maggie**
 7   **could have been successful at?**
 8             MS. BROWN:  Object to the form.
 9             THE WITNESS:  Do I answer?
10             MS. BROWN:  Yeah.
11        A.   Yes -- ask that -- could you ask that
12   again?  I'm sorry.  Could you repeat it?
13             MR. ALTMAN:  Can you read that back?
14        Sorry.
15             COURT REPORTER:  "Do you think that the
16        solutions that were offered should have been
17        solutions that Maggie could have been
18        successful at?"
19        A.   Of course we'd want the solutions to be
20   something she could be successful at.  We want her
21   to earn her degree.
22   BY MR. ALTMAN:
23        **Q.   Were you aware that Maggie has been**
24   **diagnosed with dyscalculia?**
25        A.   Verbally I -- yes, they told me she was.

MAGGIE RUSSELL vs MISS. GULF COAST COMMUNITY COLLEGE
Aimee McGehee - 03/29/2023                                                    Page 24

1      Q.   Do you know what that is?

2      A.   Yes.

3      Q.   What is it, as far as you understand?

4      A.   It's a processing disorder dealing with

5   numbers and math calculations.

6      Q.   Makes it very difficult to do math,

7   correct?

8      A.   It does make it harder, yes.

9      Q.   And so you would agree that given that

10   diagnosis, that Maggie may not ever be able to

11   complete a class that involves significant

12   mathematics, correct?

13           MS. BROWN:  Object to the form.

14      A.   No, I don't agree with that.  I -- people

15   can pass math classes with disabilities just like

16   dyscalculia.

17   BY MR. ALTMAN:

18      Q.   Have you ever dealt with another student

19   with dyscalculia?

20      A.   Yes.

21      Q.   And were they diagnosed with dyscalculia

22   before they had come to you?

23      A.   Yes.

24      Q.   Did you ever deal with a student who was

25   diagnosed with dyscalculia after they came to you?

```
 1                MS. BROWN:  Object to the form.

 2        A.   No.

 3   BY MR. ALTMAN:

 4        Q.   And you would agree those who were

 5   diagnosed with dyscalculia at an earlier age would

 6   have been learning coping skills, correct?

 7                MS. BROWN:  Object to the form.

 8        A.   Yes, they would have learned skills.

 9   BY MR. ALTMAN:

10        Q.   And you would agree that somebody that is

11   diagnosed later in life is going to have a much

12   harder time overcoming that deficit, correct?

13                MS. BROWN:  Object to the form.

14        A.   That's so subjective to each person.  I

15   don't know how to answer that question.

16   BY MR. ALTMAN:

17        Q.   Well, if they don't have the coping

18   skills --

19        A.   But they can develop them.

20        Q.   But it's harder as you get later in life

21   to develop those kind of skills, right?

22                MS. BROWN:  Object to form.

23        A.   I don't -- I don't know how to answer

24   that question because I think every person is

25   different, and so some people learn those skills
```

1    faster than others.  So I can't say that one person

2    is going to learn it faster or slower.

3    BY MR. ALTMAN:

4         **Q.   Now, what resources does the school**

5    **provide to a student with dyscalculia?**

6         A.   Accommodations.

7         **Q.   What kind of accommodations go to that**

8    **kind of a student?**

9         A.   The same accommodations that we discussed

10   earlier.  They can have extended time, a quiet room

11   to test.  They can use a calculator.  They can --

12        **Q.   How -- sorry.**

13        A.   -- use the LRC to get tutoring.

14        **Q.   How does any of that give them coping**

15   **skills to deal with dyscalculia?**

16             MS. BROWN:  Object to form.

17        A.   Coping skills?

18   BY MR. ALTMAN:

19        **Q.   Well, where does -- I mean, being given**

20   **more time and a distraction-free testing is not**

21   **going to give somebody tools to deal with a**

22   **disability like dyscalculia, right?**

23             MS. BROWN:  Object to the form.

24        A.   We offer -- we have a licensed

25   professional counselor, LPC, and they can use that

1   resource as well if they need to develop some --

2   some skills for anxiety about testing, anything

3   that could help them.  And also going to the

4   learning lab, they can teach them skills to cope

5   with what's causing them issues with not being able

6   to pass those topics or objectives.

7   BY MR. ALTMAN:

8       **Q.   Is there anybody in the learning center**

9   **that's got skills in helping students cope with**

10  **dyscalculia?**

11      A.   Not that I'm aware of.

12      **Q.   So how would going to the learning center**

13  **help her learn coping skills to deal with**

14  **dyscalculia?**

15          MS. BROWN:  Object to the form.

16      A.   They could teach her skills on how to

17  learn in different ways, different methods of doing

18  the same -- of achieving the same objective; but as

19  far as coping skills, I don't know how that would

20  happen.

