**In the Matter of:**

## MAGGIE RUSSELL

### vs

## MISS. GULF COAST COMMUNITY COLLEGE

*PUGH, DR. JASON*

*March 29, 2023*





EXHIBIT

"9"

844.533.DEPO

MAGGIE RUSSELL vs MISS. GULF COAST COMMUNITY COLLEGE
Dr. Jason Pugh - 03/29/2023

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                      SOUTHERN DIVISION


 3


 4   MAGGIE RUSSELL                           PLAINTIFF


 5   VS.                         1:22-CV-00086-TBM-RPM


 6   MISSISSIPPI GULF COAST COMMUNITY
     COLLEGE through its Board of
 7   Trustees (in their official
     capacities) and DOES 1-20; inclusive    DEFENDANTS

 8


 9   _____


10              DEPOSITION OF DR. JASON PUGH
     _____

11


12   Taken at the offices of Boyce Holleman &
     Associates, 1720 23rd Avenue/Boyce Holleman
13   Boulevard, Gulfport, Mississippi, on Wednesday,
     March 29, 2023, beginning at 3:49 p.m.

14


15


16


17


18                    REPORTED BY:


19           Kati Vogt, RPR, RMR, RDR, CRR
               MS CSR #1557  NCRA #052536
20           eDeposition Reporting Services
               Post Office Box 14148
21            Jackson, Mississippi  39236
              kati.vogt@edeposition.com
22             Mobile: (228) 860-5111
                    844-533-3376
23
                    COAST ADDRESS:
24
                  Post Office Box 1048
25             Biloxi, Mississippi  39533
```

```
 1                    A P P E A R A N C E S

 2

 3      REPRESENTING THE PLAINTIFF:

 4            KEITH ALTMAN, ESQ.
              Law Office of Keith Altman
 5            33228 West 12 Mile Road
              Suite 375
 6            Farmington Hills, MI  48331
              keithaltman@kaltmanlaw.com
 7

 8      REPRESENTING THE DEFENDANT:

 9            C. HUNTER SALAMONE, ESQ.
              Daniel Coker Horton & Bell, P.A.
10            1712 15th Street, Suite 400
              Post Office Box 416
11            Gulfport, Mississippi  39502
              kbrown@danielcoker.com
12            hsalamone@danielcoker.com

13            HOLLIS TAYLOR HOLLEMAN, ESQ.
              Boyce Holleman & Associates, P.A.
14            1720 23rd Avenue
              Gulfport, Mississippi  39501
15            hollis@boyceholleman.com

16

17
        ALSO PRESENT:
18
              Philip Bonfanti
19

20

21

22

23

24

25
```

MAGGIE RUSSELL vs MISS. GULF COAST COMMUNITY COLLEGE
Dr. Jason Pugh - 03/29/2023                                           Page 3

```
 1                    I N D E X

 2

 3   WITNESS:  DR. JASON PUGH                      PAGE:

 4

 5   Examination by Mr. Altman.................. 5

 6   Certificate of Court Reporter.............. 22

 7   Errata Sheet............................... 23

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              S T I P U L A T I O N

 2        It is hereby stipulated and agreed by and

 3   between the parties hereto, through their

 4   respective attorneys of record, that this

 5   deposition may be taken at the time and place

 6   hereinbefore set forth, by Kati Vogt, RPR, RMR,

 7   CRR, RDR, Court Reporter and Notary Public,

 8   pursuant to the Federal Rules of Civil Procedure,

 9   as amended;

10        That the formality of reading and signing is

11   specifically RESERVED;

12        That all objections, except as to the form of

13   the questions and the responsiveness of the

14   answers, are reserved until such time as this

15   deposition, or any part thereof, may be used or is

16   sought to be used in evidence.

17                        - - -

18

19

20

21

22

23

24

25
```

```
 1                       JASON PUGH,

 2         having been first duly sworn, was

 3         examined and testified as follows:

 4                       EXAMINATION

 5                        - - -

 6    BY MR. ALTMAN:

 7         Q.    How are you, Dr. Pugh?

 8         A.    I am well.  Thank you.

 9         Q.    Do I need to go over the rules with you,

10    or have you heard them twice already?

11         A.    I think I'm okay with the rules.

12         Q.    All right.  We'll let you slide on that

13    one.

14               All right.  What is your current title

15    at the college?

16         A.    I am currently the executive vice

17    president of administration and finance.

18         Q.    Okay.  During the 2015 to 2018 or so time

19    frame what was your title at the university?

