**In the Matter of:**

## MAGGIE RUSSELL

### VS

## MISS. GULF COAST COMMUNITY COLLEGE

*BONFANTI, PHILIP*

*March 29, 2023*



.COM

844.533.DEPO



EXHIBIT

"22"

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                     SOUTHERN DIVISION

 3

 4   MAGGIE RUSSELL                              PLAINTIFF

 5   VS.                          1:22-CV-00086-TBM-RPM

 6   MISSISSIPPI GULF COAST COMMUNITY
     COLLEGE through its Board of
 7   Trustees (in their official
     capacities) and DOES 1-20; inclusive     DEFENDANTS
 8

 9   _____

10      30(B)(6) DEPOSITION OF MISSISSIPPI GULF COAST
                     COMMUNITY COLLEGE
11
             30(B)(6) DESIGNEE:  PHILIP BONFANTI
12   _____

13
     Taken at the offices of Boyce Holleman &
14   Associates, 1720 23rd Avenue, Gulfport,
     Mississippi, on Wednesday, March 29, 2023,
15   beginning at 1:49 p.m.

16

17

18                    REPORTED BY:

19          Kati Vogt, RPR, RMR, RDR, CRR
              MS CSR #1557  NCRA #052536
20          eDeposition Reporting Services
                Post Office Box 14148
21           Jackson, Mississippi  39236
              kati.vogt@edeposition.com
22            Mobile: (228) 860-5111
                   844-533-3376
23
                  COAST ADDRESS:
24
                Post Office Box 1048
25            Biloxi, Mississippi  39533
```

```
 1                    A P P E A R A N C E S

 2

 3     REPRESENTING THE PLAINTIFF:

 4          KEITH ALTMAN, ESQ.
            Law Office of Keith Altman
 5          33228 West 12 Mile Road
            Suite 375
 6          Farmington Hills, MI  48331
            keithaltman@kaltmanlaw.com
 7

 8     REPRESENTING THE DEFENDANT:

 9          KRISTI ROGERS BROWN, ESQ.
            C. HUNTER SALAMONE, ESQ.
10          Daniel Coker Horton & Bell, P.A.
            1712 15th Street, Suite 400
11          Post Office Box 416
            Gulfport, Mississippi  39502
12          kbrown@danielcoker.com
            hsalamone@danielcoker.com
13
            HOLLIS TAYLOR HOLLEMAN, ESQ.
14          Boyce Holleman & Associates, P.A.
            1720 23rd Avenue
15          Gulfport, Mississippi  39501
            hollis@boyceholleman.com
16

17
       ALSO PRESENT:
18
            Jason Pugh
19          Aimee McGehee

20

21

22

23

24

25
```

```
 1                     I N D E X

 2

 3   WITNESS:  PHILIP BONFANTI                    PAGE:

 4

 5   Examination by Mr. Altman................... 5

 6   Certificate of Court Reporter............... 68

 7   Errata Sheet................................ 69

 8

 9

10                   E X H I B I T S

11
     Exhibit 6
12        Defendant's Response to Plaintiff's
          Notice of 30(b)(6) Deposition of
13        MGCCC and Requests for Production of
          Documents............................  14
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              S T I P U L A T I O N

 2          It is hereby stipulated and agreed by and

 3     between the parties hereto, through their

 4     respective attorneys of record, that this

 5     deposition may be taken at the time and place

 6     hereinbefore set forth, by Kati Vogt, RPR, RMR,

 7     CRR, RDR, Court Reporter and Notary Public,

 8     pursuant to the Federal Rules of Civil Procedure,

 9     as amended;

10          That the formality of reading and signing is

11     specifically RESERVED;

12          That all objections, except as to the form of

13     the questions and the responsiveness of the

14     answers, are reserved until such time as this

15     deposition, or any part thereof, may be used or is

16     sought to be used in evidence.

17                         - - -

18

19

20

21

22

23

24

25
```

```
 1                   PHILIP BONFANTI,

 2          having been first duly sworn, was

 3          examined and testified as follows:

 4                      EXAMINATION

 5                       - - -

 6   BY MR. ALTMAN:

 7          Q.   Hello, Dr. Bonfanti.  Thank you for

 8   appearing today.  How are you?

 9          A.   I'm doing fine.  How about yourself?

10          Q.   All right.  I'm doing okay.

11               Before we begin, have you ever had your

12   deposition taken before?

13          A.   I have not.

14          Q.   Okay.  So I just want to go over a couple

15   of rules, shall we say, just to make sure we get a

16   good record.

17               One of the things, that's going to take

18   some practice, is for you to wait for me to finish

19   asking my questions, and for me to wait for you to

20   finish answering my questions, so we get a nice

21   clean record and the court reporter doesn't get

22   mad at either one of us, particularly me.

23          A.   Good.

24          Q.   You have to use verbal responses.  Nods

25   and head, shakes of the head don't work.  "Yes,
```

1    no," please.

2         A.   Got it.

3         Q.   If I ask you a question and you don't

4    understand it, please let me know.  Okay?

5         A.   Uh-huh.

6         Q.   Is that a yes?

7         A.   Yes.

8         Q.   We do that all the time and we still

9    forget.

10             Okay.  If you don't tell me that you

11   don't understand a question, I'll assume that you

12   do.  Okay?

13        A.   Got it.

14        Q.   The other thing here is this is not an

15   endurance test.  Anytime you think you need a

16   break, as long as there's not a question pending,

17   just let us know, and we'll take a break to meet

18   your needs.  Okay?

19        A.   Sounds perfect.

20        Q.   All right.  Dr. Bonfanti, what's your

21   title at the university?

22        A.   I'm the executive vice president for

23   student services and enrollment management.

24        Q.   What does that mean to those that are not

25   here?

```
 1        A.   Well, I really wear two hats.  I'm in

 2   charge of -- overall in charge of student services

 3   for the ten locations across the district.  So

 4   student services includes admissions, financial

 5   aid, enrollment services center, student

 6   activities, student discipline, and so on, typical

 7   things you might find under student services.

 8             And then enrollment management, I'm in

 9   charge of the recruitment, marketing, retention

10   efforts at the college.

11        Q.   You don't have enough things going on.

12        A.   That's why I'm gray.

13        Q.   And how long have you been in this

14   position?

15        A.   I've been in this position since May

16   of 2019.

17        Q.   Okay.  What were you doing before that?

18        A.   Before that, I was the dean of student

19   services and enrollment management at the now

20   Harrison County campus.  I was there from 2014

21   to 2019.

22        Q.   Is that the campus that Maggie Russell

23   attended?