21  BY MR. ALTMAN:

22      **Q.   Did Maggie or Susan talk to you about the**

23  **fact they were trying to talk with Dr. Brown and**

24  **not receiving responses from Dr. Brown?**

25      A.   No.

```
 1        Q.   Is that the first -- is this the first
 2   time you're hearing that?
 3        A.   That Dr. Brown did not respond to them?
 4        Q.   Yes.
 5        A.   Yes, that's the first I've heard of that.
 6        Q.   Did you hear that -- have you heard
 7   anything inconsistent with that?
 8             MS. BROWN:  Object to the form.
 9        A.   Can you repeat that?
10   BY MR. ALTMAN:
11        Q.   Have you heard anything inconsistent
12   with -- that's a really bad question.
13             Before today was it your understanding
14   that Dr. Brown responded to at least one of Susan
15   Russell's nine letters to her --
16        A.   Yes.
17        Q.   -- concerning the College Algebra?
18        A.   Yes.
19        Q.   Were those responses in writing?
20        A.   I assume they were.  I wasn't privy to
21   that.
22        Q.   So you don't know as you sit here right
23   now?
24        A.   I do not know.
25        Q.   Okay.  Now, how is it that you know that
```

1    Dr. Brown responded to them?

2         A.   Just conversations.

3         Q.   With Dr. Brown?

4         A.   Yes.

5         Q.   Now, those conversations, did they take

6    place contemporaneously while these issues were

7    going on, or is that just in preparation -- you

8    know, once the lawsuit's been filed?

9         A.   We spoke before, as it was going on, you

10   know, just to get guidance as to what my -- what my

11   role was in it after she went further with the OCR.

12        Q.   Did you learn about the OCR complaint

13   contemporaneously?

14        A.   Yes.

15        Q.   Were you surprised by it?

16        A.   No.  Her mother had threatened that in my

17   office before she even started it, so it wasn't a

18   surprise that she took it to that level.

19        Q.   Now, had the school offered her any kind

20   of course substitution before she went to the OCR?

21        A.   Not that I'm aware of.  I know they've

22   offered other substitutions since then, but I'm not

23   sure about what timeline those happened.

24        Q.   And as a result of the school's agreement

25   with the -- strike that.

1              Have you ever seen the resolution

2    agreement with the OCR?

3        A.    No.

4        Q.    Did you become aware of the general terms

5    of the resolution agreement with the OCR?

6        A.    Yes.

7        Q.    Was that contemporaneously when it came

8    down?

9        A.    Yes.  I think Maggie's mother actually

10   shared what three classes she would need to take.

11       Q.    You would agree that having to do three

12   classes instead of one is a lot more work, right?

13             MS. BROWN:  Object to the form.

14       A.    It would be more work, yes.  However, she

15   had already completed one of those three prior to

16   that OCR agreement.

17   BY MR. ALTMAN:

18       Q.    You'll have to forgive me.  I'm kind of

19   blind here.

20             Was there ever any question in your

21   mind, based on your working with Maggie, that she

22   has significant deficits with respect to

23   mathematics?

24       A.    I always knew math was a struggle for --

25   was going to be a struggle for Maggie.

```
 1              MR. ALTMAN:  Why don't we take just,
 2         like, five minutes.  I don't need to keep
 3         everybody sitting around.
 4         (Off the record.)
 5    BY MR. ALTMAN:
 6         Q.   Ms. McGehee, thank you for your time.
 7         A.   Thank you.
 8            (Deposition concluded at 3:47 p.m.)
 9                      - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              CERTIFICATE OF COURT REPORTER

 2         I, Kati Vogt, RPR, RMR, CRR, RDR, Court

 3    Reporter and Notary Public in and for the County of

 4    Harrison, State of Mississippi, hereby certify:

 5         That on the 29th day of March, 2023, there

 6    appeared before me AIMEE MCGEHEE;

 7         That I placed the witness under oath to

 8    truthfully answer all questions in this matter

 9    under the authority vested in me by the State of

10    Mississippi;

11         That the foregoing 31 pages, and including

12    this page, contain a full, true, and correct

13    transcript of the testimony of said witness, as

14    reported by me using the stenotype reporting

15    method, to the best of my skill and ability.

16         I further certify that I am not in the employ

17    of, or related to, any counsel or party in this

18    matter, and have no interest, monetary or

19    otherwise, in the final outcome of the proceedings.

20         Witness my signature and seal, this the 20th

21    day of April, 2023.

22

23    _____

24    Kati Vogt, RPR, RMR, CRR, RDR
      My Commission Expires January 4, 2026

25
```

1                          ERRATA SHEET

2          I, AIMEE MCGEHEE, do solemnly swear that I
    have read the foregoing transcript and that the
3   same is a true and correct transcript of the
    testimony given by me on the 29th day of March,
4   2023, at the time and place hereinbefore set forth,
    with the following corrections:

5
    Page:     Line:     Correction:          Reason for
6                                            Correction:

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16                      _____
                        AIMEE MCGEHEE
17

18                      NOTARIZATION

19       Subscribed and sworn to before me, this _____

20  day of _____, 2023.

21

22                      _____
                        NOTARY PUBLIC

23  MY COMMISSION EXPIRES:

24  _____

25