20         A.    I took the position I have now in the

21    summer of 2018.  And prior to that, in the

22    2015-and-forward timeline, I was the college's

23    chief academic officer.  My title at the time was

24    vice president of teaching and learning and

25    community campus.
```

1      **Q.   All right.  What is your -- what was your**
2  **direct personal involvement with Maggie and Susan**
3  **Russell during the 2015 to 2019 time frame?**
4      A.   I had no involvement with them during
5  that time frame.
6      **Q.   When was the first time you heard of**
7  **Susan and Maggie Russell?**
8      A.   The first time I would have heard of
9  Susan and Maggie Russell would have been in 2018
10  when one of the letters that Ms. Russell sent
11  forward was brought to my attention --
12      **Q.   Okay.  Was that a letter that she sent to**
13  **Dr. Brown?**
14      A.   I think it would have been one of the
15  letters that was sent to Dr. Graham.
16  Typically when --
17      **Q.   Dr. Graham?**
18      A.   President Graham.
19      **Q.   Oh, okay.**
20      A.   The president of the college.  Typically
21  when anything that looks to be a legal matter,
22  something like that, the president's office will
23  forward it to my attention.
24      **Q.   Okay.  Are you an attorney?**
25      A.   I am not.

1      Q.   Okay.  Were you aware of the OCR letter

2   contemporaneously?  I'm sorry.  Strike that.

3            Were you aware of the OCR complaint

4   contemporaneously?

5      A.   I was not aware of the OCR complaint

6   until the college received it in September of 2018.

7      Q.   Did you have any involvement in

8   developing a response to the OCR?

9      A.   I did.  I was the college's liaison

10  between everybody involved at the college and the

11  OCR, working with Mr. Nydick.

12     Q.   Okay.  Who was it that came up with the

13  proposed four options for resolution?

14     A.   That would have been a group of faculty

15  members and our campus administration on the

16  Harrison County campus led by Dr. Bradley.

17     Q.   Okay.  Who were the faculty members who

18  were involved?

19     A.   I do not know the specific names.  I know

20  that Dr. Joan Haynes was involved.  She was the

21  Economics teacher and so forth at the time.  I

22  assume Dr. Emma Miller, who is the dean there now

23  and is a professor of mathematics, was involved at

24  the time.  And I do recall some other names that

25  they brought in, but I can't call them off the top

1  much my head.  But there was a group of faculty.

2      **Q.   Was there any question that Maggie**

3  **Russell had significant difficulties with**

4  **mathematics at that time?**

5      A.   I don't recall there being any question,

6  no.

7      **Q.   Nobody thought she was faking it, right?**

8      A.   Not to my knowledge, no, sir.

9      **Q.   Okay.  And the school didn't know about**

10  **the dyscalculia diagnosis because that happened**

11  **after that point in time, right?**

12      A.   I'm not sure when the college became

13  aware of that diagnosis.

14      **Q.   Now, the -- how was Maggie's disabilities**

15  **considered when coming up with those four proposed**

16  **solutions?**

17      A.   I'm not aware of how specifically the

18  faculty considered her disabilities specifically.

19  It's my understanding that what took place was they

20  were asked to review the competencies in the

21  College Algebra course and find other methods

22  within the college by which a student could

23  potentially achieve those competencies; and these

24  were the set of courses or options and sequences

25  that they came up with that would meet those

1    competencies.

2         Q.   **Was there anything in the school**
3    **curriculum that made provisions for coming up with**
4    **an alternate to College Algebra?**

5         A.   In the school curriculum itself?

6         Q.   **Yes.**

7         A.   Not to my knowledge, no.

8         Q.   **Who decided that the school, then, could**
9    **offer something besides College Algebra in place of**
10   **College Algebra?**

11        A.   The faculty members, which the curriculum
12   is controlled by the faculty members.

13        Q.   **So there's no state law that says you**
14   **must have certain things in the curriculum?**

15        A.   I'm not aware of a state law of that.
16   Our accrediting body is essentially the body that
17   oversees the curricular components of this, and our
18   faculty have to drive that per our accreditation
19   standards.  College Algebra being part of the core
20   curriculum, that's decided by our general education
21   committee at the college, which is a group of
22   faculty members, and they put that forth as the
23   core curriculum.  It has to be approved by the
24   accrediting body -- or it is approved by the
25   accrediting body during our review process.

1        Q.    How often does that review take place?

2        A.    We have an intermittent review.  It's a

3    ten-year review, and we have intermittent reviews

4    on a five-year basis.  Our accreditation review.

5    The General Ed committee meets annually on a

6    regular basis, and there's a lot of review of the

7    curriculum.

8        Q.    Do they ever change the curriculum, the

9    core curriculum?

10       A.    They do change the core curriculum.  I

11   can't remember the exact dates of the last time

12   that a core curriculum was changed, but I can

13   safely say that it was within the last ten years

14   that there were some tweaks made to the core

15   curriculum.  I cannot remember specifically what

16   those were at the time.

17       Q.    Did those changes have to be run by the

18   accreditation body when they were made, or only

19   when there was a review?

20       A.    Only when there's a review, I think.  I

21   think it's done only during the review process.

22       Q.    So the university does have the ability

23   on its own to change the core curriculum if it

24   chooses to, correct?