24        A.   Yes, sir.

25        Q.   Okay.  Now, you understand that today
```

1    you're not here as you.  You are here as the

2    university, correct?

3         A.   As the college, yes.  That's correct.

4         Q.   And the answers that you give are binding

5    on the college.  You understand that, correct?

6         A.   Correct.

7         Q.   Okay.  Now, do you have -- aside from

8    this lawsuit, did you have any specific knowledge

9    of Maggie Russell?

10        A.   Well, I had met -- actually, I had met

11   Maggie Russell and her mom prior to the -- to the

12   lawsuit.  I was actually the person she met with,

13   with the testing proctor, when she had the issue

14   with the testing center proctor.

15        Q.   Okay.

16        A.   It was -- we look a little alike, so I

17   guess --

18        Q.   Well, to me, I'm blind, so you guys look

19   like two guys in -- you know, with white shirts and

20   ties.

21        A.   Yeah.  But as the dean of student

22   services, the testing proctor that she had a

23   complaint against reported to me.

24        Q.   Okay.

25        A.   And so she did come to my office.  We

 1   resolved that issue.  It was separate and distinct

 2   from -- from the lawsuit.

 3       **Q.   Did you have any involvement in the**

 4   **underlying issues forming the basis of this**

 5   **lawsuit?**

 6       A.   I'm not sure I understand the question.

 7       **Q.   Well, you understand that this**

 8   **essentially boils down to a dispute as to what**

 9   **Maggie needs to do to finish up and graduate,**

10   **correct?**

11       A.   Correct.

12       **Q.   Okay.  Did you have any involvement with**

13   **Maggie concerning that particular issue outside of**

14   **the context of this lawsuit?**

15       A.   My involvement would have been that I --

16   I manage the office that credentials students, that

17   decides whether or not they graduate.

18       **Q.   Okay.**

19       A.   Okay.  I'm thinking that's what you might

20   mean.

21       **Q.   I'm just asking whether you personally,**

22   **as you sit here right now, remember dealing with**

23   **Maggie Russell with her dispute with the**

24   **university.**

25       A.   I do remember it happening, but I did not

 1   have any direct --

 2        Q.   Okay.

 3        A.   -- conversations with her during the --

 4   during the dispute.

 5        Q.   Did you have any discussions with anyone

 6   concerning Maggie Russell?  And I'm not asking

 7   about the proctoring situation, the situation with

 8   the proctor.  Leave that alone.

 9        A.   Yeah.

10        Q.   About her fundamental issue of taking

11   College Algebra?

12        A.   Yes.

13        Q.   Okay.  And who did you have discussions

14   with?

15        A.   I would have had discussions with

16   Dr. Bradley, Dr. Brown, and Aimee McGehee.

17        Q.   Okay.  And when was the last time you had

18   a conversation with them about Maggie before the

19   lawsuit was filed?

20        A.   Oh, before the --

21        Q.   Let me -- let me be clear so we don't

22   have to say this every time.  Okay?  None of the

23   questions I'm asking you are from the lawsuit going

24   forward.  They're all during the contemporaneous

25   time when Maggie was attending or trying to resolve

 1   her issue.  I don't want -- just don't want to have

 2   to say that every single time.

 3        A.   It might be helpful if you tell me when

 4   -- remind me when the lawsuit was actually filed.

 5        Q.   That's an excellent question.  I wish I

 6   knew.

 7             MS. BROWN:  Early 2022.

 8             MR. ALTMAN:  Yeah.

 9        A.   Early 2022?

10   BY MR. ALTMAN:

11        Q.   About a year ago.

12        A.   I probably would have had -- prior to

13   that would have had a discussion in 2019 or so,

14   just prior to moving away from the campus to become

15   the vice president, and probably would not have, to

16   my recollection, discussed that until the lawsuit

17   was -- was brought.

18        Q.   Okay.  What did you do to prepare for

19   today's deposition?  And one of the things I want

20   to be careful of -- I'm sure sister counsel and

21   brother counsel won't let you -- but the questions

22   I'm asking you, I don't want to know what you

23   talked to them about.  Okay?  I just want to be

24   very clear that I'm going to ask you certain

25   questions.  The conversations you had, that's

1    privileged and protected, and so, you know, I'll

2    probably stop you, I'm sure they'll stop you if it

3    comes up.  All right?

4         A.    Uh-huh.

5         Q.    So what did you do to prepare for today's

6    deposition?

7         A.    I reviewed the interrogatories, both

8    interrogatories and documents pertaining to the

9    case; so letters we had received, emails that were

10   sent, I think things that were all submitted to you

11   as part of the discovery.

12        Q.    Okay.  Did you meet with anyone to

13   prepare for today's deposition?

14        A.    Other than counsel?

15        Q.    Did you meet with anyone?

16        A.    Yes.

17        Q.    Okay.  Who did you meet with?

18        A.    I met with counsel.

19        Q.    Okay.  Anybody other than counsel?

20        A.    My colleague.  There were colleagues

21   there, Dr. Pugh and Aimee McGehee.

22        Q.    Okay.  So the three of you.  Were there

23   any other people from the university there?

24        A.    Dr. Brown was there, and Dr. Bradley came

25   in and out, I think, for a few minutes.

1        Q.   Okay.  And how many times did you meet?

2        A.   Just the once.

3        Q.   One time?

4        A.   Uh-huh.

5        Q.   When did you meet?

6        A.   Yesterday.

7        Q.   Okay.  Was that the first time you had

8    had any substantive discussions about this case

9    with anyone?

10            MS. BROWN:  Object to form.

11   BY MR. ALTMAN:

12       Q.   You can answer.

13            MS. BROWN:  You can answer.

14            THE WITNESS:  Oh, okay.

15   BY MR. ALTMAN:

16       Q.   These are technical things between us

17   pinheads that, you know, we have to deal with.

18       A.   Yes.

19       Q.   Okay.  And who did you meet with?

20       A.   I met with Dr. Pugh primarily as he was

21   the -- he was the person that was talking to

22   counsel and would come back to us and say, "I need

23   to collect" --

24       Q.   Be careful.  I don't want you to say what

25   he was told.

```
 1          A.   Oh, okay.

 2          Q.   Just be careful that you don't say what

 3    he was told.

 4          A.   Sure.

 5          Q.   If he did something, that's okay.  But

 6    what he was told, I just -- I don't want to get

 7    into that.

 8          A.   Okay.

 9          Q.   Okay.  So aside from that, how many times

10    did you have meetings talking about the case?

11          A.   Less than half a dozen times, I would

12    say.

13          Q.   Okay.  All right.  So I'm going to mark

14    as Exhibit 6 a copy of the deposition notice, that

15    I won't be able to read, but, you know, we can do

16    it anyway.

17               (Exhibit 6 was marked.)

18    BY MR. ALTMAN:

19          Q.   Have you ever seen that document before?

20          A.   I have.

21          Q.   Okay.  When did you see that document?

22          A.   I don't have the exact date.  This was

23    presented to me by Dr. Pugh.  We had a meeting to

24    discuss it and to collect the answers to the

25    interrogatories.
```

```
1         Q.   Well, this is not --

2         A.   Is it not?

3         Q.   This is not the interrogatories.  This is

4    a deposition notice.

5         A.   Oh, okay.

6         Q.   And, I believe, responses from sister

7    counsel.  Just take a minute to go through it.  I

8    just want to know if you've seen it before.  Or

9    seen -- let me ask it a little more artfully.

10   There are some responses here that you may not have

11   seen, but they're the topical areas, they're

12   numbered.  And that's what I want to know, whether

13   you've ever seen those topical areas before.

14        A.   I'm not seeing -- I'm not seeing

15   responses on this.

16             MR. HOLLEMAN:  If I may?

17             MR. ALTMAN:  Yeah, please.  Was that

18        just the raw notice without the responses?

19             MR. HOLLEMAN:  These are what he's

20        talking about (indicating).

21             THE WITNESS:  But there are no -- is he

22        asking about our responses to each of these?

23             MR. ALTMAN:  Is that just the raw

24        notice, or just the one with responses?

25             MS. BROWN:  Let me see.  It's just the
```

```
 1        notice.
 2   BY MR. ALTMAN:
 3        Q.   Okay.  Then my question is:  Have you
 4   ever seen this document before?
 5        A.   I believe so.
 6        Q.   Okay.  When did you see this document?
 7        A.   I honestly don't recall.  It would have
 8   been in preparation --
 9        Q.   Okay?
10        A.   -- to respond to it.
11        Q.   Did you do any research in preparation
12   for today's deposition?
13             MS. BROWN:  Object to form.  Go ahead.
14        A.   Other than what I stated, reviewing
15   documents and -- and what we had submitted to you
16   and the responses to the interrogatories.
17   BY MR. ALTMAN:
18        Q.   Okay.  So you reviewed the submissions to
19   us --
20        A.   Yes, sir.
21        Q.   -- correct?  Okay.
22             Did you go any other place to look for
23   documents?
24        A.   I would have gone to our website and --
25   and reviewed our guide -- we have a guide there for
```

 1    students with disabilities -- and our policies,

 2    just to refresh myself with them.

 3        Q.    I understand.

 4              All right.  The university would agree

 5    that doing three classes instead of one is

 6    generally going to be a lot more work, correct?

 7        A.    I would think we would say three classes

 8    is -- would take more time.

 9        Q.    More time, more work, correct?

10        A.    More work.  That's correct.

11        Q.    Okay.  You were not part of the

12    negotiation between the OCR and the university

13    concerning Maggie, correct?

14        A.    That's correct.

15        Q.    Okay.  Now, was that the first time that

16    the university had been contacted by the OCR with

17    respect to an issue with disability accommodations?

18        A.    To my knowledge.

19        Q.    Okay.

20        A.    That would have been the first time,

21    yeah.  That's the only knowledge I have of the OCR.

22        Q.    If -- were you aware that the OCR had

23    reached out to the university to discuss the

24    matter?

25        A.    This particular matter?

 1      Q.   Yes.

 2      A.   At some point I became aware.  I was

 3   not -- they didn't contact me, so at some point I

 4   became aware that they --

 5      **Q.   Did you become aware of it before the**

 6   **matter was resolved between the OCR and the**

 7   **university?**

 8      A.   Probably.

 9      **Q.   Okay.  So if the OCR had reached out to**

10   **the university to discuss a student who was**

11   **complaining about disability accommodations during**

12   **your tenure at least as dean, would you have known**

13   **about it?**

14      A.   Probably.  Not necessarily, but -- but I

15   would not have been involved in those negotiations,

16   so --

17      **Q.   I'm sorry.**

18           MR. ALTMAN:  What's this?

19           MR. HOLLEMAN:  The correct one.

20           MR. ALTMAN:  Oh.

21           MS. BROWN:  That's the notice with the

22      response.

23           MR. ALTMAN:  Okay.  Do we want to -- do

24      we want to substitute this?

25           MS. BROWN:  That's completely up to you.