25       A.    The faculty members do -- does review and

1  periodically change the core curriculum, yes; but

2  it's not often, and there's typically some

3  mitigating factors associated with it.  I can only

4  remember it being modified that one time slightly

5  in many years.  I've been associated with the

6  college for over 20 years now.

7      **Q.   So nothing stopped the university if it**

8  **wanted to from granting an exception with respect**

9  **to Maggie Russell, correct?**

10     A.   I would have to think through that

11  question to properly answer it.

12     **Q.   Please do.  Take whatever time you need.**

13     A.   The institution would have a very

14  difficult time with its accrediting body if it made

15  a waiver to its core curriculum for any purpose,

16  because it's just not something that's -- that's on

17  the table to be done.  It's also not a good

18  practice for transferability, because quite often,

19  it kills that process.  So -- so no, I don't -- I

20  would say that our biggest challenge would be with

21  the accrediting body.

22     **Q.   But you're hypothesizing that, correct?**

23     A.   Well --

24          MR. HOLLEMAN:  Object to form.

25     A.   Well, hypothesis based on experience with

1   accrediting bodies that those kind of changes are

2   not -- never found to be favorable.  I have some

3   experience with accrediting bodies just from time

4   in the system.

5        Q.   Did you ever request a -- did you ever

6   discuss a waiver with an accrediting body?

7        A.   Not to my knowledge, no.

8        Q.   Did you ever see a waiver for a specific

9   student for a specific reason lead to difficulties

10   with an accrediting body?

11        A.   Not in my tenure, no.

12        Q.   So as you sit here --

13        A.   I don't -- but we've never done one; so I

14   wouldn't have had the opportunity to see that.

15        Q.   So as you sit here right now saying it

16   would have caused difficulty with the accrediting

17   body, that's speculation, correct?

18        A.   That was --

19             MR. HOLLEMAN:  Objection to form.

20        A.   That -- I mean, call it speculation if

21   you like, but I would call it experience, based on

22   having been through substantive changes reviews and

23   many accreditation reviews and so forth, and being

24   knowledgeable of the rules.

25        Q.   But to be clear, you've never dealt with

1    a situation seeking a specific waiver for one

2    specific student for one particular reason,

3    correct?

4         A.   Not to my knowledge, no.

5         Q.   Okay.  I mean, that's not something the

6    school deals with every day, correct?

7         A.   No, we do not.

8         Q.   You would agree that -- I'm going to use

9    the phrase "Maggie," but "Maggie" always means

10   Maggie and Susan because --

11        A.   Okay.

12        Q.   -- it appears that they're inseparable.

13   Is that fair enough?

14        A.   Okay.  Sure.

15        Q.   I don't think Maggie ever does anything

16   on -- specifically on her own.

17             You would agree that Maggie should have

18   been part of that process of resolving the OCR

19   complaint, correct?

20             MR. HOLLEMAN:  Objection to form.

21             MR. SALAMONE:  Object to form.

22        A.   The college would agree that anytime

23   there's an issue, that all parties involved should

24   be a part of the conversation and resolution, and

25   that all parties should work to find what's in the

1  best interests of all those parties.  And as we

2  went through the resolution process with OCR, we

3  were guided by OCR and, for lack of a better way to

4  describe it, it would -- our assumption all along

5  that the communication with the Russells on this

6  matter was via OCR and was not -- not with us.

7      **Q.   Did you ever ask the OCR whether they**

8  **were --**

9      A.   Did I specifically ask --

10     **Q.   Hold on.  You've got to let me finish.**

11     A.   Sorry.

12     **Q.   That's okay.  It takes practice.  But you**

13  **guys have been doing a great job today.**

14          **Did you ever specifically ask the OCR**

15  **whether the Russells were involved in discussing**

16  **the proposed alternatives?**

17     A.   I did not specifically ask that question,

18  no.

19     **Q.   Okay.  So is it fair to say that nobody**

20  **at the university knew whether the Russells had**

21  **been involved or not; you just assumed they were?**

22          MR. SALAMONE:  Object to the form.

23     A.   It is fair to say that nobody at the

24  university specifically asked OCR if they were

25  being involved, and that we assumed that they were

1    being involved through OCR, that's correct.

2         Q.    Okay.  Fair enough.

3               So who at the OCR did you deal with?

4         A.    Craig Nydick.

5         Q.    Had you dealt with him before?

6         A.    No.

7         Q.    Do you know if the university had

8    received other OCR complaints before?

9         A.    To my knowledge, we had not seen any --

10   received any OCR complaints.  Prior to this, the

11   only OCR-related knowledge that I had was that

12   there was a time period in the last few years where

13   apparently the OCR contracted with some individuals

14   to review websites of colleges and universities all

15   over the United States and require or suggest

16   improvements; and we did get a letter from OCR at

17   that point in time, and we had some conversations

18   with their contractors to make our website better

19   for that, and so we were able to accomplish all

20   those goals.  That's the only OCR interactions

21   we've had in my tenure that I can recall.

22        Q.    Were there any specific policies and

23   procedures for dealing with an OCR complaint?

24        A.    Any particular policies and procedures

25   for dealing with an OCR-specific complaint --

1      Q.   Yes.

2      A.   -- at the college?  No, not that I'm

3  aware of.

4      Q.   Who first became aware of the OCR

5  complaint?