```
 1              MR. ALTMAN:  I'm fine with that if you
 2         want.  I don't have a preference.
 3              All right.  Let's just -- I'm going to
 4         take that one back, and we're going to
 5         relabel this one as 6.
 6              And if I happen to ask a question that
 7         you think goes beyond the designation and he
 8         has knowledge, you can say, "Hey", he's
 9         not -- he's testifying as himself and not" --
10              MS. BROWN:  Sure.
11              THE COURT:  I'm going to try not to do
12         that, but it's really hard for me to --
13              MS. BROWN:  I know.
14              MR. ALTMAN:  -- to read the --
15              MS. BROWN:  And with three designees,
16         it's difficult.  So I'll just --
17              MR. ALTMAN:  I understand.
18              MS. BROWN:  -- put on the record to the
19         extent that he was not designated to testify
20         about OCR, if he has personal knowledge, he
21         can answer those questions.
22              MR. ALTMAN:  Okay.
23    BY MR. ALTMAN:
24         Q.  Are you aware of any other OCR complaints
25    that are not related to disability services that
```

 1   came into the university --

 2        A.   No.

 3        Q.   -- during the -- let's talk 2015 time

 4   frame forward?

 5        A.   I am not.

 6        Q.   Okay.  Do you think you would know about

 7   that --

 8        A.   Not --

 9        Q.   -- if they had come in?

10        A.   Not necessarily, no.

11        Q.   Okay.  Now, with respect to -- let me

12   just start looking through this.  Okay.  On the

13   admission process, when a student comes in who has

14   disabilities, how does that student, as part of

15   their enrollment, have their disabilities taken

16   into consideration and accommodations established?

17        A.   The student would have to approach a

18   student services coordinator and ask for

19   accommodations, to disclose their disability and

20   request accommodations.

21        Q.   Okay.  And if they did that, then what

22   happens?

23        A.   The -- there's a discussion; there will

24   be a collection of the medical documentation so we

25   can see the nature of the disability; and then they

 1   would work with the student to say -- ask the

 2   student, "What accommodations are you requesting?"

 3   They would review that list of requests and then

 4   they would approve them.  At that point, the

 5   student the services coordinator would contact the

 6   faculty through a letter that says, "This student

 7   has been granted these accommodations," and then

 8   they would list the accommodations that were

 9   approved.

10        Q.   Why don't they just do it orally?

11        A.   Well, I think they would like to have it

12   in writing.

13        Q.   So it's important to have discussions

14   like that in writing?

15        A.   To --

16             MS. BROWN:  Object to the form.

17        A.   I'm not sure -- I'm not sure I understand

18   what --

19   BY MR. ALTMAN:

20        Q.   It's important -- I'll ask it this way:

21   It's important to have communications between the

22   disability office and faculty in writing?

23             MS. BROWN:  Object to the form.

24        A.   I think that's our practice.

25   BY MR. ALTMAN:

```
 1        Q.   Okay.  Why?

 2        A.   I would think just to have a record of

 3   having provided accommodations to a student.

 4        Q.   So if a student was writing

 5   communications to the school, it would be just as

 6   important for the school to respond to the student

 7   in writing, correct?

 8        A.   I think -- I'm not sure how to answer

 9   that.  That's awfully broad.

10        Q.   Well, if a student was complaining about

11   the accommodations that they were receiving --

12        A.   Uh-huh.

13        Q.   -- it would be just as important for the

14   school to respond to that student in writing for

15   the same reasons, right?

16        A.   I think our practice would be to pick up

17   the phone and call the student and say, "How can I

18   assist you?"  I mean, we may -- the school may

19   respond no writing, but I don't want to say that

20   that's our practice right now.  I think that it

21   depends.  They may -- it depends on the nature of

22   the complaint, the nature of, you know...