6      A.   That would have been the office of the

7  president.  There was a letter received.  I think

8  the date on the letter was September 24th or

9  something like that, and so it came to the

10  president's office a few days after that.

11      Q.   Okay.  And then it -- as you described,

12  it came to you because it appeared to be legal in

13  nature?

14      A.   That's correct.  And at that point, we

15  share it with counsel.

16      Q.   Who convened the panel of people at the

17  university to deal with the complaint?

18      A.   That would be me, if this is what you're

19  referring to.  We -- the initial starting point was

20  a phone call conversation to Mr. Nydick, whose name

21  was on the complaint form.  The individuals on that

22  particular call was myself, our counsel, Dr. Cedric

23  Bradley, I believe, was on the call, and Dr. Suzi

24  Brown, I think, was on the call, and maybe

25  Dr. Jonathan Woodward was on the call that day.

1    And so that's where we began the conversation with

2    Mr. Nydick.

3         **Q.   And what was -- what did the school first**

4    **tell Mr. Nydick that day?**

5         A.   We didn't necessarily tell him anything.

6    We asked him to explain to us -- this was new to

7    us, so we asked him to explain to us, you know,

8    what this was, what our responsibilities were, what

9    the next steps in the process were.

10        **Q.   And he did all of that?**

11        A.   He did.  He gave us some guidance on what

12   we -- you know, what to do next and what the

13   process looked like and that sort of thing.

14        **Q.   How long did it take to propose a**

15   **solution to the OCR?**

16        A.   Not long.  If I remember correctly, our

17   phone call with the OCR was somewhere around

18   October 1st, and he talked us through doing a --

19   there was a number for it, and I can't -- it's a

20   302-something number, they call it -- a resolution

21   agreement with OCR and how to do that.  And so we

22   immediately went back and went to work on it, and I

23   would say that within ten days or so, we probably

24   had a response back to him.

25             And basically what we had to do to

 1    respond back to him was we had to -- he asked us

 2    to do -- for the resolution agreement to have two

 3    components to it.  Component Number 1 being trying

 4    to find one or more -- I don't remember if he gave

 5    us a number -- he just said trying to see if there

 6    were any other options that we could offer the

 7    Russells at this point in time, which is -- the

 8    end result being the four options, that you're

 9    very aware of.

10            And then the second piece of the

11    agreement was they asked that we conduct some

12    training amongst our employees regarding students

13    with disabilities and things of that nature.  And

14    so we had to prepare a curriculum for that and

15    that be part of the process.

16            So I don't remember the date that the

17    final agreement got signed on, but it was all done

18    within a very few days after October 1st.  So

19    there was not a long period of time.

20        **Q.   Were you part of the deliberations that**

21    **the faculty had over coming up with solutions?**

22        A.   I was not.

23        **Q.   But I think you said you're the ones who**

24    **picked the faculty to come up with those**

25    **alternatives?**

MAGGIE RUSSELL vs MISS. GULF COAST COMMUNITY COLLEGE
Dr. Jason Pugh - 03/29/2023                                          Page 19

1         A.    I personally did not pick them.

2    Dr. Cedric Bradley, the campus vice president in

3    Harrison County, the dean, Dr. Emma Miller, who I

4    think was dean at that time, and then I suspect

5    Dr. Brown had a role in also deciding, you know,

6    which faculty had the most expertise in the matter.

7         **Q.    How was Maggie's disabilities considered**

8    **during that process?**

9         A.    I do not know.

10        **Q.    Do you know if they were considered at**

11   **all?**

12        A.    I do not know if there was any discussion

13   about her specific disabilities.

14        **Q.    The college would agree it certainly**

15   **should have made sense to consider Maggie's**

16   **disabilities as part of that process, right?**

17        A.    I agree it should -- and I assume that

18   all the faculty members were aware since the dean

19   was aware and Dr. Brown was aware, but I was not

20   physically present at the conversations.

21             MR. ALTMAN:  Just give me a couple

22        minutes, please.  Let's go off the record for

23        five minutes.

24        (Off the record.)

25   BY MR. ALTMAN:

MAGGIE RUSSELL vs MISS. GULF COAST COMMUNITY COLLEGE
Dr. Jason Pugh - 03/29/2023                                                      Page 20

1          Q.   Dr. Pugh, did Mr. Nydick, did he just
2    simply accept the proposal from the university as a
3    resolution?
4          A.   To the best of my recollection, yes.  The
5    only thing we had to do didn't pertain to the
6    options for the Russells.  We had to go -- we had
7    to -- we had follow-up items we had to do
8    throughout the next few months.  We had to document
9    that we had communicated those options to Maggie in
10   the letter, after the acceptance.  And then
11   anything -- anytime she did something, we had to
12   report that to him.
13              On Part B, we had to provide him with
14   the curriculum we used for the training.  We had
15   to do the training within the specific time frame.
16   We had to send him rosters of who we trained.  But
17   all that was after the signature on the front end.
18   I don't remember us making multiple submissions,
19   no.
20         Q.   So there was no negotiation with the OCR.
21   They just simply accepted your proposal?
22         A.   To the best of my knowledge, yes.  We
23   didn't enter into any kind of communication --
24   negotiation with them.
25         Q.   I don't have anything else.  Thank you,