23        Q.   Okay.  Now, who is Dr. Brown?

24        A.   Dr. Brown is currently the vice president

25   for marketing and the foundation.
```

1          Q.    And what was she before that?

2          A.    She was the dean of teaching and learning

3     at the Harrison County campus.

4          Q.    And when did she become the vice

5     president of marketing?

6          A.    Probably shortly before I became the vice

7     president, so maybe January of 2019.  I'm not

8     exactly sure.

9          Q.    Okay.  So during the main time that's

10    important for this lawsuit, 2015 to 2019 time frame

11    or so, she was the dean of teaching and learning?

12         A.    That's correct, yeah.

13         Q.    Okay.  And that's why she would have been

14    involved in Maggie's matter?

15         A.    That's correct.

16         Q.    Okay.  So I'm not sure I understand why

17    it's important that you communicate with faculty in

18    writing concerning disability issues, but you

19    communicate with students verbally by phone.

20              MS. BROWN:  Object to the form.

21         A.    Well, I would say that the nature of the

22    communications are different.  We're giving

23    instructions to a faculty member that has a list of

24    accommodations.  And I guess I could call them on

25    the phone and hope they correctly write down all of

1   the accommodations and get it correct, but it seems

2   to me the prudent thing to do would be to send them

3   a list of accommodations in writing.

4           If a student is complaining, I think the

5   compassionate thing to do is pick up the phone and

6   say, "I have a complaint from you.  Can we get

7   together and talk," and invite them to come into

8   the office and talk.  I guess I should make a

9   distinction between if they're -- if the complaint

10  comes as part of the formal grievance process,

11  then they would absolutely get something back in

12  writing.  But if they're sending an email that

13  says, "I'm complaining about a proctor," we're

14  going to call them in and say, "What can we do to

15  help?"

16  BY MR. ALTMAN:

17       Q.   Okay.  Fair enough.

18            Now, does the student have to

19  specifically ask for what accommodations they want

20  once it's been established that they're entitled

21  to accommodations?

22       A.   That's our practice, is that they request

23  an accommodation.

24       Q.   How does a student know what are the

25  appropriate accommodations?

1          A.    They're on our website in the guide.

2     They would have been given the guide to students

3     with disabilities.  I don't have the exact title of

4     the guide.  And in it, it lists all of the

5     accommodations that they're -- that they're

6     entitled -- it's not an exhaustive list, but the

7     typical ones that we see.

8          **Q.    And so the student would be the one to**

9     **have to try to figure out which ones are the right**

10    **accommodations?**

11         A.    Yeah, and I imagine it's a collaborative

12    process between the student services support

13    coordinator and them, that they may suggest at some

14    point an accommodation that the student is unaware

15    of; but the student would have to say, "I want that

16    accommodation."

17         **Q.    Okay.  One thing I just want to clear up.**

18         A.    Uh-huh.

19         **Q.    If there was a formal grievance process**

20    **that had been going on, you would agree at that**

21    **point it would be appropriate for the school to**

22    **respond to the student in writing in addition to**

23    **possibly having discussions or meetings, et cetera,**

24    **but writing should also be employed?**

25         A.    It is.  And that's the college practice.

1          Q.    Okay.  Did Maggie Russell disclose her

2    disabilities at the time she was accepted by the

3    university?

4          A.    I would say so.  I'm -- her first

5    disabilities was the fall of 2015, the first

6    request for disabilities and granting of

7    accommodations, and I'm assuming that is also the

8    first semester that she enrolled in classes.

9          Q.    Okay.  So the school was aware she had

10   significant issues with math from the time they

11   accepted her, correct?

12         A.    We were aware of her disabilities, that

13   she had documented autism, Aspergers, depression, I

14   think there may have been one other.

15         Q.    But the school was specifically

16   knowledgeable that there was an issue with her

17   doing math, correct?

18         A.    I can't answer that.  They were -- we

19   were aware of the disabilities that she disclosed

20   to us.

21         Q.    Okay.  So as we sit here right now, I

22   just want to be clear, because I'm asking the

23   university, not necessarily you.

24         A.    Okay.

25         Q.    And if you don't know because maybe you

 1    didn't ask that question, that's fine.  We can deal

 2    with that.

 3         A.   Okay.

 4         Q.   I mean, did you ask the question of

 5    whether she disclosed that she was -- had an issue

 6    with doing math, or you just simply don't know?

 7         A.   Are you talking about in fall of 2015?

 8         Q.   Fall of 2015 when she first came to

 9    campus.

10         A.   I don't know.

11         Q.   Okay.

12         A.   I mean, I can look at the paperwork and

13    see what was listed there, and it was not listed

14    specifically a disability that she had problems

15    with math.  It was autism --

16         Q.   Did you look at -- did you look at that

17    document before today's deposition?

18         A.   I did not.

19         Q.   Okay.  So you --

20         A.   No, excuse me, I did look at the

21    accommodations that she was granted.

22         Q.   That's the accommodations she was

23    granted.  But --

24         A.   Yes.

25         Q.   -- did you look at what she disclosed

 1   when she first came to the campus?

 2        A.   I did not.

 3        Q.   Okay.  So you just don't know what it

 4   says?

 5        A.   That's correct.

 6        Q.   It could have said math; it might not

 7   have said math.  Okay.  Fair enough.

 8             Okay.  Now, is the university would

 9   agree that Maggie's got more disabilities than

10   most, that are non-physical, correct?

11        A.   I don't -- I don't know.  I mean,

12   that's -- we've got a number of students with

13   disabilities.  I don't know that she has any more

14   or less than the other students that we're serving.

15        Q.   Okay.  Fair enough.

16             Now, were you aware that there were

17   offers to Maggie to -- strike that.  Bad question.

18             The university was aware, because it

19   negotiated with the OCR, that there were four

20   alternatives offered to Maggie to complete her

21   degree, correct?

22        A.   That's correct.

23        Q.   One of them was to take the College

24   Algebra class, correct?

25        A.   It was a four-credit -- it was 1314, not

1    1313.  So it was a College Algebra class that

2    included a lab and tutoring session.

3         Q.    Okay.  But that was one option?

4         A.    That was one option.

5         Q.    The other three options, she had to take

6    multiple classes, correct?

7         A.    Two of those options had a sequence of

8    courses that she had to take.

9         Q.    And what was the last one?

10        A.    Quantitative Reasoning, I believe, is one

11   of them.  It was a single course, I think.

12        Q.    What did the university do to assess

13   whether she would be able to complete any of those

14   options successfully given her disabilities?

15             MS. BROWN:  Object to form.

16        A.    I think -- what the university's -- what

17   the college's responsibility was, in that case, was

18   to find a substitute that allowed her to obtain the

19   same skills as she would in College Algebra; and

20   that's what they did.  So the faculty in that

21   discipline would have said, "Okay.  What are the

22   skills that we expect her to have out of College

23   Algebra?  Can she get those in other places?"

24             Now, it's not a one-to-one; otherwise,

25   it would be called College Algebra.  So she had --

 1   they had to go to other courses and say, "She can

 2   get some of the skills here, some of the skills

 3   here, some of the skills here," I'm assuming is

 4   the process that the faculty went through.

 5        **Q.    I understand.  But what did the school do**

 6   **to determine whether she could have completed any**

 7   **of those options given her disabilities?**

 8             MS. BROWN:  Object to form.

 9        A.   I think they would have -- I don't know.

10   They would have expected her to enroll in classes

11   as any other student would have.

12   BY MR. ALTMAN:

13        **Q.    But that's not my question, Dr. Bonfanti.**

14        A.    Uh-huh.

15        **Q.    What did the school do to determine**

16   **whether her disabilities would have allowed her to**

17   **successfully complete any of those options?**

18        A.   To my knowledge, I don't know what they

19   do.

20        **Q.    Should the school have, you know,**

21   **assessed her disabilities to see whether any of**

22   **those options were viable?**

23        A.   I'm assuming they did assess her

24   disabilities and decided that those were viable.

25   I'm just -- I'm unaware.

1          Q.    Okay.

2          A.    I mean, that would have happened between

3    the discussions between the student support

4    services coordinator, the faculty.  And the

5    faculty -- student support service coordinator is

6    aware of the disabilities.  The faculty are aware

7    of the skill sets that she's supposed to obtain.

8    I'm sure they would have had that discussion.

9          Q.    **Should Maggie have been part of those**

10   **discussions?**

11         A.    I would assume she was -- that she spoke

12   with the student support service coordinator and

13   that the student support service coordinator

14   gathered the information she needed directly from

15   Maggie, took it to her discussions with the

16   faculty.

17         Q.    **But you're making an assumption.  You**

18   **don't know that that happened, correct?**

19         A.    No.  It's the normal course of the way

20   things would have happened.

21         Q.    **Okay.  Let's say that it didn't happen.**

22   **Would you agree that -- would the university agree**

23   **that it would have been difficult to assess whether**

24   **any of those options were viable without Maggie's**

25   **input?**

```
 1        A.   It's difficult for us to assess whether

 2   any student is going to pass any class that they

 3   enroll in.

 4        Q.   I understand that.  But --

 5        A.   So yes.

 6        Q.   Who would know whether Maggie was

 7   involved in any discussions concerning those four

 8   options?

 9        A.   I -- well, Dr. Brown, I assume, might

10   know, or -- or Aimee McGehee is actually the person

11   I would think.

12        Q.   Okay.

13        A.   I don't know that they had those

14   discussions, but that's...

15        Q.   Now, to some degree, a lot of this

16   dispute comes down to whether Maggie could have

17   been successful at a Visual Basic class, right?

18        A.   If you say so.

19        Q.   Well, I mean, if you're not sure -- you

20   don't have to agree with it.

21        A.   I'm not sure.

22        Q.   Okay.  All right.  If Maggie had taken

23   the Visual Basic class and could not do the work

24   because of her disability, would they have given

25   her her degree?
```

```
 1        A.    No.

 2        Q.    Okay.

 3        A.    But I think they would have continued to

 4   work with her.

 5        Q.    Well, what does that mean?

 6        A.    They would have continued to look for

 7   other accommodations.

 8        Q.    Well --

 9        A.    To help get her to --

10        Q.    -- why not have discussed that with her

11   before these options were developed?

12        A.    We did discuss --

13        Q.    Hold on.

14        A.    Oh, I'm sorry.

15        Q.    It takes some practice.

16              You were here for part of the testimony

17   of Ms. Russell.  Would it surprise you to know

18   that both Maggie and Ms. Russell testified that

19   they did not speak with anybody at the school or

20   the OCR about the resolution?