```
 1    Dr. Pugh.

 2         A.    Thank you.

 3              (Deposition concluded at 4:13 p.m.)

 4                          - - -

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                CERTIFICATE OF COURT REPORTER

 2        I, Kati Vogt, RPR, RMR, CRR, RDR, Court

 3   Reporter and Notary Public in and for the County of

 4   Harrison, State of Mississippi, hereby certify:

 5        That on the 29th day of March, 2023, there

 6   appeared before me DR. JASON PUGH;

 7        That I placed the witness under oath to

 8   truthfully answer all questions in this matter

 9   under the authority vested in me by the State of

10   Mississippi;

11        That the foregoing 21 pages, and including

12   this page, contain a full, true, and correct

13   transcript of the testimony of said witness, as

14   reported by me using the stenotype reporting

15   method, to the best of my skill and ability.

16        I further certify that I am not in the employ

17   of, or related to, any counsel or party in this

18   matter, and have no interest, monetary or

19   otherwise, in the final outcome of the proceedings.

20        Witness my signature and seal, this the 20th

21   day of April, 2023.

22

23   _____
     Kati Vogt, RPR, RMR, CRR, RDR
24   My Commission Expires January 4, 2026

25
```

```
 1                      ERRATA SHEET

 2        I, DR. JASON PUGH, do solemnly swear that I
      have read the foregoing transcript and that the
 3    same is a true and correct transcript of the
      testimony given by me on the 29th day of March,
 4    2023, at the time and place hereinbefore set forth,
      with the following corrections:

 5
      Page:    Line:    Correction:          Reason for
 6                                           Correction:

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16                      _____
                        DR. JASON PUGH
17

18                      NOTARIZATION

19        Subscribed and sworn to before me, this _____

20    day of _____, 2023.

21
                        _____
22                      NOTARY PUBLIC

23    MY COMMISSION EXPIRES:

24    _____

25
```