21        A.    Yes, it would surprise me.

22        Q.    Okay.  Now, we can agree, if that were

23   true, it is somewhat problematic, isn't it, that

24   you should have spoken with a student before coming

25   up with a resolution?
```

```
 1        A.   No, I don't necessarily agree with that.
 2        Q.   So how did they determine -- I probably
 3   asked you this.  How did they determine that those
 4   options were in any way viable without talking to
 5   the student?
 6             MS. BROWN:  Object to the form.
 7        A.   I think their concern was to make sure
 8   that the student completed and obtained the skills
 9   required of a student earning an associate of arts
10   degree.  They looked at three courses that they
11   think were viable substitutes and brought those to
12   Maggie and said, "These are -- this is what we
13   think would be a viable substitute for College
14   Algebra."
15   BY MR. ALTMAN:
16        Q.   But let's come back to the Visual Basic.
17   You said they would have continued to work with her
18   if she could not complete Visual Basic?
19        A.   I think if she were struggling, I have no
20   doubt the college would have worked with her, would
21   have said, "If you're struggling with this, now
22   that we see you're in it and you're struggling with
23   it, what are our other options?"
24        Q.   Well, what would the other options be?
25        A.   I can't speculate on that would be.  I
```

1    know another option was offered once the

2    lawsuit was in -- so there's an example of another

3    viable option.  I think it had to do with basic

4    courses.

5         Q.   Sure.  But that was just, you know,

6    "We'll put you in a class and we'll let you keep

7    working at it until maybe you pass it," right?

8         A.   I wasn't a part of that, so I'm not

9    exactly sure what the -- what that option was.  But

10   as an example, that the college is continuing to

11   this day to work with her to find a viable

12   accommodation to get her through to graduation.

13        Q.   I have to use this as an example, but did

14   you play an instrument in -- when you went to

15   school?

16        A.   I did not.

17        Q.   Okay.  So as -- as I said, if I threw you

18   into a class, a band performance class where you

19   had to play the oboe, you're not going to be able

20   to do that, are you?

21        A.   I sure would give it a shot and try to

22   learn; and eventually I'm either going to succeed

23   or fail.

24        Q.   Okay.  So if you were -- if you failed

25   because you couldn't do it, then should you --

 1    should that keep you from graduating?

 2         A.    If that was a requirement for graduation.

 3         Q.    Now, who developed the requirements for

 4    graduation for the university?

 5         A.    The core curriculum, that's beyond my

 6    knowledge base.  It's -- we've got a developed core

 7    curriculum of 40 courses that are standard for all

 8    the degrees.  You would have to talk to one of the

 9    academic officers as to how that's developed.

10         Q.    So who I would talk to?

11         A.    Dr. Woodward is our -- currently our

12    chief academic officer.

13         Q.    Do you know how long -- I don't know if

14    it's a man or a woman.

15         A.    Oh, Jonathan Woodward.

16         Q.    Okay.  How long has he been in that

17    position?

18         A.    He's been in that position since 2018, I

19    would suspect, 2018.

20         Q.    Do you know who it was before that?

21         A.    Dr. Jason Pugh.

22         Q.    Okay.  Is that the same Dr. Pugh that's

23    here?

24         A.    That's the same Pugh that's right here.

25    So he might be able to speak --

 1              THE WITNESS:  I wasn't going to

 2         volunteer you.

 3              MR. ALTMAN:  Oh, he doesn't mind.

 4         A.   But I'm sure he knows the process about

 5    how the state -- how this is developed.  As a

 6    student services professional, I just know that

 7    that's the core curriculum that all of our students

 8    are expected to pass and complete before they can

 9    graduate.

10    BY MR. ALTMAN:

11         **Q.   Maggie Russell attempted College Algebra?**

12         A.   She did.

13         **Q.   And was unsuccessful at it.  She**

14    **eventually withdrew.  Why didn't the university**

15    **work with her then --**

16         A.   They did --

17         **Q.   -- to try to get her through College**

18    **Algebra?**

19         A.   The college did work with her.  They

20    offered to put her into, initially, Math 1314,

21    which is a version of that class that combines

22    Intermediate Algebra and College Algebra into

23    course, adds a lab component to it, and I believe

24    we talked to her about using the learning resource

25    center for tutors.

1        Q.   But she was unsuccessful as far as she

2    went to the class, right?

3        A.   She never enrolled in 1314.

4        Q.   Okay.  Now I'm confused.  I thought 1314

5    was the class she took.

6        A.   No, she took 1313 in the summer of 2018.

7    That's -- she took College Algebra 1313, which is

8    the regular.  So that -- that course assumes you've

9    passed Intermediate Algebra.  And it's a regular

10   course.  And she signed -- she registered for that.

11   She was unsuccessful.  We said, "You need to be in

12   1314."

13       Q.   Which would be more intensive-involved

14   than 1313, right?

15       A.   I wouldn't say intense.  What I would say

16   is it's got more support.  It's a course that's got

17   built in support that requires the student -- so

18   you if you're in Math 1313, whether or not you go

19   to learning resources or tutoring is up to you.  If

20   you're in 1314, you're required.  It is a built in

21   part of the class that you have to get assistance.

22       Q.   But when she took 1313, though, she did

23   have support, didn't she?

24       A.   I would have to go back and see.  The

25   support was available to her, yes.

1        Q.    She was using tutoring wasn't she?

2        A.    I don't recall.  It would have been

3    available to her.

4        Q.    Okay.  So she could have taken 1313 or

5    1314?

6        A.    Right.

7              The other thing I'll say is she took

8    1313 in a compressed format in the summer.  1314

9    would have been a 16-week format in the fall.

10   1313 in the summer, I believe, was a five-week

11   format.  I would have to go back and look at it,

12   but I believe it was a five-week format.  So it

13   was much more compressed.

14       Q.    So more time during the week?

15       A.    Oh, yeah.  It was daily.  You had to go

16   every day for longer periods of time in order to

17   get the hours in, the clock hours in.

18       Q.    When a student complains that they're

19   having -- a student who has disability

20   accommodations complains that they're not receiving

21   any accommodations or the support necessary to be

22   successful, how are those complaints handled?

23       A.    Generally they're handled informally.

24   Generally the student goes to the student support

25   services coordinator.  They try to work it out with

1    the faculty.  If it can't be worked out with the

2    faculty, it's then brought to both deans, most

3    likely the dean of student services who is in

4    charge of the students services support

5    coordinator, and the dean of teaching and learning

6    who is in charge of the faculty to see if they

7    can't work it out.

8         **Q.   And if they can't work it out, then what**

9    **happens?**

10        A.   It really depends on the nature of what

11   the complaint is.  So if -- it may involve moving

12   the student to another class in order to assist the

13   student right away, but then it would also involve

14   the college addressing the issue with the faculty

15   member about the necessity to offer accommodations.

16   So it really depends on the situation.  I would

17   have to have a specific example.  But that's

18   generally how it works.

19        **Q.   Now, there's no dispute that Maggie**

20   **raised issues about the math to the university,**

21   **correct?  Strike that.  Terrible question.**

22        **Up through 2015 to we'll say 2018, the**

23   **university would agree that Maggie Russell raised**

24   **issues about her having to do College Algebra,**

25   **whatever, to the university, correct?**

1        A.    I'm not aware.  The first time I became

2    aware of a complaint was when she wrote the letter

3    asking for the College Algebra -- when Maggie's

4    mom.  So it wasn't Maggie.  But there may have been

5    conversations -- and I know you're going to talk

6    with Aimee McGehee.  There may have been

7    conversations between her and the student about

8    difficulties in math, but the administration became

9    aware of it -- the college administration became

10   aware of it when the letter was received in the

11   summer of 2018.

12       **Q.    Okay.  So there's no question at that**

13   **point that the university was aware that there was**

14   **an issue with Maggie and math, correct?**

15       A.    That's correct.

16       **Q.    Okay.  Was the university surprised that**

17   **it received an OCR complaint concerning Maggie?**

18            MS. BROWN:  To the extent that that's in

19       his designation, if he knows, he can answer

20       it.

21       A.    I don't know if they were surprised or

22   not.  I would think so.  I think at that point we

23   thought we were working with the student.  We had

24   found a solution, and...

25   BY MR. ALTMAN:

1        Q.    What was -- and the solution that was

2    found?

3        A.    The Math 1314.

4        Q.    So it was the university's expectation

5    she would have taken Math 1314 in the fall of 2018?

6        A.    That's correct.

7        Q.    And what kind of support would they have

8    provided to Maggie?

9        A.    Well, she would have gotten, I'm

10    assuming, all of the accommodations she had

11    received for the prior six semesters or so that she

12    was receiving.  In addition to that, 1314 has a

13    built in lab.  We would have made sure she made use

14    of the learning resource center.  And at this

15    point, the college was aware she was having

16    difficulty, I think they would have been checking

17    on her regularly, on her progress, to make sure

18    that she was doing well, and they would have been

19    committed to her passing that course.

20        Q.    So what does that mean?  What if she

21    could not -- is it the -- strike that.

22             Is it the university's position -- let's

23    put substitutes aside -- that if Maggie doesn't

24    pass College Algebra, she does not get to

25    graduate?

```
 1                    MS. BROWN:  Object to the form.
 2         A.   No, I think our position was we were
 3    going to get her through College Algebra 1314 and
 4    get her to graduation.  I think that was the
 5    position of the college at the time.
 6    BY MR. ALTMAN:
 7         Q.   I understand.  But that presumes that she
 8    could be successful at it.  And I'm asking you
 9    to --
10         A.   We --
11         Q.   -- the university to assume that she
12    could not be successful at doing College Algebra --
13                    MS. BROWN:  Object to the form.
14    BY MR. ALTMAN:
15         Q.   -- no matter what --
16                    MR. ALTMAN:  I didn't finish yet.
17    BY MR. ALTMAN:
18         Q.   -- no matter what resources were thrown
19    at her.
20                    MS. BROWN:  Object to the form.
21         A.   I think it's --
22                    MR. ALTMAN:  I'm still not done yet.  I
23         didn't get a chance to finish.  Let me try it
24         again.  Let's start over.
25    BY MR. ALTMAN:
```

```
 1        Q.   Is it the university's position that if

 2   Maggie could not successfully complete College

 3   Algebra, irrespective of whatever support that the

 4   university gave to her, that she would not

 5   graduate?

 6             MS. BROWN:  Finished?

 7             MR. ALTMAN:  Yes.  Now I'm finished.

 8             MS. BROWN:  Object to the form.

 9             MR. ALTMAN:  Okay.

10        A.   I think the college would have worked --

11   continued to work with Maggie until she got across

12   the stage and graduated.

13   BY MR. ALTMAN:

14        Q.   Well, how would they have done that if

15   she couldn't pass the class?

16        A.   I think they would have --

17             MS. BROWN:  Same objection.

18        A.   I think they would have done what they're

19   doing.  They would have found substitutes for

20   College Algebra on their own.  I don't think -- I

21   think if the college saw that she was having

22   difficulty, they -- we would not have needed an OCR

23   complaint to get us to the point where we were

24   going to offer substitutes for that course.

25             But the first thing we were going to try
```

 1   and do is get her through 1314.  That would have

 2   been the preferrable route to put her through.

 3   And if we couldn't get her through 1314, I have no

 4   doubt the college would have looked for

 5   substitutes.

 6          Q.   What would the substitutes have been?

 7          A.   So those substitutes would have been

 8   decided by the faculty in that discipline, and

 9   they, through OCR, came up with the two options we

10   saw.  I don't have them in front of me, but I know

11   testifies Visual Basic, Economics, Physical --

12          Q.   And, I mean, I happen to be a computer

13   expert.  Is it really the school's belief that a

14   student who could not complete College Algebra

15   would be able to be successful in a programming

16   class?

17              MS. BROWN:  Object to the form.

18          A.   It certainly was the belief of the

19   faculty that this is what would be needed to

20   substitute.  And the college would have done

21   everything it could, as it does with all its

22   students, to make sure that they're supported and

23   successful in their courses.

24   BY MR. ALTMAN:

25          Q.   Okay.  But what if she has a disability

1    that keeps her from being successful in that class?

2          A.   Well, I think --

3          Q.   **Then what would the university have done?**

4          A.   They would have continued to help her.

5    Now, what those details are, I can't tell you now.

6    I don't know.  I would not -- I know that the

7    college would have denied to help her.  What they

8    would have come up with would have been determined

9    not necessarily by me, but the faculty involved

10   with it.

11         **Q.   So if it took her three years to get**

12   **through Visual Basic, the university would have**

13   **just kept plugging away at it?**

14         A.   Well, I'm assuming they would have come

15   up with an accommodation.  I don't think they would

16   -- I don't think the college would have said, "Hey,

17   you're going to keep taking this and failing it."

18   At some point, they would have said, "Okay.  Let's

19   take a different route," until they found a route

20   that got her to graduation.  That route may have

21   been, for example, what showed up later on in the

22   lawsuit.  That may have happened without an OCR

23   complaint, without a lawsuit, that eventually the

24   college would have got to the point they said,

25   "Okay.  Let's try this.  Let's try this."

 1                  But I think the college's stance is
 2      we're going to start with College Algebra and
 3      start to branch out until we find a way to get her
 4      across the stage.
 5           **Q.   What stopped the university from waiving**
 6      **the requirement for College Algebra in this**
 7      **particular case given this particular student's**
 8      **difficulties?**
 9           A.   Well, if would have fundamentally altered
10      the nature of the program in that the core
11      curriculum is the same for all students who walk
12      across the stage and graduate from Gulf Coast.
13      They've all completed the same 40 hours.  So to
14      simply remove one of those for a student would have
15      fundamentally altered the nature of the foundation
16      of what we call our associate of arts degree.
17           **Q.   Is the university aware -- I can't**
18      **remember the name of the golf pro who was given the**
19      **right to use an electric golf cart when playing in**
20      **golf tournaments?**
21                  MS. BROWN:  Object to the form.
22           A.   I'm not aware.  I'm not aware of it, and
23      I don't know that the university is aware of it --
24      the college.  Excuse me.
25      BY MR. ALTMAN:

1      Q.   Would it surprise you to learn that

2    courts have decided that there was a golf pro who

3    was given the right to use electric -- an electric

4    golf cart during pro tournaments because of his

5    disabilities?

6      A.   No.

7      Q.   That fundamentally changes the game,

8    right?

9           MS. BROWN:  Object to the form.

10     A.   I wouldn't think so.

11   BY MR. ALTMAN:

12     Q.   You don't think it makes a difference

13   that every other golf pro has got to walk several

14   miles, and this pro gets to ride in a cart?

15          MS. BROWN:  Object to the form.

16     A.   I'm not a golf expert.

17   BY MR. ALTMAN:

18     Q.   Okay.  I just want to be clear on

19   something.  The university's position is that it

20   was not -- Maggie did not need to be involved in

21   the negotiation between the school and the OCR over

22   the resolution?

23          MS. BROWN:  Object to form.

24     A.   I don't know what the process in OCR is.

25   I don't know who is normally involved in coming up

 1   with a resolution.  I don't know how the complaint

 2   process works.  I wasn't involved in the process.

 3   BY MR. ALTMAN:

 4        **Q.   Okay.  But you are being designated today**

 5   **for the question as to how it is determined what,**

 6   **if any, additional learning aids students may**

 7   utilize (i.e., process, calculate, paper, pencils,

 8   notes, et cetera) in order to be successful?

 9        A.   That's correct.

10        **Q.   Okay.  So you don't -- so since you are**

11   **the person who is supposed to speak to that, you're**

12   **saying the university can't say --**

13             MS. BROWN:  I object to that.

14             MR. ALTMAN:  Hold on.  Let me ask my

15        question.

16   BY MR. ALTMAN:

17        **Q.   Are you saying that you, the university,**

18   **can't say whether Maggie should have been part of**

19   **that process?**

20        A.   She's --

21             MS. BROWN:  Hold on.

22             You're asking him about the OCR.  And

23        the area of inquiry you've just read has

24        nothing to do with the OCR.  He is not

25        designated to talk about the OCR process.

1        MR. ALTMAN:  It's got nothing to do with

2   the OCR process.  It's got to do with whether

3   Maggie should have been involved in the

4   process.

5        MS. BROWN:  With the OCR.

6        MR. ALTMAN:  It has nothing to do with

7   the OCR.  The question is whether the

8   university should have put these possible

9   solutions in front of Maggie before agreeing

10  to them to see if she could be successful and

11  get her view.

12       MS. BROWN:  And he is not designated to

13  testify regarding this area of inquiry.

14       MR. ALTMAN:  He is.  "How the university

15  determines if any and/or what alternative

16  courses may be offered."

17       MS. BROWN:  And he can answer a question

18  regarding that.

19       MR. ALTMAN:  Well, okay.

20       MS. BROWN:  With respect to the OCR, he

21  is not designated to testify about that

22  process.

23       MR. ALTMAN:  I don't care about the OCR.

24       MS. BROWN:  Then ask a question that

25  doesn't include that.

1    BY MR. ALTMAN:

2        **Q.   The school agreed to four alternatives**

3    **with the OCR.  Is it the school's position that**

4    **Maggie should not have been part of that discussion**

5    **before the university agreed with the OCR?**

6            MS. BROWN:  Same objection.

7        A.   Well, I think Maggie was in discussions

8    with Aimee McGehee, her student support

9    coordinator, about the accommodations she needs.  I

10   think that her mother did not request an

11   accommodation, but instead wrote a letter to the

12   administration requesting a waiver, and then filed

13   a complaint with OCR.  That's not Maggie talking to

14   the student support coordinator about what she

15   needs to pass a course.

16   BY MR. ALTMAN:

17       **Q.   That's not the question I asked you.**

18   **There were four alternatives that the university**

19   **agreed to with the OCR.**

20       A.   Uh-huh.

21       **Q.   Should the university have discussed**

22   **those four alternatives with Maggie before**

23   **resolving the matter with the OCR?**

24           MS. BROWN:  Same objection.

25       A.   I don't know the answer to that.  I can't

 1    tell you the process for OCR.

 2    BY MR. ALTMAN:

 3        **Q.   It's got nothing to do with OCR.**

 4    **Should -- somebody at the university decided that**

 5    **those were the four alternatives they were willing**

 6    **to offer, right?**

 7        A.   Yes.

 8             MS. BROWN:  Object.

 9        A.   I wasn't part of the process.  I'm

10    assuming that it did not come from OCR; it came

11    from the college.  But that's an assumption.

12    BY MR. ALTMAN:

13        **Q.   Okay.  So don't you agree it would have**

14    **been reasonable for the university to have**

15    **discussed those four alternatives with Maggie or**

16    **her mother before agreeing to them with the OCR?**

17             MS. BROWN:  Object to the form.

18        A.   No, I do not.

19    BY MR. ALTMAN:

20        **Q.   So who determined that those were viable**

21    **alternatives -- strike that.**

22             **So the university decided that these**

23    **were viable alternatives without discussing it at**

24    **all with Maggie to see whether she could**

25    **accomplish any of those, right?**

1                     MS. BROWN:  Object to the form.

2          A.   Well, at this point, Maggie or her mom

3    has filed a complaint with OCR.  So at this point,

4    the college was going to discuss it with OCR.  I

5    mean, they've already filed a complaint.

6          Q.   I see.

7          A.   And so -- and I'm assuming at the point

8    they filed a complaint, the college is going to say

9    I've got to talk to OCR.  They're the mediator in

10   this -- in this process.  And again, I'm not as

11   familiar with the process, but they're the

12   mediator.  So I think at that point, that's who the

13   college is going to talk with, is OCR.  The --

14   Maggie and her mom have already decided they don't

15   want to talk to the college.  That's why they filed

16   a complaint with OCR.  They want to talk to OCR.

17         Q.   Okay.  So do you think somebody should

18   have discussed this with Maggie --

19         A.   I don't think it was an option.

20         Q.   Hold on.

21         A.   Okay.  Sorry.

22         Q.   Don't you think somebody should have

23   discussed those options with Maggie before it was

24   agreed to?

25                     MS. BROWN:  Object to the form.

1        A.   I don't -- I don't know the OCR process,

2   so I don't know if they reached out and tried to

3   talk to her or not.

4   BY MR. ALTMAN:

5        **Q.   They didn't.  So I'm asking the**

6   **university, though, don't you think, whether you**

7   **could talk directly -- and I don't mean -- whether**

8   **the university can talk to Maggie directly or not,**

9   **don't you think it would have been prudent for**

10  **somehow Maggie to have been part of this process of**

11  **the university deciding what options to provide?**

12       A.   I'm assuming once they filed a complaint,

13  that we're not talking directly to them.  We're

14  talking through OCR.

15            So what OCR -- how OCR communicates with

16  the complainant in this case, I don't know.  But

17  I'm assuming once it was filed, that the college

18  is only talking with OCR officials.

19       **Q.   Okay.  Who was the person at the --**

20  **person or persons at the disability office who was**

21  **working with Maggie Russell?**

22            MS. BROWN:  Object to the form.

23  BY MR. ALTMAN:

24       **Q.   During the time that she was there?**

25       A.   What do you mean by "disability office"?

1          Q.   Well, there's a disability office at the

2     university, right?

3          A.   We have student support coordinators in

4     each of our enrollment services centers.

5          Q.   I understand.  But there's an office that

6     specializes in helping students with disabilities,

7     correct?

8          A.   No.

9          Q.   Okay.  So where -- so who does -- I guess

10    under student services are there disability

11    specialists who deal with students who have

12    disabilities?

13         A.   Yeah, student support services

14    coordinator.  We have one-stop shops.  It's called

15    enrollment services center.  Students go there for

16    admissions, financial aid, advising, disability

17    accommodations, any number of things.  They go to

18    one place.  There are specialists in that place in

19    each of those areas, and in each of those is a

20    student support services coordinator.

21         Q.   All right.  So who were the people from

22    that department who were responsible for Maggie

23    Russell's disability needs?

24         A.   Aimee McGehee.

25         Q.   Okay.  That's it?

 1      A.    That's it, yeah.

 2      Q.    Okay.  And that's for the whole time

 3  basically, 2015 to 2019?

 4      A.    Yeah.  Aimee's still employed there as

 5  the student services coordinator.

 6      Q.    Now, was Aimee McGehee the person who

 7  provided services to Maggie?

 8      A.    I'm not sure that I understand "provided

 9  services."  She -- she received the medical

10  documentation, verified the disabilities,

11  negotiated the accommodations with the student, and

12  then informed the faculty that these are the

13  accommodations.  She's -- she is allowed to -- and

14  sometimes she provided the accommodations such as

15  proctoring an exam.

16      Q.    What about reading -- reading questions

17  to Maggie?  Would that have been Aimee also?

18      A.    She may have, yeah.  She may have done

19  that as well.

20      Q.    Now, when -- according to Susan Russell,

21  she sent nine letters to Dr. Brown, none of which

22  were responded to in writing.  Is that a problem at

23  all for the university?  Should Dr. Brown have

24  responded in writing?

25      A.    I'm not -- I'm not aware that nine

 1  letters were written and nothing was responded --

 2  that she did not respond to them.  If that is true,

 3  I would have to -- I would have to look and see how

 4  Dr. Brown responded.

 5      Q.   If Dr. Brown -- if Susan Russell sent

 6  nine letters, as she testified to, and that's the

 7  only testimony right now, okay, and she also

 8  testified that Dr. Brown never responded to her in

 9  writing to any of those nine letters, is that

10  acceptable?

11      A.   That would be unacceptable if that's what

12  happened.

13      Q.   Okay.

14      A.   I'd like to add a comment to that last

15  question.

16      Q.   Sure.  Go ahead.

17      A.   If at some point she had obtained a

18  lawyer, then we expected our responses to go

19  through a lawyer.

20      Q.   Okay.  But somebody should have been

21  responding to those nine letters?  Regardless of

22  who --

23      A.   Yeah --

24      Q.   -- they should not have gone unresponded

25  to?

```
 1        A.    That's correct.
 2        Q.    I mean, maybe the first or second, but
 3   not nine.
 4        A.    Right.
 5        Q.    Obviously somebody was not happy --
 6        A.    Right.
 7        Q.    -- with what was going on, when they
 8   write nine letters, right?
 9        A.    Yeah.  So my assumption is -- well, I'm
10   not going to assume anything other than she has
11   testimony that that's what happened.
12        Q.    Now, you've testified that the
13   university, had she taken the College Algebra 1314
14   or done Visual Basic, or whatever it ultimately
15   came to, and she was not successful, that the
16   school would have tried something else to help her
17   to be successful, right?
18        A.    That's correct.
19        Q.    I mean, how much time does the school get
20   to do that?  Does that go on forever?
21        A.    I think as long as she needed help, they
22   would have continued to provide her help.
23        Q.    And so she was just supposed to keep
24   trying?  "Try this course.  If that doesn't work,
25   try another course.  It that doesn't work, we'll
```

1   try another course," and have nothing concrete?

2       A.   I don't know what -- how that would have

3   played out in terms of what the accommodation would

4   have been or substitution, but the college would

5   have continued to support her and help her try and

6   earn the degree.

7       Q.   If, as the testimony was, Ms. Russell

8   sent nine letters to Dr. Brown, why did it take the

9   OCR -- the OCR's involvement for the school to

10  actually respond back with some alternatives?

11          MS. BROWN:  Object to the form.

12      A.   I don't know that that's -- I know that

13  that's what she's testified, but I don't know that

14  that's the case.  So I find that a difficult

15  question to answer, because I don't know that

16  that's the case, that we did not, as a college,

17  respond until OCR, until she filed an OCR

18  complaint.

19  BY MR. ALTMAN:

20      Q.   Did you do anything to research that

21  issue in terms of preparing for today's deposition?

22      A.   I did not.  There are communications

23  there.  There was a list.  I don't have -- I don't

24  have it memorized.  There were multiple

25  communications, phone calls, emails between

1    Dr. Brown and Ms. Russell.  I just don't have them
2    memorized, and I think that they took a -- they
3    took place after the letter that we received saying
4    that she would like a waiver of the course all the
5    way up through the OCR complaint, the filing of the
6    OCR complaint.
7        **Q.   Since there's two Ms. Russels, I just**
8    **wanted to be a little more --**
9        A.   Oh, sorry.  Susan Russell.
10       **Q.   I just wanted to be a little more**
11   **precise.**
12       A.   Susan Russell.  I know that there were --
13   there was multiple communications between Dr. Brown
14   and Susan Russell between the letter that was
15   received in June and the OCR complaint later that
16   fall.
17       **Q.   Okay.  How did the school consider**
18   **Maggie's disabilities when deciding the options to**
19   **propose to the OCR?**
20       A.   I wasn't part of the negotiations --
21            MS. BROWN:  Object to the form.
22       A.   -- but I'm -- but they would have looked
23   at two things:  What are the -- what is the
24   college-level proficiency that we're expecting her
25   to get, whether that's mathematical problem

 1   solving, critical thinking, whatever it is; how can

 2   she get that through other courses; and are those

 3   these courses that we believe she can get through

 4   based on her disabilities.  I'm assuming that would

 5   have been involved in part of that discussion.

 6        **Q.   But you're making assumptions.  You don't**

 7   **have the knowledge as you sit here, correct?**

 8        A.   I would not have been in the discussions.

 9        **Q.   Okay.  And that is topic number -- I just**

10   **want to be clear, Maggie would have received an**

11   **associate's degree in arts, correct?  Is that the**

12   **degree she would have gotten?**

13        A.   No.

14        **Q.   What's the degree she would have gotten?**

15        A.   An associate of arts.

16        **Q.   That's what -- I mean -- okay.**

17        A.   It's the same degree every student would

18   have received.  There's no -- we only offer one --

19   we only offer three degrees:  An associate of arts,

20   associate of science, and associate of applied

21   science.  That's it.

22        **Q.   Gotcha.**

23        A.   There's no -- unlike a four-year

24   institution, you don't have an associate of arts in

25   something.  It's just an associate of arts.

1        Q.    I understand.

2              And then presumably she could have tried

3    to go to a four-year school to get a bachelor's?

4        A.    Right.  The associate of arts is designed

5    to prepare you to transfer to a degree in the arts

6    broadly, not fine arts, but in the arts at a

7    four-year institution, associate of science in a

8    science field, so on.

9        Q.    Now, the -- was it Aimee McGehee who

10   would have informed Maggie's instructors about her

11   accommodations?

12       A.    Yes, that's correct.

13       Q.    And that's not something the instructors

14   can -- this is a one-way dictation, shall we say?

15   It's not something the instructors can negotiate

16   over, correct?

17       A.    That's correct.

18       Q.    Is it the university's testimony that

19   it's never waived any of its graduation

20   requirements in its history with respect to any

21   student?

22       A.    Not to my knowledge.  We have not waived

23   graduation requirements.

24       Q.    Now, are you speaking as you, yourself,

25   personally, or are you speaking on behalf of the

 1    university?

 2         A.    On behalf of the university.

 3         Q.    Okay.

 4         A.    I'd say on behalf of the current

 5    administration of the university, qualify with

 6    that.  I can't speak for -- but the current

 7    administration.

 8         Q.    How long have you been at the university?

 9         A.    The college?

10         Q.    Excuse me.  The college.

11         A.    The -- I've been there since

12    October 1st, 2014.

13         Q.    And where were you before that?

14         A.    Mississippi State University.

15         Q.    How long were you there for?

16         A.    Fifteen years.  1999 to 2014.

17         Q.    And were you in administration when you

18    were there?

19         A.    Various.  I held various positions there,

20    all in administration.  But about five different

21    positions over 15 years.

22         Q.    Have there been other students at the

23    university who simply couldn't pass some class or

24    some graduation requirement who were never able to

25    obtain a degree who -- and I'm not talking about

1    somebody who just, you know, was lackadaisical and

2    didn't want to work, but somebody who really worked

3    hard to get a degree and was not able to get a

4    degree?

5              MS. BROWN:  Object to the form.

6         A.   I mean, we have students who enroll

7    all -- who enroll all the time and don't earn

8    degrees.

9    BY MR. ALTMAN:

10        Q.   I understand that.  I'm not talking about

11   a student who comes and goes and -- I'm talking

12   about a student who comes to the university with

13   the intent to get a degree and is unable to obtain

14   the degree because of some class that they can't

15   pass.

16             MS. BROWN:  Object to form.

17        A.   I believe our graduation rate currently

18   sits at about close to 50 percent, somewhere in

19   there; so yeah, half the students who come don't

20   graduate.

21        Q.   How many students are there at the

22   college?

23        A.   8,000.

24        Q.   Is that all in that one campus?

25        A.   No.  They're spread out across ten

 1   locations.

 2        Q.   In the campus that's here, that Maggie

 3   went to, how many students are there?

 4        A.   Probably close to 3,000.

 5        Q.   Okay.

 6             MR. ALTMAN:  Let's take a break for a

 7        couple of minutes.  I may be done with

 8        Dr. Bonfanti.

 9             MS. BROWN:  All right.

10        (Off the record.)

11   BY MR. ALTMAN:

12        Q.   Dr. Bonfanti, do you think that a student

13   who is willing to do the work, put the time in,

14   takes it seriously, should be able to get a degree

15   at the college?

16             MS. BROWN:  Object to form.

17        A.   I think a student like that would get a

18   lot of support, and the college would make sure

19   that student graduated.

20   BY MR. ALTMAN:

21        Q.   Do you think there's ever a circumstance

22   where a student just simply should not be able to

23   graduate no matter how hard they work?

24             MS. BROWN:  Object to the form.

25   BY MR. ALTMAN:

1          Q.    Strike that.

2                Does the university think there are

3    students who, no matter how hard they work, should

4    be able to graduate --

5                MS. BROWN:  Object to the form.

6    BY MR. ALTMAN:

7          Q.    -- because they can't meet some

8    requirement?

9          A.    I think the university says our degree

10   says you have a certain level of college

11   proficiency in five areas; and if you cannot show

12   us that you have those five levels of proficiency,

13   we can't give you your degree that says you have

14   something you don't have.

15               It's about work, but it's also about

16   attaining certain levels of proficiency.  We're

17   telling employers with our degree, we're telling

18   four-year institutions with our degree that these

19   students have obtained this level of proficiency

20   in these five areas.

21         Q.    So if a student is not able to meet some

22   requirement, then they should not be able to get a

23   degree, because of a -- because of a disability?

24         A.    If the student --

25               MS. BROWN:  Object to the form.

```
 1        A.   If the student cannot master the five

 2   college-level proficiencies, then we should not

 3   give them a piece of paper that says they did.

 4   BY MR. ALTMAN:

 5        Q.   Dr. Bonfanti, thank you for your time.

 6        A.   All right.  Thank you.

 7           (Deposition concluded at 3:06 p.m.)

 8                    - - -

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              CERTIFICATE OF COURT REPORTER

 2         I, Kati Vogt, RPR, RMR, CRR, RDR, Court

 3    Reporter and Notary Public in and for the County of

 4    Harrison, State of Mississippi, hereby certify:

 5         That on the 29th day of March, 2023, there

 6    appeared before me PHILIP BONFANTI;

 7         That I placed the witness under oath to

 8    truthfully answer all questions in this matter

 9    under the authority vested in me by the State of

10    Mississippi;

11         That the foregoing 67 pages, and including

12    this page, contain a full, true, and correct

13    transcript of the testimony of said witness, as

14    reported by me using the stenotype reporting

15    method, to the best of my skill and ability.

16         I further certify that I am not in the employ

17    of, or related to, any counsel or party in this

18    matter, and have no interest, monetary or

19    otherwise, in the final outcome of the proceedings.

20         Witness my signature and seal this the 20th

21    day of April, 2023.

22

23    _____
      Kati Vogt, RPR, RMR, CRR, RDR
24    My Commission Expires January 4, 2026

25
```

```
 1                    ERRATA SHEET

 2        I, PHILIP BONFANTI, do solemnly swear that I
     have read the foregoing transcript and that the
 3   same is a true and correct transcript of the
     testimony given by me on the 29th day of March,
 4   2023, at the time and place hereinbefore set forth,
     with the following corrections:
 5
     Page:      Line:     Correction:          Reason for
 6                                              Correction:

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16                       _____
                         PHILIP BONFANTI
17

18                    NOTARIZATION

19        Subscribed and sworn to before me, this _____

20   day of _____, 2023.

21

22                       _____
                         NOTARY PUBLIC

23   MY COMMISSION EXPIRES:

24   _____

25
```